UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM KOLBERT,<br><br>       Plaintiff,<br><br>  -against-<br><br>BENWORTH CAPITAL PARTNERS LLC; BENWORTH CAPITAL PARTNERS PR LLC; BENWORTH FINANCIAL LLC; BERNARDO NAVARRO a/k/a BERNARDO E. NAVARRO; CLAUDIA NAVARRO a/k/a CLAUDIA PEZZIA NAVARRO; and OTO ANALYTICS, LLC f/k/a OTO ANALYTICS, INC., d/b/a WOMPLY; and TOBY SCAMMELL a/k/a TOBY G. SCAMMELL;<br><br>       Defendants. | Civil Action<br>Case No.: 2:25-cv-00117<br><br><br>**COMPLAINT** |

   Plaintiff William Kolbert ("Plaintiff"), by and through his attorneys, Petroff Amshen LLP, as and for his complaint against the defendants named herein (collectively, "Defendants"), hereby alleges the following upon personal knowledge, review of public record, and/or otherwise upon information and belief:

   1. Plaintiff, a licensed CPA since 1983, has provided professional accounting and tax preparation services for individuals, businesses, and trust entities for more than 40 years. Despite dedicating his life and career to helping others maintain their finances, while also carefully and diligently maintaining his own, Plaintiff has fallen victim to financial fraud and identity theft facilitated and perpetrated by the Defendants, who operated a widespread criminal enterprise that started during the COVID-19 pandemic.

   2. Now in his seventies, and relying on income from social security benefits he earned over a lifetime as a practicing accountant, Plaintiff's livelihood and reputation have been damaged

1

by a fraudulent Paycheck Protection Program ("PPP") loan Defendants approved and funded in his name, without his knowledge or authorization.

3.     As a result of Defendants' knowing, willful, and unlawful conduct, in furtherance of a massive scheme to defraud the federal government and Federal Reserve System, exploit emergency government assistance intended to assist small businesses and individuals adversely affected by the COVID-19 pandemic, and profit off of hundreds of thousands of fraudulent PPP loans processed, approved, and funded through their joint enterprise, Plaintiff's social security benefits are now being garnished by the federal government, to repay a "delinquent debt" falsely attributed to Plaintiff because of the fraudulent PPP loan.

4.     Plaintiff therefore seeks judgment against Defendants granting statutory, equitable, compensatory, and other relief, including a declaration that the fraudulent PPP loan and any related agreement(s) in Plaintiff's name is/are null and void *ab initio*, and monetary damages.

## PARTIES

5.     Plaintiff is an individual and resident of the State of New York, County of Nassau, residing at 4 Donald Drive, Syosset, New York 11791 ("Plaintiff's Residence").

6.     Defendant Benworth Capital Partners LLC ("Benworth FL") is a limited liability company organized under the laws of the State of Florida, with a principal business address of 700 Biltmore Way, Suite C-1, Coral Gables, Florida 33134.

7.     Defendant Benworth Capital Partners PR LLC ("Benworth PR") is a limited liability company organized under the laws of Puerto Rico, with a principal business address of 221 Avenida Ponce De Leon, Suite 1401, San Juan, Puerto Rico 00917, and registered agent for service c/o Alfred F. Andreu, 700 Biltmore Way, Suite C-1, Coral Gables, Florida 33134.

8.    Upon information and belief, Benworth PR is co-owned by Bernardo Navarro and Claudia Navarro.

9.    Defendant Benworth Financial LLC ("Benworth Financial") is a limited liability company organized under the laws of the State of Florida, with a principal business address of 700 Biltmore Way, Suite C-1, Coral Gables, Florida 33134.

10.    Defendant Bernardo Navarro a/k/a Bernardo E. Navarro ("Mr. Navarro") is an individual and resident of Florida and Puerto Rico.  Upon information and belief, Mr. Navarro is the sole member and manager of Benworth FL and Benworth Financial, and a member of Benworth PR.

11.    Defendant Claudia Navarro a/k/a Claudia Pezzia Navarro ("Mrs. Navarro") is an individual and resident of Florida and Puerto Rico.  Upon information and belief, Mrs. Navarro is married to Mr. Navarro.[1]  Upon further information and belief, Mrs. Navarro is the managing member of Benworth PR.

12.    Upon information and belief, Benworth FL, Benworth PR, and Benworth Financial (collectively, the "Benworth Entities") all operate under the exclusive ownership and control of Mr. Navarro and/or Mrs. Navarro, and/or other business entities they also own and control.

13.    Defendant Oto Analytics, LLC f/k/a Oto Analytics, Inc., d/b/a Womply ("Womply") is a limited liability company organized under the laws of the State of Delaware, with no physical presence (operating only virtually), and registered agent for service c/o The Corporation Trust Company, Corporation Trust Center – 1209 Orange Street, Wilmington, Delaware 19801.

---

[1] Mr. Navarro and Mrs. Navarro may be collectively referred to herein as the "Navarros."

14. Defendant Toby Scammell a/k/a Toby G. Scammell ("Mr. Scammell") is an individual and resident of the State of Nevada. Upon information and belief, Mr. Scammell is the founder and CEO of Womply.

## JURISDICTION

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's claims substantially arise under federal law.

16. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and Plaintiff resides in this district.

## STATEMENT OF FACTS

17. Plaintiff, a licensed CPA since 1983, is the managing partner of a boutique accounting firm in Nassau County, where he has been employed since 1985.

18. Plaintiff has also resided in Nassau County, within the same 14-mile radius, for the last 30 plus years.

19. As a licensed professional providing accounting and tax preparation services for individuals, businesses, and trust entities for more than 40 years, Plaintiff has also maintained an exemplary and unblemished credit history, which he carefully monitors on a rolling basis.

20. Now in his seventies and partially retired, Plaintiff relies on receipt of his monthly social security retirement benefit ("SSR"), in order to cover living expenses.

21. On or about September 18, 2024, Plaintiff discovered that his SSR deposit for September 2024 was reduced from the usual monthly benefit amount by $476.57.

22. Plaintiff immediately contacted the Social Security Administration (the "SSA") regarding the unexpected SSR reduction, and was informed that it was an offset collected under the Treasury Offset Program ("TOP"), to pay a delinquent debt owed to the SBA.

23. Unaware of any debt he purportedly owed to the SBA, Plaintiff requested additional information regarding the SSR reduction and TOP offset, which he later learned was the result of a fraudulent PPP loan originated in Plaintiff's name in 2021, without his knowledge or permission.

### The Fraudulent PPP Loan

24. In response to Plaintiff's request for additional information regarding the SSR reduction and TOP offset, by letter dated September 25, 2024, addressed to Plaintiff's Residence, the SSA enclosed a copy of a letter dated September 18, 2024, from the U.S. Department of the Treasury, Bureau of the Fiscal Service (the "Treasury Dept. Letter"). A true and correct copy of the Treasury Dept. Letter, with SSA cover letter dated September 25, 2024, is annexed hereto as **Exhibit A**.

25. The Treasury Dept. Letter, which Plaintiff had not received from the Treasury Department, was addressed to Plaintiff at 15614 80TH ST # 2, HOWARD BEACH, NY 11414-2503 (the "Howard Beach Address").

26. Notably, the Howard Beach Address is in Queens County, and is not Plaintiff's Residence (which is located in Nassau County):

U.S. Department of the Treasury
Bureau of the Fiscal Service
P.O. Box 1686
Birmingham, AL 35201-1686



PLEASE RETAIN FOR YOUR RECORDS

09/18/24



WILLIAM KOLBERT
15614 80TH ST # 2
HOWARD BEACH, NY 11414-2503

*See* Ex. A.

27. The Treasury Dept. Letter advised that it applied "all or part" of Plaintiff's SSR payment to a "delinquent debt" categorized as a "Non-Tax Federal Debt," which Plaintiff purportedly owed to the SBA:



**What Happened to My Payment?**

The U.S. Department of the Treasury, Bureau of the Fiscal Service (Fiscal Service), applied all or part of your payment to delinquent debt that you owe. This action is authorized by federal law. Below is your payment information:

Payment From: Social Security Administration
Payee Name: WILLIAM KOLBERT
Original Payment Amount: $3177.10
Payee TIN (Last Four): 7591
Beneficiary TIN (Last Four): 7591

Payment Date: 09/18/24
Payment Type: EFT
Claim Account Number: ▮▮▮▮

**Who Do I Owe?**

We applied your payment to debt that you owe to the following agency:

Small Business Administration
409 3RD ST SW
WASHINGTON    DC  20416

TOP Trace Number: ▮▮▮7884
Account #: ▮▮▮0001
Applied To This Debt: $476.57
Type of Debt: Non-Tax Federal Debt

*See* Ex. A.

28. Plaintiff does not reside at the Howard Beach Address, and he does not receive mail there. Plaintiff has not lived, or received mail, in Queens County, or at any address outside of Nassau County, in over 30 years.

29. Accordingly, Plaintiff did not receive the Treasury Dept. Letter – or any other notices regarding the purported "delinquent debt" owed to the SBA – that were mailed to the Howard Beach Address, which is nearly 30 miles from Plaintiff's Residence.

30. Using the limited information provided in the Treasury Dept. Letter, Plaintiff subsequently conducted internet searches to determine the source of the purported debt. A true and correct copy of the internet research search results Plaintiff obtained regarding the purported SBA debt is annexed hereto as **Exhibit B**.

31. As a result of this research, upon information and belief, the source of the purported debt is a PPP loan originated by Benworth FL on or about May 2, 2021, in the amount of $18,803.00 (the "Fraudulent PPP Loan"):

6

Loan Detail

| | |
|---|---|
| Loan Number | ███8905 |
| Date Approved | May 2, 2021 |
| Loan Status | Charged Off |
| Loan Status Date | Aug. 10, 2023 |
| Term | 33 Months |
| Lender | Benworth Capital |
| Initial Approval Amount | 18,803.00 |
| Current Approval Amount | 18,803.00 |
| Payroll Proceed | 18,803.00 |

*See* Ex. B.

32.    Plaintiff has never requested or applied for a loan of any kind with any of the Defendants.

33.    Plaintiff did not request, apply for, or authorize the Fraudulent PPP Loan, he had no prior knowledge of its existence, and he did not receive or benefit from any proceeds of the Fraudulent PPP Loan.

34.    Plaintiff also did not request, apply for, or authorize the Fraudulent PPP Loan on behalf of any business entity under his ownership, control, or authority to operate in his name ("Authorized Business Entities"); nor did he authorize any other individual to submit an application to, or obtain a loan from, any of the Defendants on his behalf, or on behalf of any Authorized Business Entities.

35.    None of the proceeds of the Fraudulent PPP Loan were received or used by, or for the benefit of, Plaintiff, or any Authorized Business Entities.

36.    Upon information and belief, the Fraudulent PPP Loan was obtained through a single member LLC fraudulently created in Plaintiff's name, and without Plaintiff's knowledge or authorization (the "Fraudulent LLC"). *See* Ex. B. Notably, it appears the perpetrator(s) used the

7

Howard Beach Address for the Fraudulent PPP Loan and/or the Fraudulent LLC, knowing Plaintiff would never receive mail sent to that address:

| Business Detail | |
|---|---|
| Name | WILLIAM KOLBERT |
| Address | 15614 80th St # 2 |
| City | Howard Beach |
| State | New York |
| ZIP Code | 11414-2503 |
| Rural/Urban | Urban |
| Hubzone | No |
| Labor Market Information (LMI) | No |
| Business Age Description | Existing or more than 2 years old |
| Jobs Reported | 1 |

| | |
|---|---|
| NAICS | 621511: Medical Laboratories |
| Business Type | Single Member LLC |
| Race/Ethnicity | Unanswered |
| Gender | Unanswered |
| Veteran | Unanswered |

37.     It also appears the business industry classification for the Fraudulent LLC was listed under NAICS code 621511,[2] used for "Medical Laboratories."  *See* Ex. B.

38.     Plaintiff is not in or associated with the medical industry, and he has never created or authorized a business entity in his name or under his control that could be classified as a "medical laboratory."

39.     Plaintiff had no prior knowledge of the Fraudulent LLC's existence, he did not create or authorize the creation of the Fraudulent LLC, and he did not use the Howard Beach

---

[2] Upon information and belief, the North American Industry Classification System ("NAICS") "was developed . . . as the standard for use by Federal statistical agencies in classifying business establishments for the collection, tabulation, presentation, and analysis of statistical data describing the U.S. economy."  "There is no central government agency with the role of assigning, monitoring, or approving NAICS codes for establishments. . . . The U.S. Census Bureau has no formal role as an arbitrator of NAICS classification. . . . Generally, the U.S. Census Bureau's NAICS classification codes are derived from information that the business establishment provided on surveys, census forms, or administrative records."  Source: U.S. CENSUS BUREAU, NORTH AMERICAN INDUSTRY CLASSIFICATION SYSTEM (NAICS), "Frequently Asked Questions," https://www.census.gov/naics/#q1 (Last accessed Dec. 17, 2024).

Address for any purpose in or around May of 2021.  To date, Plaintiff has no additional knowledge or information regarding the Fraudulent LLC.

40. Upon information and belief, the Fraudulent LLC and the Fraudulent PPP Loan were each the result of an unknown individual or individuals using Plaintiff's personal identifying information, criminally obtained through identity theft, without Plaintiff's knowledge and without authorization.

**Plaintiff Reports Identity Theft**

41. Plaintiff does not know who obtained the Fraudulent PPP Loan or created the Fraudulent LLC in his name, or how the perpetrator(s) obtained his personal identifying information to do so, as he has not provided this information to any other individual, or authorized any other individual to use such information for the purpose of creating an LLC or applying for a loan with any of the Defendants.

42. Plaintiff also does not know how the Fraudulent PPP Loan became associated with him personally, such that his SSR benefits could be subject to TOP offset for its repayment, as it has never appeared on any of Plaintiff's credit reports over the last several years, nor does it appear on Plaintiff's credit report to date.

43. Plaintiff never received any information, correspondence, or notices from any of the Defendants regarding the Fraudulent PPP Loan.

44. Plaintiff also never received any information, correspondence, or notices of any kind regarding the Fraudulent LLC.

45. Before obtaining a copy of the Treasury Dept. Letter from the SSA on or about September 25, 2024, Plaintiff never received any information, correspondence, or notices from the SBA, Treasury Department, SSA, or any other government agency regarding the Fraudulent PPP

9

Loan and purported "delinquent debt," and he was therefore deprived of any opportunity to dispute the debt before the TOP offset was implemented and his SSR benefits were garnished.

46.    Upon information and belief, any information, correspondence, or notices regarding the Fraudulent PPP Loan and/or the Fraudulent LLC, if they were sent, were mailed to the Howard Beach Address.  Accordingly, Plaintiff did not receive them.

47.    On September 30, 2024, Plaintiff filed an Identity Theft Report with the Federal Trade Commission ("FTC"), under FTC Report Number 178185118 (the "FTC Report").

48.    Also on September 30, 2024, Plaintiff completed a "Declaration of Identity Theft," which he submitted to the SBA with a copy of the FTC Report and his New York State driver's license (collectively, the "ID Theft Packet").  True and correct copies of Plaintiff's email to the SBA dated September 30, 2024, submitting the ID Theft Packet for review, along with the completed ID Theft Packet attached to the email, are annexed collectively hereto as **Exhibit C**.

49.    On October 11, 2024, the SBA confirmed receipt of Plaintiff's email and ID Theft Packet, and advised that it "will refer [Plaintiff's] ID Theft complaint to SBA's Office of Inspector General for investigation," while noting:

> SBA does not have the regulatory authority to adjudicate fraud allegations.  SBA will not provide information regarding the status of any possible criminal investigations being conducted by SBA's Office of Inspector General or other law enforcement agencies in connection to your case.  SBA is also unable to release any documents related to an ongoing criminal investigation.

A true and correct copy of the SBA acknowledgment email dated October 11, 2024, is annexed hereto as **Exhibit D**.

50.    Accordingly, Plaintiff has no knowledge or information regarding any criminal investigation into the Fraudulent PPP Loan or the Fraudulent LLC, or whether any such criminal investigation is being conducted.

10

51.    The SBA has also not released or disclosed any additional information to Plaintiff regarding the Fraudulent PPP Loan or the Fraudulent LLC, to the extent any such information is in the SBA's possession.

52.    Upon information and belief, to date, the SBA's review of Plaintiff's identity theft complaint remains pending and unresolved.

**The Benworth Enterprise**

53.    Upon information and belief, Benworth FL is a Florida-based hard money lender that was initially established on or about April 1, 2008, as a Florida corporation called Benworth Capital Partners Incorporated, and it was subsequently converted to a Florida LLC on or about February 1, 2012.

54.    Benworth FL was a licensed mortgage lender/servicer in the State of Florida, operating under NMLS ID 374363, and License No. MLD359, issued on or about June 13, 2011. True and correct copies of the relevant Florida Department of State Filing Information for Benworth FL, and the NMLS Consumer Access database information for Benworth FL, as of December 26, 2024, are annexed collectively hereto as **Exhibit E**.

55.    The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), signed into law on March 27, 2020, was enacted to provide emergency assistance for individuals, families, and businesses affected by the coronavirus pandemic.  Through the CARES Act, the SBA received funding and authority to establish the PPP as a new loan program, to assist small businesses adversely impacted by the pandemic.  The PPP provided loans to small businesses to help them keep their workers on the payroll during the economic downturn caused by the pandemic.

11

56.    The Paycheck Protection Program Liquidity Facility ("PPPLF"), implemented by the Federal Reserve to bolster the effectiveness of the SBA's PPP, extended credit to eligible financial institutions that originated PPP loans, taking the loans at face value as collateral.

57.    Upon information and belief, beginning in or about May 2020, Benworth FL was approved for PPPLF financing to fund PPP loans.  Upon further information and belief, Benworth FL obtained this funding through credit advances drawn on PPPLF agreements with the Federal Reserve Bank of San Francisco (the "Federal Reserve Bank"), and subsequently defaulted on these agreements due to fraud, insolvency, and other misconduct, which are currently the subject of a pending lawsuit by the Federal Reserve Bank discussed further below.

58.    Upon information and belief, Benworth FL received approximately $4.3 billion in advances from the Federal Reserve Bank under the PPPLF, which Benworth FL used to fund at least 300,000 PPP loans.  Upon further information and belief, Benworth FL earned at least $680 million in fees, accrued interest, and other amounts from the loans in its PPP portfolio.

59.    Upon information and belief, on or about May 3, 2024, Benworth FL voluntarily surrendered its mortgage lender servicer license.  *See* Ex. E.

60.    Benworth PR was formed in Puerto Rico on June 28, 2021, just shy of sixty days following origination of the Fraudulent PPP Loan.  Upon information and belief, Mr. Navarro caused Benworth FL to transfer most or all of its assets, employees, and operations to Benworth PR, and Benworth PR is now operating as Benworth FL's alter ego.

61.    Benworth PR is a licensed mortgage lender/servicer in Puerto Rico and Florida, operating under NMLS ID 2234263, Florida License No. MLD2534 (issued on or about January 19, 2024), and Puerto Rico License No. IH-253 (issued on or about September 22, 2021).  True and correct copies of the relevant Puerto Rico and Florida Department of State Filing Information

for Benworth PR, and the NMLS Consumer Access database information for Benworth PR, as of December 26, 2024, are annexed collectively hereto as **Exhibit F**.

62.     Upon information and belief, pursuant to Loan Servicing Agreements ("LSAs") between Benworth FL and Benworth PR executed in 2021, all loan servicing functions for Benworth FL's PPP loan portfolio, which Benworth FL previously performed and received compensation for, have been delegated to Benworth PR.

63.     Upon further information and belief, the LSAs were executed by Mr. Navarro on behalf of Benworth FL, and by Mrs. Navarro on behalf of Benworth PR; however, the first LSA Mrs. Navarro executed on Benworth PR's behalf – dated May 31, 2021 – was dated almost a month before Benworth PR was actually formed.  *See* Ex. F.

64.     According to Mr. Navarro's self-reported employment information appearing in the NMLS database, from April 2008-present, he has acted as President of Benworth FL; and from June 2021-present, he has acted as Director of Benworth PR.  A true and correct copy of the NMLS Consumer Access database information for Mr. Navarro, as of December 26, 2024, is annexed hereto as **Exhibit G**.

65.     Mr. Navarro holds mortgage loan originator licenses in Florida and Puerto Rico, through Benworth PR, issued on or about March 15, 2011 (License No. LO3865), and June 30, 2022 (License No. MLO-946), respectively.  *See* Ex. G.

66.     According to Mrs. Navarro's self-reported employment information appearing in the NMLS database, from April 2008-present, she has acted as Vice President of Benworth FL; and from June 2021-present, she has acted as President of Benworth PR.  A true and correct copy of the NMLS Consumer Access database information for Mrs. Navarro, as of December 26, 2024, is annexed hereto as **Exhibit H**.

67.     Mrs. Navarro holds mortgage loan originator licenses in Florida and Puerto Rico, through Benworth PR, issued on or about July 26, 2022 (License No. LO111219), and June 30, 2022 (License No. MLO-947), respectively.  *See* Ex. H.

68.     Benworth Financial was initially established on or about May 15, 2019, as a Florida limited liability company called Pay Advance USA, LLC.  On or about July 2, 2019, Pay Advance USA, LLC changed its name to Benworth Financial.

69.     Upon information and belief, Mr. Navarro is the sole member and manager of Benworth Financial.

70.     Upon information and belief, the Benworth Entities all operate a shared website under the domain benworthcapital.com (the "Benworth Website").

71.     Upon information and belief, the Benworth Entities are each alter egos of one another, acting under the same ownership, management, and control.

72.     Upon further information and belief, the Benworth Entities are exclusively owned, managed, and controlled by the Navarros, who established Benworth PR and Benworth Financial as alter egos of Benworth FL in order to effectuate fraudulent transfers of Benworth FL's assets to Benworth PR, Benworth Financial, and themselves, in an attempt to shield those assets from collection as a result of illegal activities conducted by, or at the direction of, the Navarros, in furtherance of the Benworth Enterprise.

73.     Specifically, the "About" section of the Benworth Website refers generally to "Benworth Capital," without differentiating between Benworth FL and Benworth PR, stating:

> Headquartered in Coral Gables, Florida, we opened our doors in 2008, when many banks were closing theirs because of the global financial crisis. . . .  Following our success in Florida, we opened an office in San Juan, Puerto Rico in 2021. . . .
>
> Currently, we finance property in Florida.  It's the market we know best (and love).  . . .

14

> Anyone (with cash) can fund a loan but we're different than a great uncle or the cash-rich entrepreneur down the street.  <u>Benworth Capital is licensed to lend.  And that's a big deal, especially in Florida, because it's the law.  It's an even bigger deal for borrowers because that means our borrowers are protected by U.S. regulations that oversee our industry.</u>

*See* https://benworthcapital.com/about/ (emphasis added).  A true and correct copy of the "About Us" page of the Benworth Website, as it appeared on December 26, 2024, is annexed hereto as **Exhibit I**.

74.     While Benworth FL was formed in 2008, and is headquartered in Coral Gables, Florida, it voluntarily surrendered its Florida mortgage lender license on May 3, 2024.  *See* Ex. E.

75.     Benworth PR, which was formed in Puerto Rico thirteen years later in 2021, and is headquartered there, is currently licensed to lend in Florida.  *See* Exs. E, F.

76.     The bottom of the "About Us" page of the Benworth Website references both Benworth PR and Benworth Financial, noting that Benworth Financial is a "licensed Consumer Finance Company #CF9901387":

> © 2024 Benworth Capital Partners PR LLC NMLS #2234263 ⌂ Equal Housing Lender.
> Benworth Financial, LLC  is a licensed Consumer Finance Company #CF9901387.
>
> Disclaimers: Benworth Capital Partners PR, LLC makes loans solely for business purposes (and not for personal or consumer use) and is exempt from licensing in all states in which it operates. Benworth Capital Partners PR, LLC does not lend on owner-occupied properties. Listed rates, terms, and conditions are offered only to qualified borrowers, may vary by loan product, deal structure, property type, or other applicable considerations, and are subject to change at any time without notice. Furthermore, any Letter of Intent issued by Benworth Capital Partners PR, LLC shall, at Benworth Capital Partners PR, LLC's discretion, be subject to revocation, modification and cancellation up and to the moment the transaction is completed.  No information on this site is intended to, or shall, created a legally binding commitment or obligation on the part of Benworth Capital Partners PR, LLC, and all terms are expressly subject to Benworth Capital Partners PR, LLC 's credit, legal, and investment approval process.

*See* Ex. I.

77.     A consumer finance company license issued by the State of Florida "authorizes the holder to solicit, make and collect loans to consumers in this state [of Florida] for an amount not exceeding $25,000 at an interest rate greater than 18%.  The license is not required for banks and certain other financial institutions doing business under state or federal laws."  *See* https://flofr.gov/divisions-offices/division-of-consumer-finance/consumer-finance-companies.

78.     Accordingly, upon information and belief, Benworth Financial is also licensed to lend in Florida, subject to certain restrictions.

**The Womply Enterprise**

79.     Upon information and belief, Womply is a fintech company formed on or about February 22, 2011, as a provider of marketing services and technology for small businesses.

80.     Upon information and belief, Womply is not a bank and is not otherwise licensed to lend money.

81.     Beginning in or about April 2020, Womply acted as an unlicensed referral agent between PPP loan applicants and lenders, taking illegal kickbacks.  Upon information and belief, Womply had no prior experience with, or involvement in, loan referrals or processing.

82.     Beginning in or about February 2021, Womply launched its "PPP Fast Lane" system, which it aggressively advertised and marketed both directly to consumers and small businesses, and through referral partners including social media influencers.

83.     Womply ads appearing on NYC buses advertised that applicants could "[g]et up to $50k in PPP," and urged them to "Apply now!," but noted that "Womply is not a lender":



84.     With PPP Fast Lane, in addition to referral services, Womply also purportedly offered marketing, technology, application review, eligibility verification, document analysis,

16

fraud prevention, and other services to PPP lenders, including Benworth FL, to facilitate the processing and funding of PPP loans. Upon information and belief, Womply is not a licensed mortgage lender or loan provider in any state.

85. Upon information and belief, in furtherance of its kickback scheme with Benworth FL to personally benefit from as many PPP loans as possible, with the highest profit from fees and other receivables, Womply overwhelmingly approved and referred fraudulent applications over legitimate and eligible applicants.

86. Womply also induced its lending partners to fund as many PPP loans as possible, and penalized them if they did not fund enough in a certain time period. Specifically:

> Agreements between Womply and its lending partners . . . reveal that Womply often took at least half—and in some cases up to 90 percent—of all the taxpayer-funded fees allocated to lenders by SBA to compensate it for processing PPP loans. Under these agreements, Womply was entitled to fees both for referring applicants to PPP lenders and for providing its PPP Fast Lane pre-qualification review, eligibility verification, and fraud detection services. . . . Additionally, multiple Womply contracts contain provisions that imposed "Under-Funding Fees" that required lenders to pay Womply additional funds as a penalty for failing to fund a certain value of PPP loans in a calendar week.

*See* Ex. L (below) at 47.

87. "[T]he vast majority of [Womply's] revenue—$1.9 billion in 2021—was 'PPP Technology Service Revenue' from the PPP Fast Lane." *See* Ex. L at 47.

88. Womply and its CEO, Mr. Scammell, were aware of rampant fraud in the applications they were processing, that Womply's technology platform and processing services were incapable of and failed to detect fraud and identity theft in applications Womply reviewed, and that Womply was specifically targeted by criminal gangs and fraudsters seeking easy access to PPP loans; and continued knowingly approving and referring fraudulent applications for PPP funding in order to collect the substantial fees Womply was allotted under its fee agreements.

89.     On March 18, 2024, the FTC filed a complaint against Womply and Mr. Scammell, in the United States District Court for the Northern District of California, under Case No. 3:24-cv-01661, titled *Federal Trade Commission v. Oto Analytics, Inc., et al.* (the "FTC Lawsuit"). *See* FTC Lawsuit, Complaint (ECF Doc. No. 1), a true and correct copy of which is annexed hereto as **Exhibit J**.

90.     The FTC Lawsuit alleges that both Womply and Mr. Scammell, individually, made deceptive claims to consumers and engaged in deceptive practices "in or affecting commerce . . . associated with . . . a government benefit," that violated the FTC Act and the COVID-19 Consumer Protection Act. *See id.*

91.     Specifically, the FTC Lawsuit alleges that Womply "advertised, marketed, or distributed PPP financing services to small business consumers throughout the United States," that Mr. Scammell "formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Womply, including the acts and practices described in this Complaint," and that Mr. Scammell also "managed the day-to-day business of Womply for years and has knowledge of and involvement in the company's advertising, marketing, and provision of PPP financing services to small business consumers." *See* Ex. J, FTC Lawsuit, Complaint at 3-4.

92.     The FTC Lawsuit alleges in detail Mr. Scammell's direct role in Womply's violation of consumer protection laws and deceptive practices associated with the PPP:

> Defendant Scammell controlled and directly participated in Womply's advertising and marketing of its PPP loan services. Throughout the duration of PPP Fast Lane, he frequently sent and received messages regarding the marketing of Womply's services. Defendant Scammell reviewed and provided feedback on draft marketing emails to consumers and content on Womply's website, and he wrote and edited language to be used in Womply's advertising. . . .
> Despite being flooded with customer service requests and complaints about stalled applications, Defendants consistently increased their spending on advertisements in order to increase traffic to PPP Fast Lane throughout at least April 2021. Defendants also used referral programs to generate new PPP loan applications,

18

offering what Defendant Scammell called "aggressive rewards" to those who referred new applicants, and using "very strict time bound campaigns to drive urgency and capture attention." In addition to Womply's own customers who could be paid hundreds of dollars for referring their friends and family to PPP Fast Lane, Defendants sought out accountants, as well as gig companies and social media influencers popular with gig workers, to refer their clients, workers, and audience.

*See* Ex. J, FTC Lawsuit, Complaint at 14-15.

93.    "Between at least February 2021 and May 2021, Defendants [Womply and Mr. Scammell] disseminated advertisements for PPP loans, or otherwise made statements to consumers, that claimed consumers who qualified for PPP loans would receive loan funds if they applied with Womply." *See* Ex. J, FTC Lawsuit, Complaint at 5.

94.    Womply and Mr. Scammell "also made these claims in advertisements on social media" in sponsored posts:





*See* Ex. J, FTC Lawsuit, Complaint at 6-9.

95.    While Womply implemented an aggressive marketing campaign targeting consumers and small businesses to apply for loans through PPP Fast Lane, promising "faster" and "better" processing, and high-level customer service and support, its "customer support channels were useless for thousands of consumers seeking assistance with their applications." *See* Ex. J, FTC Lawsuit, Complaint at 5-10.

96.    The FTC Lawsuit further notes:

Despite Defendants' promises that small business consumers would get PPP loan funds if they applied with Womply, of more than 3.25 million PPP loan applications initiated by consumers, Defendants failed to achieve funding for more than 1.99 million of them (61%).  Many of the consumers who never received funding were eligible for PPP loans, but Defendants failed to fix known technical issues with their system or otherwise provide the assistance necessary to process consumers' applications.

*See* Ex. J, FTC Lawsuit, Complaint at 10.

97.     The FTC's allegations also highlight Womply's disfavor of legitimate PPP applicants who required more hand-holding and effort than fraudulent applicants:

> Because of the time-sensitive nature of the PPP and its limited funding, speedy application processing was critical for consumers. . . . [E]ven to the extent consumers did ultimately  obtain PPP loans through Womply, in numerous instances Defendants' delays in processing their applications deprived struggling small business consumers of emergency funds they needed immediately.

> Concerned applicants also contacted Womply when they had not heard about their applications within 24 hours as promised. . . . Consumers complained to Womply after not hearing anything about their applications for more than twenty-four hours, only to find when they logged into Womply's portal that their applications had been cancelled.

*See* Ex. J, FTC Lawsuit, Complaint at 13.

98.     Upon information and belief, some Womply applicants' loans were marked disbursed by the SBA, but the funds were never received by the applicant, and Womply failed and refused to provide information or assistance in response to the applicants' requests.  *See* Ex. J, FTC Lawsuit, Complaint at 11.

99.     On or about April 3, 2024, Womply and Mr. Scammell agreed to pay $26 million to settle the FTC Lawsuit, which settlement included a permanent injunction prohibiting Womply, Mr. Scammell, and their officers, agents, and employees, from making deceptive, false, and/or unsubstantiated claims in connection with "advertising, marketing, promoting, distributing, servicing, or offering any financial product or service."  *See* FTC Lawsuit, Stipulated Order for Permanent Injunction and Monetary Judgment (ECF Doc. No. 10), a true and correct copy of which is annexed hereto as **Exhibit K**; *see also* https://www.ftc.gov/legal-library/browse/cases-proceedings/womply-ftc-v.

**The Congressional Investigation of PPP Fraud Involving Womply and Benworth FL**

100.     A two-year congressional investigation into rampant fraud and misconduct in the PPP program, perpetuated and facilitated by unregulated fintechs and their lending partners, put

Womply and Benworth FL squarely in the crosshairs, and left the two entities pointing fingers at each other in an attempt to escape liability for their roles in facilitating the disbursement of billions of dollars in PPP funds to ineligible and/or fraudulent applicants.

101.    While Womply, Benworth FL, and their principals each had express knowledge of widespread fraud in the loan program, they continued approving and funding fraudulent loans without taking any measures to identify or prevent such fraud, and earned hundreds of millions in profits at the expense of individuals and taxpayers.

102.    The Fraudulent PPP Loan is one such loan, which Womply and Benworth FL jointly and individually failed to properly vet, and which neither wants to take responsibility for.

103.    According to the report by the House Select Subcommittee on the Coronavirus Crisis (the "House Subcommittee"), issued in connection with the House Subcommittee's investigation of fraud in PPP loan programs (the "Subcommittee Report"):

> The Select Subcommittee's investigation found that fintechs were given extraordinary responsibility in administering the nation's largest pandemic relief program—a responsibility that some of the fintechs that facilitated the highest volumes of loans were either unable or unwilling to fulfill.  Despite fintechs' claims that their use of technology and innovation would allow them to better administer the PPP than traditional financial institutions, many of these companies appear to have failed to stop obvious and preventable fraud, leading to the needless loss of taxpayer dollars.  The . . . investigation found that many fintechs, largely existing outside of the regulatory structure governing traditional financial institutions and with little to no oversight from lenders, took billions in fees from taxpayers while becoming easy targets for those who sought to defraud the PPP.
>
> The investigation found that two unvetted and unregulated fintechs that, together, facilitated nearly one in every three PPP loans funded in 2021—Womply and Blueacorn—failed to implement systems capable of consistently detecting and preventing fraudulent and otherwise ineligible PPP applications.  Their lending partners, who were tasked with supervising the activities of these fintechs, often did little to oversee the activities of the companies to which they delegated their responsibilities.

*See* Subcommittee Report dated December 2022, at 1 (emphasis added); a true and correct copy of which is annexed hereto as **Exhibit L**.

22

104.    Notably, "[i]nternal communications obtained by the Select Subcommittee show that fintechs and their lending partners both anticipated and observed high levels of fraud in the PPP." *See* Ex. L at 17.

105.    The Subcommittee Report summarized Womply's role in the PPP as follows:

Womply, also known as Oto Analytics, Inc., was founded in 2011 as a provider of reputation management, email marketing, and business intelligence services for small businesses. . . .

The fintech—which had never before involved itself in loan processing or high volume fraud prevention screening—began its involvement in the PPP in April 2020 as a referral agent. . . . Upon receipt of the referral, lenders would conduct all other tasks associated with processing, managing, and tracking the PPP loans, including verifying borrower identity and auditing borrowers. . . .

Beginning in February 2021, Womply initiated a "PPP Fast Lane" service, which it claimed would provide PPP lenders with technological, marketing, underwriting, prequalification review, eligibility verification, and other services. . . .

In a presentation to Select Subcommittee staff, Womply explained that, as part of its new PPP Fast Lane service, the fintech's staff (1) conducted automated eligibility checks; (2) identified and verified their PPP borrowers' identities through automated and manual KYC management; (3) conducted automated and manual bank and tax document analysis to confirm PPP program eligibility; and (4) implemented automated and manual anti-fraud tools and measures to detect application fraud, in service of BSA requirements. Applicants that passed Womply's pre-qualification reviews were then forwarded to one of its partner lenders.

*See* Ex. L at 46.

106.    Following its investigation, the House Subcommittee concluded:

Womply has described itself as a "technology service provider," despite performing functions usually associated with LSPs [lender service providers], and has used its purported status to avoid accountability [for approval of fraudulent PPP loans]. Evidence obtained by the Select Subcommittee indicates that Womply likely should have been considered an LSP and therefore been subject to SBA regulation. While Womply did provide some technology services, its core functionalities appear to closely resemble the SBA's criteria for an LSP. . . . Evidence further indicates that Womply independently conducted pre-qualification reviews on PPP applications based on SBA and lender criteria before referral to lenders.

*See* Ex. L at 59.

107.    The House Subcommittee further noted that "Womply used the same reasoning to avoid responsibility for approving fraudulent loans through its PPP Fast Lane Service." *Id.* at 60.

108.    "PPP loan applicants submitted a total of over 3.7 million applications in 2021 through Womply, with most likely going through their PPP Fast Lane Program.  Of that 3.7 million, 70 percent . . . were sent to lenders after passing Womply's pre-qualification reviews and underwriting processes." *See* Ex. L at 46.

109.    "In March 2021 alone, Womply referred 889,275 PPP loan applications to lenders." *See id.*

110.    "Multiple high volume PPP lenders relied on Womply to review PPP applications for eligibility and potential fraud, even though the fintech lacked prior experience in conducting high volume small business lending, managing large scale financial crime compliance, or creating scalable automated fraud prevention technology." *See* Ex. L at 45.

111.    Of particular relevance to Plaintiff's situation, the House Subcommittee investigation revealed that "individuals looking to commit fraud identified Bluevine, Blueacorn, and Womply as 'fintechs with lower fraud risk capabilities that were letting a lot more fraud go through,'" and that "Womply communications obtained by the Select Subcommittee show that the fintech knew that it was a top target for fraud." *See* Ex. L at 61.

112.    Specifically:

Womply- and Blueacorn-facilitated PPP loans were crucial to one violent drug dealing enterprise in central Florida.  <u>Police and media reporting show that gang members allegedly created limited liability companies, solicited individuals through social media, and, in some cases, stole identities to apply for PPP loans, which were then approved.</u>  Investigators believe the PPP loans were then used to finance the criminal enterprises, including the purchase of guns and drugs.  Police documents allege that the gang members quickly identified Womply and Blueacorn as easy targets to obtain PPP loans without much scrutiny.

*See* Ex. L at 62 (emphasis added).

24

113. The Subcommittee Report also revealed Mr. Scammell's history of illegal and unethical conduct, which could (and probably should) have precluded him – and Womply – from conducting business with the SBA, or participating in the PPP, as follows:

> Mr. Scammell—who served as Womply's CEO and ran its fraud prevention operations—was previously convicted of financial crime and barred from the securities industry. Despite this, Mr. Scammell's company was allowed to oversee the distribution of billions of dollars of taxpayer funds, with Mr. Scammell serving as the highest ranking Womply executive that had "responsibilities related to the KYC process and anti-fraud measures implemented by Womply for the Fast Lane Program."

> In 2009, Scammell was charged with stealing proprietary and confidential information from his girlfriend related to a potential merger between Disney and Marvel Entertainment, and trading on that information using bank accounts belonging to his brother. On August 11, 2011, the SEC filed a civil action alleging that Mr. Scammell engaged in unlawful insider trading through that conduct. On June 15, 2012, Scammell consented to the entry of a permanent injunction prohibiting him from participating in the securities industry. On April 21, 2014, in a parallel criminal case, Mr. Scammell pleaded guilty to "'knowingly and with intent to defraud' engag[ing] in a fraudulent scheme" related to insider trading and was sentenced to three months of imprisonment and $120,000 in restitution, in addition to the $801,000 he was to pay under a civil settlement with the SEC. . . .

> The SEC stated that Mr. Scammell provided misleading information regarding Womply in the course of their 2011 investigation, . . . that Mr. Scammell continued his dishonest behavior even after his civil and criminal punishments[,] . . . and accused Mr. Scammell of lying to federal regulators about Womply's financial condition in an attempt to frustrate government's efforts . . . . Additionally, according to the SEC, Mr. Scammell also improperly used Womply investor funds for his personal legal defense.

*See* Ex. L at 51-52.

114. Womply and Mr. Scammell also refused to comply with SBA requests for information to aid in its investigation into potential fraud related to PPP loans, with the Subcommittee Report noting that "Womply declined requests to help the federal government prevent fraud in the program and ensure that loans were going to only eligible Americans." *See* Ex. L at 52-55.

115.    On December 8, 2022, the SBA published a press release regarding findings from the Subcommittee Report on PPP fraud, stating that it "immediately suspended non-lenders Blueacorn and Womply, companies that worked with PPP lenders, from working with the SBA in any capacity," and also "launched a full investigation of the lenders – [including] Benworth . . . as well as the individuals and other related entities named in the report." *See* SBA Press Release 22-98 (Dec. 8, 2022), available at https://www.sba.gov/article/2022/dec/08/us-small-business-administration-statement-house-select-subcommittee-coronavirus-crisis-report.

116.    By providing services fitting the SBA's criteria for an LSP, Womply bears individual responsibility for its failure to properly vet PPP applications it reviewed and processed, including its failure to implement fraud prevention measures, particularly when it had express knowledge of its systems' vulnerability to fraud.

117.    As for its part in perpetrating PPP fraud, while Benworth FL attempted to shift blame solely to Womply by claiming that it "relied on Womply to prevent fraud related to identity theft and the use of fake documents by using its systems to validate a PPP applicant's identity, authenticity, and type of documents submitted, calculations for the PPP loan amount, and bank account information, among other underwriting services,"[3] it also approved and funded loans despite "express[ing] serious concerns about Womply's fraud prevention and eligibility verification program capabilities" in and around the time the Fraudulent PPP Loan was originated. *See* Ex. L at 49.

118.    Specifically:

[A] series of May 2021 emails between Womply and Benworth, the fintech's second-largest PPP lending partner, in which Benworth's senior leadership expressed serious concerns about Womply's fraud prevention and eligibility verification program capabilities . . . show that, in late April and early May 2021, Womply discovered what Benworth described as "rampant fraud" in the over

---

[3] *See* Ex. L at 47.

26

> 200,000 PPP loan applications Womply had referred to Benworth.  Subsequently, Benworth became concerned that Womply's application screening processes were inadequate and had exposed it to "a dangerous amount of liability."

*See* Ex. L at 49.

119.  Mr. Navarro acknowledged Benworth FL was aware that "banks involved in disbursing PPP loans referred by Womply had previously voiced concerns about the high incidence of fraud in Womply-reviewed loans," which led Benworth FL to being "on the brink of being closed 3 times"; and to giving Benworth FL's own PPPLF lender (the Federal Reserve Bank of San Francisco) "assurances that [it] ha[d] every protocol in place to mitigate fraud," even though it did not.  *See* Ex. L at 50.

120.  On April 8, 2021, approximately one month before the Fraudulent PPP Loan was funded, "Womply proposed changes to its pre-qualification, fraud prevention, and other screening processes to better address fraud."  More than a month later, and after the Fraudulent PPP Loan was funded, "Benworth's CEO characterized Womply's new proposed fraud review process as 'unproven' and 'last minute,' and pointed out that these changes would not detect fraud in the 200,000 loans that Womply had already referred to the lender."  *See* Ex. L at 50-51.

121.  By that time, Benworth FL had already funded the Fraudulent PPP Loan, despite its "multiple concerns with Womply's performance," which it acknowledged included documentation errors, missing supporting documents in application packages, and receipt of complaints and subpoenas relating to loans Womply referred to Benworth FL.  *See* Ex. L at 51.

122.  Despite ample evidence that Mr. Navarro and Benworth FL were aware of rampant fraud issues in the PPP applications Benworth FL was receiving, approving, and funding – for at least a month before the Fraudulent PPP Loan was funded – Mr. Navarro and Benworth FL took no action to prevent or mitigate any such fraud, and continued knowingly funding fraudulent PPP

27

loans referred by Womply, including the Fraudulent PPP Loan attributed to Plaintiff. *See*, *generally*, Ex. L.

123.    Instead, using funds drawn from the Federal Reserve System, Benworth FL, acting at Mr. Navarro's direction, continued knowingly funding fraudulent PPP loans referred by Womply – reaping substantial profits for Benworth FL and the Navarros.

124.    As an SBA lender under the PPP, SBA regulations require Benworth FL to "exercise[] day-to-day responsibility for evaluating, processing, closing, disbursing, servicing, liquidating, and litigating its SBA portfolio," which requirements exist independent of Benworth FL's attempt to delegate these functions to Womply, an unlicensed entity, and which responsibilities Benworth failed to exercise. *See* Ex. L at 60.

125.    As discussed further below, Benworth FL's failure to comply with SBA regulations and PPP requirements resulted in a default under its agreements with the Federal Reserve Bank of San Francisco, regarding nearly $4.3 billion in PPPLF credit advances provided to Benworth FL, which it used to fund the Fraudulent PPP Loan and some 300,000 other PPP loans.

126.    The Subcommittee Report and investigation clearly demonstrate that, to the extent Benworth FL delegated application review/eligibility determination, fraud prevention/mitigation, and/or other underwriting functions to Womply, and to the extent Womply undertook providing those functions, Womply purposefully and knowingly failed to carry out those functions in accordance with SBA and PPP regulations and requirements, and continued pre-approving and referring unqualified and fraudulent PPP applicants to Benworth for funding, which Womply knew were unqualified, fraudulent, and/or improperly reviewed and vetted.

127.    The Subcommittee Report and investigation further demonstrate that, to the extent Benworth FL delegated application review/eligibility determination, fraud prevention/mitigation,

28

and/or other underwriting functions to Womply, and to the extent Womply undertook providing those functions, Benworth FL purposefully and knowingly failed to satisfy its independent responsibility to oversee and supervise Womply's activities, and to ensure those functions were carried out in accordance with SBA and PPP regulations and requirements, and continued approving and funding unqualified and fraudulent PPP applicants referred by Womply, which Benworth FL knew were unqualified, fraudulent, and/or improperly reviewed and vetted.

### RELATED LAWSUITS ALLEGING FRAUDULENT TRANSFERS

128.    Multiple lawsuits have been filed alleging fraudulent transfers from Benworth FL to Benworth PR and/or the Navarros, in an illegal attempt to shield the assets of Benworth FL, and the proceeds of the Benworth Enterprise, from creditors and lawsuits arising out of its actions and misconduct involving fraudulent PPP loans.

### The Womply Lawsuit

129.    On January 24, 2023, Womply commenced an action against Benworth PR, Benworth FL, and the Navarros, in the United States District Court for the District of Puerto Rico under Case No. 3:23-cv-01034-GMM, titled *Oto Analytics, LLC v. Benworth Capital Partners PR LLC, et al.* (the "Womply Lawsuit"), seeking to rescind alleged fraudulent asset transfers from Benworth FL to Benworth PR and/or the Navarros, which Womply alleges were intended to prevent Womply from collecting its fees owed under a breached agreement with Benworth FL.

130.    The Womply Lawsuit alleges that, "[w]ith Womply's technology, Benworth FL processed and funded more than ***305,000 PPP loans*** with a principal amount of approximately ***$4 billion***, generating more than ***$680 million*** in revenue for Benworth FL." *See* Womply Lawsuit, Complaint (ECF Doc. No. 1) (emphasis in original), a true and correct copy of which is annexed hereto as **Exhibit M**.

131.   Womply alleges that it "developed and maintained a website through which small businesses searching for PPP assistance could be connected with and submit application materials to PPP lenders," and then provided the PPP lenders (including Benworth FL) with a technology platform to review, process, and service PPP loans.  Womply further alleges that Benworth FL breached its fee agreement with Womply for use of these services, through which Benworth FL processed thousands of PPP loans.  *See* Ex. M, Womply Lawsuit, Complaint at 3-4.

132.   On June 11, 2024, Womply obtained a final arbitration award in separate JAMS arbitration proceedings it commenced against Benworth FL in or about August 2021 (the "Arbitration"), which awarded Womply nearly $118 million in unpaid fees, interest, and costs owed under its fee agreement with Benworth FL.

133.   In the Womply Lawsuit, Womply alleges that during the course of Arbitration proceedings, it discovered that the Navarros formed Benworth PR for the purpose of preemptively and fraudulently transferring and shielding assets of Benworth FL, in order to prevent Womply from collecting on any judgment or award obtained in the Arbitration.  *See* Ex. M, Womply Lawsuit, Complaint at 2.

134.   Thus, in connection with the fraudulent transfers, the Womply Lawsuit alleges that "[t]he separation of Benworth FL and Benworth PR as distinct corporate entities is an illusion—they are effectively the same company." *See* Ex. M, Womply Lawsuit, Complaint at 5.

135.   The Womply Lawsuit further alleges that "Benworth FL sought to avoid accountability for its failure to conduct a good faith review of applicant information before deciding to fund PPP loans" by misrepresenting to the House Subcommittee – in connection with the House Subcommittee's investigation of fraud in PPP loan programs – "that it relied on Womply to determine applicant eligibility," when "it was Benworth FL that decided which Womply-

30

referred PPP loans to submit to the SBA for approval and, if approved, to fund." *See* Ex. M, Womply Lawsuit, Complaint at 7.

**The Federal Reserve Bank Lawsuit**

136.    On July 10, 2024, after learning about the Womply Lawsuit, the Federal Reserve Bank of San Francisco (the "Federal Reserve Bank") commenced its own lawsuit against Benworth PR, Benworth FL, and the Navarros, in the United States District Court for the District of Puerto Rico under Case No. 3:24-cv-01313-MAJ, titled *Federal Reserve Bank of San Francisco v. Benworth Capital Partners PR LLC, et al.* (the "Federal Reserve Bank Lawsuit").  A true and correct copy of the Complaint in the Federal Reserve Bank Lawsuit (ECF Doc. No. 1) is annexed hereto as **Exhibit N**.[4]

137.    The Federal Reserve Bank Lawsuit seeks "damages for breach of contract, collection of money, conversion, and rescission of fraudulent transfers of various assets from Benworth FL to Benworth PR and the Navarros."  *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 1 (emphasis added).

138.    The Federal Reserve Bank, which is part of the Federal Reserve System, provided Benworth FL with PPPLF financing pursuant to PPPLF Letters of Agreement dated May 4, 2020, January 14, 2021, and January 30, 2023 (the "Letters of Agreement"), through credit advances totaling approximately $4.3 billion.  *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 4.

139.    Specifically, the Federal Reserve Bank alleges that "Benworth FL received Advances from the Federal Reserve Bank from time to time in an aggregate principal amount of approximately $4.3 billion, secured by approximately 300,000 Pledged PPP Loans and the other PPP Collateral.  Upon information and belief, Benworth FL processed, funded, and managed this

---

[4] On August 20, 2024, the District Court consolidated the Womply Lawsuit and the Federal Reserve Bank Lawsuit under Case No. 3:23-cv-01034-GMM.

loan portfolio, earning accrued interest income and various other fees in relation to those loans."

*See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 9.

140.    Notably:

[T]he Reserve Bank has become aware that Benworth FL has failed to comply with the terms of the PPP for at least some portion of the outstanding Pledged PPP Loans, which has caused Benworth FL's outstanding Advances to become recourse obligations . . . . Benworth FL has represented to the Reserve Bank that for a period of years, it did not have appropriate documentation to support its requests for guaranty purchases for all of the relevant PPP loans, either due to Womply's withholding of the appropriate documentation . . . , or due to other problems internal to Benworth FL.  <u>These facts have caused the Reserve Bank to determine that Benworth FL has failed to comply with the terms of the PPP for at least some portion of its PPP portfolio</u>, causing the Advance amounts to become recourse.

*See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 8 (emphasis added).

141.    The Federal Reserve Bank further alleges that "Benworth FL fraudulently transferred various assets, including the Reserve Bank's collateral, to Benworth PR and the Navarros, who are exercising dominion and control over those assets.  As a result, Benworth FL was left with virtually no capital to fulfill its current obligations to the Reserve Bank."  *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 2.

142.    According to the Federal Reserve Bank Lawsuit, "[a]lthough Benworth PR was formed as a separate entity from Benworth FL, it is effectively the same company as Benworth FL, and any corporate separateness is illusory."  *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 11.  "Benworth PR provides certain services to process and/or service Benworth FL's mortgage and PPP loans, as well as other services such as fraud monitoring and loan forgiveness, all of which Benworth FL previously performed itself."  *Id.*

143.    The Federal Reserve Bank further alleges that "Benworth FL has moved all of its employees to a Florida branch of Benworth PR," and pursuant to LSAs executed by the Navarros on behalf of Benworth FL and Benworth PR in 2021, "Benworth PR services Benworth FL's

mortgage and PPP loans" and will receive all of the PPP loan income that Benworth FL would have received for servicing the loans to maturity. *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 12-13.

144.   Notably, Benworth PR did not even exist as an entity on the date of the first LSA purportedly between Benworth FL and Benworth PR. Although the first LSA was dated May 31, 2021, Benworth PR was not formed until nearly a month later, on June 28, 2021. *See* Ex. F.

145.   Additionally, "[f]rom time to time, Benworth FL made transfers to Benworth PR. These transfers were purportedly advances in payment for loan servicing and related services that Benworth PR would render to Benworth FL pursuant to the LSAs." *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 13. In sum, the Federal Reserve Bank alleges that "[b]etween 2021 and 2023, Benworth FL transferred over $50 million to Benworth PR, which left Benworth FL unable to pay its debts as they came due, insolvent, and with inadequate capital." *Id.*

146.   The Federal Reserve Bank further alleges that "Benworth FL also made transfers to the Navarros," including a portion of dividends totaling more than $48 million paid to Mr. Navarro between 2021 and 2023, at least $800,000 paid to Mr. Navarro in 2024, and additional assets diverted to Mrs. Navarro to avoid payment of prior judgments. *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 13-14.

147.   Upon information and belief, the Navarros formed Benworth Financial in 2019, also for the purpose of fraudulently diverting and shielding assets of Benworth FL. Upon further information and belief, the Navarros have fraudulently transferred assets of Benworth FL to Benworth Financial in order to avoid paying judgments and other debts owed by Benworth FL, and/or operated Benworth Financial as an alter ego of Benworth FL.

**FIRST CAUSE OF ACTION**
**Racketeer Influenced And Corrupt Organizations Act (RICO)**
**(18 U.S.C. § 1962(c))**
*AS TO THE BENWORTH ENTITIES AND THE NAVARROS*

148.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

149.    The Benworth Entities (Benworth FL, Benworth PR, and Benworth Financial) together form an "enterprise" (the Benworth Enterprise) as defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c), which engages in activities affecting interstate commerce.

150.    Womply and Mr. Scammell together form an "enterprise" (the Womply Enterprise) as defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c), which engages in activities affecting interstate commerce.

151.    Mr. Navarro is a "person" as defined by 18 U.S.C. § 1961(3), and within the meaning of 18 U.S.C. § 1962(c).

152.    Mr. Navarro is also a "principal" of the Benworth Enterprise, within the meaning of section 2, title 18, of the United States Code.

153.    As principal of the Benworth Enterprise, Mr. Navarro has individually taken actions, and directed other members of the Benworth Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise.  Mr. Navarro is responsible for day-to-day operations and business decisions of the Benworth Enterprise, and for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes.

154.    Mrs. Navarro is a "person" as defined by 18 U.S.C. § 1961(3), and within the meaning of 18 U.S.C. § 1962(c).  Mrs. Navarro is also a member of the Benworth Enterprise.

34

155. As a member of the Benworth Enterprise, Mrs. Navarro has participated in creating, managing, and/or maintaining other business entities which are members of the Enterprise, for the purpose of accomplishing the overall goals and purposes of the Enterprise, and entered into contracts and agreements to siphon and transfer proceeds of the Enterprise to other members of the Enterprise.

156. Mr. Scammell is a "person" as defined by 18 U.S.C. § 1961(3), and within the meaning of 18 U.S.C. § 1962(c).

157. Mr. Scammell is also a "principal" of the Womply Enterprise, within the meaning of section 2, title 18, of the United States Code.

158. As principal of the Womply Enterprise, Mr. Scammell has individually taken actions, and directed other members and agents of the Womply Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise. Mr. Scammell is responsible for day-to-day operations and business decisions of the Womply Enterprise, and for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes.

159. The Benworth Entities are associated in fact through common ownership, management, and control by the Navarros, and through shared personnel, office space, resources, and/or one or more contracts or agreements relating to and/or for the purpose of originating, servicing, collecting upon, and/or otherwise profiting off of PPP loans referred by Womply and originated by Benworth FL.

160. The members of the Benworth Enterprise share the common purpose of profiting from the referral, origination, approval, funding, and servicing of these fraudulent PPP loans,

including the Fraudulent PPP Loan in Plaintiff's name, which were funded in violation of SBA and PPP regulations, using Federal Reserve Bank funds obtained through the PPPLF.

161.   The Navarros have each personally benefitted from the unlawful acts of the Benworth Enterprise through fraudulent transfers of proceeds of the Enterprise to other members of the Enterprise under their ownership and/or control, and to the Navarros individually.

162.   The Benworth Enterprise is also associated in fact with the Womply Enterprise, through one or more contracts or agreements relating to and/or for the purpose of sourcing, referring, originating, and/or otherwise profiting off of fraudulent PPP loans sourced, referred, and/or at least partially underwritten and approved for funding by Womply, and originated and/or at least partially underwritten and approved for funding by Benworth FL.

163.   The ongoing conduct of the Benworth Enterprise, acting individually and/or in concert with the Womply Enterprise, beginning in 2020 and continuing until the present, is unlawful and constitutes a pattern of racketeering activity consisting of repeated, continuous, and related acts of fraud and other unlawful conduct in violation of federal statutes governing mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), financial institution fraud (18 U.S.C. § 1344), and identity theft (18 U.S.C. § 1028), in connection with thousands of fraudulent PPP loans originated between 2020 and 2023, including the Fraudulent PPP Loan associated with Plaintiff.

164.   The Navarros knowingly conducted and/or participated, directly or indirectly, in the conduct of the Benworth Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Through members of the Benworth Enterprise, agents, or other individuals acting at their direction, and/or acting in concert with the Womply Enterprise and Mr. Scammell, the Navarros knowingly and intentionally executed or attempted to execute a scheme to defraud the federal government including the SBA, Federal Reserve Bank, and the general

36

public, in violation of 18 U.S.C. §§ 1341, 1343, 1344, and 1028, including by use of the mails and interstate wire communications in furtherance of, and for the purpose of executing, the scheme.

165. The predicate acts of racketeering activity in violation of the foregoing statutes involve Benworth FL's approval and conduct as a PPP lender subject to SBA regulations, credit advances granted to Benworth FL under the PPPLF, fraudulent transfers between the Benworth Entities and the Navarros, agreements and kickback schemes between Benworth FL and Womply, Benworth FL and Benworth PR, and other members of the Benworth Enterprise and/or the Womply Enterprise, and fraudulent PPP loans funded using Federal Reserve Bank funds, including:

a. **Bank Fraud (18 U.S.C. § 1344):** Executing or attempting to execute a scheme to defraud the Federal Reserve Bank in violation of 18 U.S.C. § 1344, in connection with credit advances granted to Benworth FL under the PPPLF, and fraudulent transfers by and between members of the Benworth Enterprise in order to misrepresent insolvency and avoid repayment. Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at their direction, the Navarros knowingly and intentionally executed or attempted to execute a scheme to defraud by (i) drawing on PPPLF credit provided by the Federal Reserve System to fund fraudulent PPP loans, including the Fraudulent PPP Loan, using Plaintiff's stolen identity and fraudulent or stolen identity information for other borrowers; and (ii) making intentional and material misrepresentations to the Federal Reserve Bank regarding (a) Benworth FL's agreements with the Federal Reserve Bank in connection with credit advances it received under the PPPLF, and (b) Benworth FL's assets and solvency in light of fraudulent transfers the Navarros caused and/or facilitated from Benworth FL to Benworth PR, and from Benworth FL directly to the Navarros and/or other members of the Benworth Enterprise.

b. **Wire Fraud (18 U.S.C. § 1343):** Devising or intending to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and transmitting by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme in violation of 18 U.S.C. § 1343, in connection with thousands of fraudulent PPP loans originated by Benworth FL, in concert with Womply, using credit advances from the Federal Reserve Bank obtained through the PPPLF, for the Navarros' and Mr. Scammell's personal gain, and at their direction; which occurred in relation to, or involving a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially

declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution.  Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at their direction, and acting in concert with the Womply Enterprise and Mr. Scammell, the Navarros knowingly and intentionally transmitted, or caused to be transmitted, by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing a scheme or artifice to defraud, including, but not limited to (i) online PPP loan applications, approvals, and disbursement instructions for thousands of PPP loans, including the Fraudulent PPP Loan associated with Plaintiff, even when the Defendants had knowledge of widespread fraud in the applicant pool; (ii) email communications among the Defendants and with third parties to coordinate the funding of fraudulent PPP loans, and funneling of PPP-related funds and profits; and (iii) continued marketing and advertising via internet and social media channels to attract more PPP applicants, despite knowledge of ongoing fraud.

c. **Mail Fraud (18 U.S.C. § 1341):**  Devising or intending to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and placing in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or depositing or causing to be depositing any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or taking or receiving therefrom, any such matter or thing, or knowingly causing to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, for the purpose of executing such scheme in violation of 18 U.S.C. § 1341, in connection with thousands of fraudulent PPP loans originated by Benworth FL, in concert with Womply, using credit advances from the Federal Reserve Bank obtained through the PPPLF, for the Navarros' and Mr. Scammell's personal gain, and at their direction; which occurred in relation to, or involving a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution. Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at their direction, the Navarros knowingly and intentionally used, or caused to be used, the U.S. mail in furtherance of a scheme to defraud, through actions including, but not limited to, mailing, or causing to be mailed, documents, notices, letters, and/or other communications regarding PPP loan applications, approvals, purported borrower obligations, and other materials integral to the fraudulent scheme, to interstate addresses (including erroneous or fictitious addresses including the Howard Beach Address) with knowledge that such mailings furthered the Enterprise's fraudulent objectives.

38

d. **Identity Theft and Related Fraud (18 U.S.C. § 1028):** Knowingly possessing, using, and/or transferring an identification document, authentication feature, or false identification document knowing that such document or feature was stolen or produced without lawful authority, with the intent that such document or feature be used to defraud the United States, and/or knowingly transferring, possessing, and/or using, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law, in violation of 18 U.S.C. § 1028. Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at their direction, the Navarros knowingly participated in, permitted, and facilitated the unauthorized possession, use, and transmission of Plaintiff's personal identifying information fraudulently obtained through identity theft, in connection with the submission, approval, and/or funding of the Fraudulent PPP Loan in Plaintiff's name, without Plaintiff's knowledge or authorization.

166. Each of the foregoing predicate acts involved a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution.

167. These acts amount to and/or pose a threat of continued criminal activity because the Navarros and the Benworth Enterprise (i) continued their unlawful activity related to the PPP and fraudulent PPP loans over a period of several years despite direct knowledge of the fraudulent nature of the loans; (ii) perpetuated additional unlawful activity related to the PPP by effectuating fraudulent transfers intended to defraud the Federal Reserve Bank and other potential creditors; (iii) only ceased certain unlawful acts or practices with respect to the PPP because the program ended; (iv) continued working in financial services after the end of the PPP; and (v) maintain the means, ability, and incentive to resume their unlawful conduct with respect to small business and consumer lending and financial services.

168. Plaintiff has been injured in his business and property by reason of the foregoing conduct in violation of 18 U.S.C. § 1962(c), which injuries were directly, factually, and proximately caused by Defendants' violations of 18 U.S.C. § 1962(c). Specifically, as a result of

39

Defendants' unlawful acts, Plaintiff has suffered damages including loss and reduction of SSR benefits that were improperly garnished under the TOP due to the Fraudulent PPP Loan, payment of attorneys' fees and costs incurred in investigating and prosecuting Defendants' criminal activities, reputational harm, and other financial and economic damages to be determined at trial.

169.    Accordingly, Plaintiff is entitled to recover treble damages, including attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

**<u>SECOND CAUSE OF ACTION</u>**
**Racketeer Influenced And Corrupt Organizations Act (RICO)**
**(18 U.S.C. § 1962(c))**
*AS TO WOMPLY AND MR. SCAMMELL*

170.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

171.    The Womply Enterprise is an ongoing "enterprise" as defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c), which engages in activities affecting interstate commerce.

172.    The Benworth Enterprise is an ongoing "enterprise" as defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c), which engages in activities affecting interstate commerce.

173.    Mr. Scammell is a "person" as defined by 18 U.S.C. § 1961(3), and within the meaning of 18 U.S.C. § 1962(c).

174.    Mr. Scammell is also a "principal" of the Womply Enterprise, within the meaning of section 2, title 18, of the United States Code.

175.    As principal of the Womply Enterprise, Mr. Scammell has individually taken actions, and directed other members and agents of the Womply Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise.  Mr. Scammell is

responsible for day-to-day operations and business decisions of the Womply Enterprise, and for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes.

176.    The Womply Enterprise is associated in fact with the Benworth Enterprise, through one or more contracts or agreements relating to and/or for the purpose of sourcing, referring, originating, and/or otherwise profiting off of fraudulent PPP loans sourced, referred, and/or at least partially underwritten and approved for funding by Womply, and originated and/or at least partially underwritten and approved for funding by Benworth FL, in violation of SBA and PPP regulations, and using Federal Reserve Bank funds obtained through the PPPLF.

177.    Mr. Scammell has personally benefitted from the unlawful acts of the Womply Enterprise through profits and illegal kickbacks from fee agreements and other arrangements with PPPLF lenders including Benworth FL.

178.    The ongoing conduct of the Womply Enterprise, acting individually and/or in concert with the Benworth Enterprise, beginning in 2020 and continuing until the present, is unlawful and constitutes a pattern of racketeering activity consisting of repeated, continuous, and related acts of fraud and other unlawful conduct in violation of federal statutes governing mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), financial institution fraud (18 U.S.C. § 1344), and identity theft (18 U.S.C. § 1028), in connection with thousands of fraudulent PPP loans originated between 2020 and 2023, including the Fraudulent PPP Loan associated with Plaintiff.

179.    Mr. Scammell knowingly conducted and/or participated, directly or indirectly, in the conduct of, the Womply Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Through members of the Womply Enterprise, agents, or other individuals acting at his direction, and/or acting in concert with the Benworth Enterprise and the

Navarros, Mr. Scammell knowingly and intentionally executed or attempted to execute a scheme to defraud the federal government including the SBA, Federal Reserve Bank, and the general public, in violation of 18 U.S.C. §§ 1341, 1343, 1344, and 1028, including by use of the mails and interstate wire communications in furtherance of, and for the purpose of executing, the scheme.

180.    The predicate acts of racketeering activity in violation of the foregoing statutes involve agreements and kickback schemes between Womply and Benworth FL, and other members of the Benworth Enterprise and/or the Womply Enterprise, to approve and fund fraudulent PPP loans funded using Federal Reserve Bank capital, and deceptive acts and practices involving interstate commerce related to Womply's PPP loan-related services, including:

a.  **Bank Fraud (18 U.S.C. § 1344):**  Individually and/or through members of the Womply Enterprise, agents, or other individuals acting at his direction, and acting in concert with the Benworth Enterprise, Mr. Scammell knowingly and intentionally executed or attempted to execute a scheme to defraud the Federal Reserve Bank in violation of 18 U.S.C. § 1344, by approving and referring fraudulent PPP loans for funding, including the Fraudulent PPP Loan, with PPPLF credit drawn on funds from the Federal Reserve System, using Plaintiff's stolen identity and fraudulent or stolen identity information for other borrowers.

b.  **Wire Fraud (18 U.S.C. § 1343):**  Individually and/or through members of the Womply Enterprise, agents, or other individuals acting at his direction, Mr. Scammell knowingly and intentionally transmitted, or caused to be transmitted, by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing a scheme or artifice to defraud, including, but not limited to (i) online PPP loan applications, approvals, and disbursement instructions for thousands of PPP loans, including the Fraudulent PPP Loan associated with Plaintiff, even when the Defendants had knowledge of widespread fraud in the applicant pool; (ii) email communications among the Defendants and with third parties to coordinate the funding of fraudulent PPP loans, and funneling of PPP-related funds and profits; (iii) deceptive acts and practices related to aggressive and ongoing marketing and advertising via internet and social media channels to attract and induce PPP applicants to apply with Womply, knowing that Womply would not, and could not, keep the promises made to the public through these advertisements, and would favor approval of fraudulent applications over legitimate ones; and (iv) continued and increased marketing and advertising via internet and social media channels to attract more PPP applicants, despite knowledge of ongoing fraud.

c. **Mail Fraud (18 U.S.C. § 1341):** Individually and/or through members of the Womply Enterprise, agents, or other individuals acting at his direction, Mr. Scammell knowingly and intentionally used, or caused to be used, the U.S. mail in furtherance of a scheme to defraud, through actions including, but not limited to, mailing, or causing to be mailed, documents, notices, letters, and/or other communications regarding PPP loan applications, approvals, purported borrower obligations, and other materials integral to the fraudulent scheme, to interstate addresses (including erroneous or fictitious addresses including the Howard Beach Address) with knowledge that such mailings furthered the Enterprise's fraudulent objectives.

d. **Identity Theft and Related Fraud (18 U.S.C. § 1028):** Knowingly possessing, using, and/or transferring an identification document, authentication feature, or false identification document knowing that such document or feature was stolen or produced without lawful authority, with the intent that such document or feature be used to defraud the United States, and/or knowingly transferring, possessing, and/or using, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law, in violation of 18 U.S.C. § 1028. Individually and/or through members of the Womply Enterprise, agents, or other individuals acting at his direction, Mr. Scammell knowingly participated in, permitted, and facilitated the unauthorized possession, use, and transmission of Plaintiff's personal identifying information fraudulently obtained through identity theft, in connection with the submission, approval, and/or funding of the Fraudulent PPP Loan in Plaintiff's name, without Plaintiff's knowledge or authorization.

181. Each of the foregoing predicate acts involved a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution.

182. These acts amount to and/or pose a threat of continued criminal activity because Mr. Scammell and the Womply Enterprise (i) continued their unlawful activity related to the PPP and fraudulent PPP loans over a period of several years despite direct knowledge of the fraudulent nature of the loans; (ii) perpetuated additional unlawful activity related to the PPP through deceptive acts and practices related to aggressive and ongoing marketing and advertising to attract, increase, and induce PPP applicants to apply with Womply, knowing Womply's advertised promises were illegitimate and the applicant pool and referrals contained widespread fraud,

43

resulting the FTC Lawsuit brought in 2024; (iii) only ceased certain unlawful acts or practices with respect to the PPP because the program ended; (iv) continued working in financial services after the end of the PPP; and (v) maintain the means, ability, and incentive to resume their unlawful conduct with respect to small business and consumer lending and financial services. Additionally, Mr. Scammell's prior related criminal conduct, including a 2014 criminal conviction for financial crime and engaging in a fraudulent scheme related to insider trading, for which he served prison time and paid nearly $1 million in restitution and related civil penalties in a parallel civil suit by the SEC, demonstrate that Mr. Scammell is not deterred by the threat or possibility of civil, or even criminal, punishments for his ongoing fraudulent and unlawful actions.

183.     Plaintiff has been injured in his business and property by reason of the foregoing conduct in violation of 18 U.S.C. § 1962(c), which injuries were directly, factually, and proximately caused by Defendants' violations of 18 U.S.C. § 1962(c). Specifically, as a result of Defendants' unlawful acts, Plaintiff has suffered damages including loss and reduction of SSR benefits that were improperly garnished under the TOP due to the Fraudulent PPP Loan, payment of attorneys' fees and costs incurred in investigating and prosecuting Defendants' criminal activities, reputational harm, and other financial and economic damages to be determined at trial.

184.     Accordingly, Plaintiff is entitled to recover treble damages, including attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Racketeer Influenced And Corrupt Organizations Act (RICO)**
**(18 U.S.C. § 1962(a))**
*AS TO THE NAVARROS*

185.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

186. The Benworth Enterprise is an ongoing "enterprise" as defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(a), which engages in activities affecting interstate commerce.

187. Mr. Navarro is a "person" as defined by 18 U.S.C. § 1961(3), and within the meaning of 18 U.S.C. § 1962(a).

188. Mrs. Navarro is a "person" as defined by 18 U.S.C. § 1961(3), and within the meaning of 18 U.S.C. § 1962(a).

189. Mr. Navarro is a "principal" of the Benworth Enterprise, within the meaning of section 2, title 18, of the United States Code, and 18 U.S.C. § 1962(a).

190. As principal of the Benworth Enterprise, Mr. Navarro has individually taken actions, and directed other members of the Benworth Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise. Mr. Navarro is responsible for day-to-day operations and business decisions of the Benworth Enterprise, and for creating, approving, and implementing the policies, practices, and instrumentalities used by the Enterprise to accomplish its common goals and purposes.

191. Mrs. Navarro is a "person" as defined by 18 U.S.C. § 1961(3), and within the meaning of 18 U.S.C. § 1962(c). Mrs. Navarro is also a "principal" of the Benworth Enterprise, within the meaning of section 2, title 18, of the United States Code, and 18 U.S.C. § 1962(a), to the extent she has aided, abetted, counseled, commanded, induced, and/or procured the commission of an offense against the United States, through operation of the Benworth Enterprise as described in detail above.

192. The Navarros knowingly participated in the conduct of the Benworth Enterprise's affairs as principals, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a),

45

consisting of repeated violations of federal statutes related to mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), financial institution fraud (18 U.S.C. § 1344), and identity theft (18 U.S.C. § 1028), in connection with thousands of fraudulent PPP loans originated between 2020 and 2023, including the Fraudulent PPP Loan associated with Plaintiff.

193.   Specifically, the Navarros willfully directed, and/or aided, abetted, counseled, commanded, induced, or procured the following acts (as described in greater detail in the First Cause of Action above), which are violations federal statutes and constitute the commission of an offense against the United States, through operation of the Benworth Enterprise:

a. **Bank Fraud (18 U.S.C. § 1344):** Executing or attempting to execute a scheme to defraud the Federal Reserve Bank in violation of 18 U.S.C. § 1344, in connection with credit advances granted to Benworth FL under the PPPLF, and fraudulent transfers by and between members of the Benworth Enterprise in order to misrepresent insolvency and avoid repayment.

b. **Wire Fraud (18 U.S.C. § 1343):** Devising or intending to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and transmitting by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme in violation of 18 U.S.C. § 1343, in connection with thousands of fraudulent PPP loans originated by Benworth FL, in concert with Womply, using credit advances from the Federal Reserve Bank obtained through the PPPLF; which occurred in relation to, or involving a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution.

c. **Mail Fraud (18 U.S.C. § 1341):** Devising or intending to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and placing in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or depositing or causing to be depositing any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or taking or receiving therefrom, any such matter or thing, or knowingly causing to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, for the purpose of executing such scheme in violation of 18 U.S.C. § 1341, in connection with thousands of fraudulent PPP loans originated by Benworth FL, in concert with Womply, using credit advances from the Federal Reserve Bank obtained through the PPPLF; which occurred in relation to, or

involving a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution.

d. **Identity Theft and Related Fraud (18 U.S.C. § 1028):** Knowingly possessing, using, and/or transferring an identification document, authentication feature, or false identification document knowing that such document or feature was stolen or produced without lawful authority, with the intent that such document or feature be used to defraud the United States, and/or knowingly transferring, possessing, and/or using, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law, in violation of 18 U.S.C. § 1028.

194. The Navarros have each received income, both directly and indirectly, from the foregoing pattern of racketeering activity in which they each participated as a principal.

195. The Navarros have each invested or used, directly or indirectly, part of such income, or the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of, one or more enterprise(s) which is/are engaged in, or the activities or which affect, interstate or foreign commerce.

196. An example of one such enterprise is Benworth PR. The Navarros have invested or used income derived from their pattern of racketeering activity to further their unlawful business activities and maintain the enterprise in violation of 18 U.S.C. § 1962(a).

197. Plaintiff's injuries were directly caused by the Navarros' illegal investment of racketeering proceeds, as Plaintiff was directly harmed by the Navarros' racketeering activity and misuse of funds that resulted in the Fraudulent PPP Loan in Plaintiff's name, and continues to be harmed by this conduct due to the fraudulent transfer of assets from Benworth FL to Benworth PR in furtherance of the Benworth Enterprise, leaving Benworth FL insolvent and unable to satisfy creditors' judgments, which would include any judgment entered in Plaintiff's favor.

198. Plaintiff has been injured in his business and property by reason of the foregoing conduct in violation of 18 U.S.C. § 1962(a), which injuries were directly, factually, and

47

proximately caused by Defendants' violations of 18 U.S.C. § 1962(a). Specifically, as a result of Defendants' unlawful acts, Plaintiff has suffered damages including loss and reduction of SSR benefits that were improperly garnished under the TOP due to the Fraudulent PPP Loan, payment of attorneys' fees and costs incurred in investigating and prosecuting Defendants' criminal activities, reputational harm, and other financial and economic damages to be determined at trial.

199. Accordingly, Plaintiff is entitled to recover treble damages, including attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

**FOURTH CAUSE OF ACTION**
**Racketeer Influenced And Corrupt Organizations Act (RICO)**
**(18 U.S.C. §§ 1962(c),(d))**
*AS TO THE BENWORTH ENTITIES, THE NAVARROS, WOMPLY, AND MR. SCAMMELL*

200. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

201. The Benworth Entities, the Navarros, Womply, and Mr. Scammell together constitute an association-in-fact "enterprise" (the "PPP Fraud Enterprise") as defined by 18 U.S.C. § 1961(4), which engages in activities affecting interstate commerce.

202. The members of the PPP Fraud Enterprise are associated in fact for the common purpose of, and/or through one or more contracts or agreements relating to, sourcing, referring, originating, and/or otherwise profiting off of fraudulent PPP loans sourced, referred, and/or at least partially underwritten and approved for funding by Womply, and originated and/or at least partially underwritten and approved for funding by Benworth FL, in violation of SBA and PPP regulations, and using Federal Reserve Bank funds obtained through the PPPLF.

203. Each of the Defendants, as members of the PPP Fraud Enterprise, conspired to violate the provisions of 18 U.S.C. § 1962(a), (b), or (c), by agreeing to conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity.

204. The Defendants did conduct, participate in, and further an ongoing scheme to fraudulently obtain and disburse PPP funds via a pattern of racketeering activity, which they facilitated by:

205. In furtherance of the conspiracy, and to affect the objects thereof, Defendants and their co-conspirators knowingly committed or caused to be committed overt acts—including but not limited to acts constituting mail fraud, wire fraud, bank fraud, identity theft, and related predicate acts—as alleged in detail above.

206. The PPP Fraud Enterprise is distinct from, and has an existence beyond the pattern of racketeering activity described herein, by recruiting, employing, overseeing, and coordinating individuals (including professionals and non-professionals) responsible for facilitating and performing a wide variety of administrative and professional functions beyond the predicate acts, including various individuals involved in other legitimate business functions of the Benworth Entities and Womply, separate and apart from the fraudulent PPP loans and associated activities.

207. Defendants' conduct, taken together, demonstrates that each Defendant was aware of the fraudulent practices within the Enterprise and agreed—tacitly or explicitly—to facilitate the scheme. The widespread fraud in PPP applications, repeated failures to implement fraud controls, and extensive profit-taking from obviously fraudulent loans all demonstrate a "meeting of the minds" to violate provisions of 18 U.S.C. § 1962.

208. As a direct and proximate result of the conspiracy, Plaintiff has sustained significant injuries, including garnished SSR benefits, reputational harm, payment of attorneys' fees and costs incurred in investigating and prosecuting Defendants' criminal activities, and other damages.

209. Accordingly, Plaintiff is entitled to recover treble damages, including attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## FIFTH CAUSE OF ACTION
### Negligence

210.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

211.    Defendants, in conducting national operations affecting consumers, and relating to lending, financial assistance, and government benefits in connection with a presidentially declared major disaster or emergency, owed a duty of care to Plaintiff and all potentially affected consumers, to properly manage the loan review, referral, and approval process, including implementing reasonable safeguards against fraud and identity theft (at least meeting minimum SBA and industry standards).

212.    Defendants breached this duty by failing to exercise reasonable care in the performance of such duties, particularly with respect to prevention of fraud and identity theft, resulting in the Fraudulent PPP Loan.  Specifically, Defendants knew or should have known about rampant fraud in the PPP applicant pool received by Benworth FL and/or referred by Womply, and further that Womply's systems were incapable of, or otherwise failed to, detect fraud and identity theft in PPP applications approved/referred by Womply to Benworth FL, and approved for funding by Benworth FL.

213.    As a direct and proximate result of Defendants' breach, Plaintiff has suffered significant financial harm, including loss and reduction of SSR benefits that were improperly garnished under the TOP due to the Fraudulent PPP Loan, payment of attorneys' fees and costs incurred in investigating and prosecuting Defendants' criminal activities, reputational harm, and other financial and economic damages to be determined at trial.

214.    Accordingly, Plaintiff is entitled to recover actual and consequential damages resulting from the harm caused by Defendants' breach of duty.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

215.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

216.    As described in detail above, each of the Defendants have engaged in improper, unlawful, and/or unjust acts in furtherance of a criminal enterprise, all of which resulted in the Fraudulent PPP Loan, to the harm and detriment of Plaintiff.

217.    Plaintiff's SSR benefits have been involuntarily garnished by the government to effect repayment of the Fraudulent PPP Loan Plaintiff did not know about or authorize, and has no lawful responsibility to repay.

218.    Defendants have benefitted from and been unjustly enriched at Plaintiff's expense by these payments, and by fees and other profits flowing from the referral, processing, origination, servicing, and existence of the Fraudulent PPP Loan, from which Plaintiff derived absolutely no benefit whatsoever.

219.    Defendants have further been unjustly enriched at Plaintiff's expense by receiving and retaining the proceeds of their racketeering activities and fraudulent conduct that resulted in the Fraudulent PPP Loan.

220.    Defendants have retained, and continue to retain, the benefit conferred by Plaintiff and at Plaintiff's expense, without compensating Plaintiff for the benefit received, violating the principles of justice, equity, and good conscience.

221.    As a result of Defendants' unjust enrichment, Plaintiff is entitled to restitution, and disgorgement of any benefits Defendants have obtained and retained at Plaintiff's expense and to his detriment, in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201, 2202)**

222.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

223.    Plaintiff brings this claim for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

224.    An actual controversy exists between the parties regarding the legal rights and obligations of Plaintiff with respect to the Fraudulent PPP Loan and any related agreements fraudulently executed in connection therewith, without Plaintiff's knowledge or authorization.

225.    Given that (i) the Fraudulent LLC was created using Plaintiff's stolen identity and personal identifying information, without Plaintiff's knowledge or authorization, and (ii) the Fraudulent PPP Loan was also originated using Plaintiff's stolen identity and personal identifying information, in the name of the Fraudulent LLC of which Plaintiff had no knowledge, all without Plaintiff's knowledge or authorization, Plaintiff cannot be legally responsible for repayment of the debt incurred in connection with the Fraudulent PPP Loan.

226.    Accordingly, Plaintiff requests a judicial declaration:

a.  Dissolving the Fraudulent LLC created in Plaintiff's name;

b.  Declaring any actions taken or agreements or contracts executed by, or on behalf of, the Fraudulent LLC void *ab initio*, including the Fraudulent PPP Loan and any related contracts or agreements;

c.  Declaring that Plaintiff has no legal responsibility for repayment of the Fraudulent PPP Loan; and

d.  Returning to Plaintiff any government benefits (including SSR), or other funds taken and/or retained from Plaintiff for the purpose of repayment of the Fraudulent PPP Loan.

**EIGHTH CAUSE OF ACTION**
**Deceptive Acts – N.Y. Gen. Bus. Law § 349**
*AS TO BENWORTH FL AND WOMPLY*

227.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

228.    New York law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  GBL § 349.

229.    "To maintain a cause of action under § 349, a plaintiff must show: (1) that the defendant's conduct is 'consumer-oriented'; (2) that the defendant is engaged in a 'deceptive act or practice'; and (3) that the plaintiff was injured by this practice."  *See Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010).

230.    "The 'consumer-oriented' requirement may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers.'"  *Id.*

231.    The FTC Lawsuit, Federal Reserve Bank Lawsuit, and House Subcommittee Report all clearly demonstrate that Defendants have been, and continue to be, engaged in consumer-oriented deceptive conduct affecting consumers at large.  *See* Exs. J-L, N.

232.    Plaintiff has personally been injured by these practices, which resulted in the Fraudulent PPP Loan and garnishment of Plaintiff's SSR benefits.  *See* Exs. A-C.

233.    As the FTC Lawsuit alleges: "Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' [Womply and Mr. Scammell] violations of the FTC Act.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest."  *See* FTC Lawsuit, Complaint at 18.

234.    Defendants' acts amount to and/or pose a threat of continued criminal activity affecting consumers at large because Defendants: (i) continued their unlawful activity related to

53

the PPP and fraudulent PPP loans over a period of several years despite direct knowledge of the fraudulent nature of the loans; (ii) perpetuated additional unlawful activity related to the PPP by effectuating fraudulent transfers intended to defraud the Federal Reserve Bank and other potential creditors; (iii) only ceased certain unlawful acts or practices with respect to the PPP because the program ended; (iv) continued working in financial services after the end of the PPP; and (v) maintain the means, ability, and incentive to resume their unlawful conduct with respect to small business and consumer lending and financial services.

235.    Accordingly, pursuant to GBL § 349(h), Plaintiff is entitled to recover (i) actual damages or fifty dollars, whichever is greater; or, in the Court's discretion, an amount not to exceed three times the actual damages, up to one thousand dollars; and (ii) reasonable attorneys' fees incurred in bringing this action.

**NINTH CAUSE OF ACTION**
**Rescission of Fraudulent Transfers**
***AS TO THE BENWORTH ENTITIES AND THE NAVARROS***

236.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

237.    To the extent the Navarros effected fraudulent transfers from Benworth FL to Benworth PR, to themselves, and/or to other members of the Benworth Enterprise to shield those assets from recovery by creditors, Plaintiff respectfully joins in the Federal Reserve Bank's requests to rescind those transactions and transfers, as alleged in the Federal Reserve Bank Lawsuit, which claims Plaintiff respectfully incorporates in their entirety herein. *See* Ex. N.

**DEMAND FOR JURY TRIAL**

238.    Pursuant to Fed. R. Civ. P. 38, Plaintiff respectfully requests a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully demands judgment awarding all actual, statutory, and/or punitive damages, recovery of attorneys' fees and costs, and any other relief available pursuant to applicable law.

Dated: Brooklyn, New York
      January 8, 2025

                                      **PETROFF AMSHEN LLP**
                                      *Attorneys for Plaintiff,*
                                      William Kolbert

                                      */s/ Steven Amshen*
                                      Steven Amshen, Esq.
                                      1795 Coney Island Avenue, Third Floor
                                      Brooklyn, New York 11230
                                      Telephone: (718) 336-4200
                                      Email: samshen@petroffamshen.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM KOLBERT,<br><br>                       Plaintiff,<br><br>         -against-<br><br>BENWORTH CAPITAL PARTNERS LLC; BENWORTH CAPITAL PARTNERS PR LLC; BENWORTH FINANCIAL LLC; BERNARDO NAVARRO a/k/a BERNARDO E. NAVARRO; CLAUDIA NAVARRO a/k/a CLAUDIA PEZZIA NAVARRO; OTO ANALYTICS, LLC f/k/a OTO ANALYTICS, INC., d/b/a WOMPLY; and TOBY SCAMMELL a/k/a TOBY G. SCAMMELL;<br><br>                       Defendants. | Civil Action<br>Case No.:<br><br><br>**INDIVIDUAL VERIFICATION** |

STATE OF NEW YORK    )
                        ) ss:
COUNTY OF _Nassau_   )

William Kolbert, being of full age and duly sworn, deposes and says:

I am the plaintiff in this action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters, I believe them to be true.

_____
William Kolbert

On the _7th_ of _January_ in the year ~~2024~~ 2025, before me, the undersigned, a Notary Public in and for said State, personally appeared William Kolbert, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Stamp/Seal:

EVAN B WHITACRE
NOTARY PUBLIC-STATE OF NEW YORK
No. 01WH6290487
Qualified in Nassau County
My Commission Expires _October 15, 2025_