UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| WILLIAM KOLBERT,<br><br>        Plaintiff,<br><br>   -against-<br><br>BENWORTH CAPITAL PARTNERS LLC; BENWORTH CAPITAL PARTNERS PR LLC; BENWORTH FINANCIAL LLC; BERNARDO NAVARRO a/k/a BERNARDO E. NAVARRO; CLAUDIA NAVARRO a/k/a CLAUDIA PEZZIA NAVARRO; OTO ANALYTICS, LLC f/k/a OTO ANALYTICS, INC., d/b/a WOMPLY; and TOBY SCAMMELL a/k/a TOBY G. SCAMMELL,<br><br>        Defendants. | Case No.: 1:25-cv-00117-FB-VMS<br><br>**AMENDED COMPLAINT** |

Plaintiff William Kolbert ("Plaintiff"), by and through his attorneys, Petroff Amshen LLP, as and for his complaint against the defendants named herein (collectively, "Defendants"), hereby alleges the following upon personal knowledge, review of public record, and/or otherwise upon information and belief:

1. Plaintiff, a licensed Certified Public Accountant ("CPA") since 1983, has provided professional accounting and tax preparation services for individuals, businesses, and trust entities for more than 40 years. Despite dedicating his life and career to helping others maintain their finances, while also carefully and diligently maintaining his own, Plaintiff has fallen victim to financial fraud and identity theft facilitated and perpetrated by the Defendants, who operated a widespread criminal enterprise that started during the COVID-19 pandemic.

2. This case arises from a massive scheme to exploit the federal Paycheck Protection Program ("PPP") during the COVID-19 pandemic. Defendants, acting in concert as an association-in-fact enterprise, solicited, facilitated, approved, and funded hundreds of thousands of fraudulent

or suspect PPP loans, including a fraudulent $18,803 PPP loan taken out in Plaintiff's name without his knowledge or authorization (the "Fraudulent PPP Loan"). As a direct result of Defendants' willful and reckless actions, Plaintiff was wrongly treated as a PPP debtor, and the U.S. Treasury garnished a portion of his Social Security benefits to repay a loan he never received.

3.    In 2021, Defendants' joint loan solicitation and processing platform ("PPP Fast Lane") enabled the Fraudulent PPP Loan to be taken out using Plaintiff's identity and personal identifying information. The Fraudulent PPP Loan was obtained through the creation of a sham limited liability company by an unknown perpetrator, and was funded by Benworth Capital Partners LLC ("Benworth FL") in Plaintiff's name. Defendants' enterprise in the operation of the PPP Fast Lane platform, and their quest to capture loan processing fees paid by the government through an astonishingly high-volume lending operation, enabled this Fraudulent PPP Loan and caused significant damages to Plaintiff. In order to maximize loan volume and associated fees, Defendants touted the PPP Fast Lane Platform as a quick, efficient way for borrowers to get pandemic relief loans, while deliberately failing to implement basic fraud controls.

4.    Through this enterprise, Defendants quickly sourced, facilitated, and funded a staggering number of PPP loans. Between February 2021 and May 2021 alone, Benworth FL and its co-conspirator Oto Analytics, LLC f/k/a Oto Analytics, Inc., d/b/a Womply ("Womply") processed and funded over 300,000 PPP loans, totaling approximately $4.3 billion.

5.    This enterprise generated windfall profits of over $680,000,000 in Small Business Administration ("SBA") processing fees for Benworth FL that, shockingly, were intended to be shared with Womply, a self-proclaimed "technology-service provider" that was unlicensed to provide lender services.

6.     Defendants knew that their lax approach was enabling and encouraging large-scale fraud. In fact, internal communications obtained by a House Subcommittee showed that Womply was aware it had become a "top target for fraud" by criminals exploiting the PPP Fast Lane. Indeed, fraudsters *specifically* identified Womply's platform and Benworth FL's lending operation as an easy way to get fraudulent PPP loans "without much scrutiny," including by using stolen identities like Plaintiff's. Defendants counted on this, as it was a necessary component of their fraudulent enterprise.

7.     As a result of Defendants' knowing and willful conduct in furtherance of this fraudulent PPP scheme, Plaintiff has suffered severe harm to his finances and reputation. The United States Treasury, unaware of the illicit nature of the Fraudulent PPP Loan, garnished $476.57 from Plaintiff's Social Security retirement benefits ("SSR") to recoup a "delinquent" PPP debt attributed to him. Plaintiff spent significant time and resources to clear his name, including filing identity theft reports and this lawsuit, and suffered considerable distress and reputational damage from being falsely associated with a defaulted SBA loan. Although the SBA eventually opened an investigation and paused further collection efforts on Plaintiff's account, Plaintiff remains exposed to ongoing uncertainty, and must obtain judicial relief to finally untether him from the Fraudulent PPP Loan, and restore his good reputation.

8.     Plaintiff brings this action against Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), for conducting and conspiring to conduct the affairs of a fraudulent enterprise (the "PPP Fraud Enterprise"), through a pattern of racketeering activity involving crimes of fraud and identity theft.

9.     Plaintiff was an innocent and foreseeable victim of Defendants' PPP Fraud Enterprise. Far from being a mere collateral casualty, Plaintiff was among countless victims

3

deliberately targeted by the scheme, many of which are still unaware of the crimes perpetrated against them.

10.     By facilitating identity theft, and actually using stolen identities to obtain and fund fraudulent loans, the Defendants' PPP Fraud Enterprise profited handsomely. At the same time, the innocent victims were left to face collections, garnishments, and an uphill battle to unravel the injustice levied upon them as a result of Defendants' relentless pursuit of "a quick buck."

## PARTIES

11.     Plaintiff is an individual and resident of the State of New York, County of Nassau, residing at 4 Donald Drive, Syosset, New York 11791 ("Plaintiff's Residence"). Plaintiff is a licensed CPA who has provided professional accounting and tax services for over 40 years.

12.     Benworth FL is a limited liability company organized under the laws of the State of Florida, with a principal business address of 700 Biltmore Way, Suite C-1, Coral Gables, Florida 33134. Benworth FL is a non-bank financial institution that engaged in lending and loan servicing, and was approved by the SBA as a PPP lender during the pandemic. Benworth FL funded hundreds of thousands of PPP loans nationwide, including the Fraudulent PPP Loan.

13.     Benworth Capital Partners PR LLC ("Benworth PR") is a limited liability company organized under the laws of Puerto Rico, with a principal business address of 221 Avenida Ponce De Leon, Suite 1401, San Juan, Puerto Rico 00917, and registered agent for service c/o Alfred F. Andreu, 700 Biltmore Way, Suite C-1, Coral Gables, Florida 33134. Upon information and belief, Benworth PR was formed in June 2021, immediately after the PPP program ended. Upon further information and belief, Benworth PR is co-owned by Bernardo Navarro and Claudia Navarro.

14.     Benworth PR was a participant in the RICO enterprise, including being used as a shell company to receive and shelter assets transferred from Benworth FL in furtherance of the

PPP Fraud Enterprise. More specifically, Benworth PR was created and used to shield PPP loan proceeds and revenue from creditors and victims, keeping the enterprise going and generating profit for its principals. Multiple lawsuits have alleged that Benworth FL fraudulently transferred assets to Benworth PR to frustrate recovery by those injured by the PPP Fraud Enterprise.

15.     Benworth Financial LLC ("Benworth Financial") is a limited liability company organized under the laws of the State of Florida, with a principal business address of 700 Biltmore Way, Suite C-1, Coral Gables, Florida 33134. Upon information and belief, Benworth Financial is an affiliate and co-conspirator of Benworth FL, operated by Bernardo Navarro.

16.     Benworth Financial is a licensed consumer finance company in the State of Florida, which allows it to solicit, make, and collect loans to consumers. Benworth Financial was an integral and indispensable part of the overall PPP Fraud Enterprise, and furthered the efforts of the enterprise by sharing offices, management, and resources with Benworth FL, and by receiving income traceable to profits, including from PPP loans, generated by the PPP Fraud Enterprise.

17.     Together, Benworth FL, Benworth PR, and Benworth Financial shall be referred to as the "Benworth Entities."

18.     Bernardo Navarro a/k/a Bernardo E. Navarro ("Mr. Navarro") is an individual and resident of Florida and Puerto Rico. Mr. Navarro is the principal and alter ego of the Benworth Entities. At all relevant times, Mr. Navarro was the sole member and manager of Benworth FL and Benworth Financial, and a managing member of Benworth PR, who exercised dominion and control over these entities and directed their policies.

19.     At all relevant times, Mr. Navarro personally oversaw Benworth FL's high-volume lending operation, and coordinated with Womply's principals to recruit and coordinate a network of "runners" who assisted the enterprise in its aggressive advertising and marketing campaign

5

designed to exploit the PPP program, identity theft victims like Plaintiff, and unsuspecting consumers nationwide, to generate maximum profits for the PPP Fraud Enterprise. As such, Mr. Navarro was a key participant in the PPP Fraud Enterprise, who also benefited personally from the scheme, including via distributions of PPP-generated revenue and fraudulent transfers of assets to himself or entities under his control.

20.    Claudia Navarro a/k/a Claudia Pezzia Navarro ("Mrs. Navarro") is an individual and resident of Florida and Puerto Rico. Mrs. Navarro is the wife of Mr. Navarro and, upon information and belief, an owner and/or member of Benworth PR, who has also held herself out as a principal of the Benworth Entities. Mrs. Navarro received, continues to receive, controlled, and/or continues to control assets derived from the PPP Fraud Enterprise, and participated in fraudulent transfers of assets described herein.

21.    The Benworth Entities all operate under the ownership and control of Mr. Navarro and/or Mrs. Navarro (collectively, the "Navarros"), and/or other business entities they also own and control.

22.    Womply is a limited liability company organized under the laws of the State of Delaware, with a registered agent for service c/o The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801. Womply is a "technology service provider" ("TSP") founded by Toby Scammell a/k/a Toby G. Scammell ("Scammell"). In early 2021, Womply's online platform, PPP Fast Lane, was launched to solicit, attract, and pre-process PPP loan applications from the public. Womply was a crucial and universally accessible "portal" through which hundreds of thousands of PPP loan applications were funneled to the Benworth Entities.

23.    Although Womply initially only acted as a referral service to lenders, and later rebranded itself as a TSP, a Congressional investigation conducted in 2022 concluded that Womply functioned as a de facto "Lender Service Provider" ("LSP").  Unlicensed to act as an LSP, and therefore evading SBA oversight and regulation, through its PPP Fast Lane service, Womply illegally performed LSP functions. These functions purportedly included reviewing borrower eligibility, performing automated underwriting, and making referrals to partner lenders for loan funding, including the Fraudulent PPP Loan. Thus, Womply entered into agreements with lenders like Benworth FL, in which Womply received a share of the lender's processing fees for each loan processed, in order to obfuscate, avoid, and conceal the illegal, improper, and unauthorized fee-sharing.

24.    Womply's aggressive expansion and willful lack of fraud controls invited rampant abuse of its system, leading to Womply being sued by, among others, the Federal Trade Commission ("FTC") for misrepresentations in its PPP marketing and advertising promotions. In a page out of the organized crime playbook, Womply, being deprived of its ill-gotten gains procured by its participation in the PPP Fraud Enterprise, is now suing the Benworth Entities for breaching their  seemingly legitimate written "contract," which was nothing more than a front for the enterprise's illegal conduct.

25.    Scammell is an individual and resident of the State of Nevada. As founder and CEO of Womply, Scammell exercised ownership, dominion, and control over the company, personally spearheaded Womply's PPP Fast Lane initiative, and was deeply involved in all aspects of Womply's operations at all relevant times, including decisions regarding Womply's knowingly deficient fraud screening processes. At all relevant times, Scammell acted as Womply's alter ego and for his own gain.

26.     In 2012, Scammell was permanently barred from participating in the securities industry for engaging in unlawful insider trading.  In a parallel criminal case in 2014, Scammell pleaded guilty to engaging in a fraudulent scheme to defraud investors, for which he served prison time.  Accordingly, Scammell's criminal history of fraud should have barred Womply from performing LSP-related services, or any involvement with the SBA's PPP program. Instead, Scammell used Womply and its "TSP" self-designation as a shield and cover to also defraud the government and general public.

27.     Summary of Defendants' Roles:

a.  **The Benworth Enterprise**: The Benworth Entities, acting under the ownership, direction, and control of the Navarros as principals, collectively operated the lending side of the scheme by contributing their legitimate lending and servicing businesses as a front for the PPP Fraud Enterprise, supplying the PPP loan funds that were advanced to Benworth FL from the Federal Reserve's Paycheck Protection Program Liquidity Facility ("PPPLF"), and ultimately pressing the "approve" button; and then transferring assets, resources, employees, and operations including servicing between the Benworth Entities, in order to continue profiting from the fraudulent scheme, while also shielding assets and profits of the enterprise from detection or collection.

b.  **The Womply Enterprise**: Womply, acting under the ownership, direction, and control of Scammell as principal, operated the intake side of the scheme using "runners" referred to as "referral partners" including social media influencers, who sourced and loan applicants (including fraudulently stolen identities) through aggressive marketing and advertising campaigns, and directing them to the PPP Fast Lane platform, which funneled applicants (including fraudulent ones) to Benworth FL for funding.

c.  With a sole focus on maximizing their illegal profits and lining their pockets with fees paid by the government for the origination, servicing, and funding of PPP loans, Defendants all joined forces to create the larger PPP Fraud Enterprise that dramatically increased PPP loan volume, at the expense of basic due diligence and truthful dealing. In a classic sense of "one hand washes the other," each Defendant benefited from the scheme through the illegal, improper, and unlawful fee-sharing, and each contributed to the lax controls and fraudulent processes that caused Plaintiff's injury.

## **JURISDICTION**

28.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under federal law, specifically RICO, 18 U.S.C. §§ 1961-1968.

29.    The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy. The declaratory relief requested also arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

30.    Defendants are all subject to personal jurisdiction in New York. Benworth FL was an approved PPP lender that purposefully directed its lending activities nationwide, including to New York residents like Plaintiff.

31.    Benworth FL and its affiliates including the Benworth Entities also purposefully availed themselves of U.S. federal programs and the banking system to process, distribute, and service PPP loans across state lines, including but not limited to loans involving New York borrowers.

32.    Womply and Scammell likewise solicited and processed PPP loan applications from consumers nationwide via an online platform accessible in New York. Further, Womply and

Scammell used extensive advertisements placed on buses operated by the New York State Metro Transit Authority ("MTA") throughout New York City.

33.    Additionally, as described herein, all Defendants participated in a common enterprise whose fraudulent acts caused foreseeable injury to Plaintiff in New York.

34.    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

35.    Plaintiff is a resident of Nassau County, New York, and he suffered financial harm in this District as a result of the Fraudulent PPP Loan. Additionally, one or more Defendants transacted business or committed acts in this District related to the claims, including but not limited to advertising, processing, and funding numerous PPP loans for New York applicants.

36.    Venue is also proper under 18 U.S.C. § 1965(a) because Defendants conducted activities affecting interstate commerce in this District.

### STATEMENT OF FACTS

**The Paycheck Protection Program and Defendants' High Volume Loan Scheme**

37.    In March 2020, in response to the COVID-19 crisis, Congress enacted the CARES Act, which established the PPP to provide forgivable loans to small businesses and self-employed individuals impacted by the pandemic. The PPP made over $950 billion available, administered by the SBA and funded by the Treasury, with private lenders originating the loans. PPP loans carried a 100% federal guarantee and were forgivable if used for qualifying expenses.

38.    Lenders, such as the Benworth Entities, received substantial government-paid processing fees for each PPP loan, ranging from 1-5% of the loan principal. Notably, smaller loans

10

yielded a higher percentage of  fees. PPP lending began in early April 2020, and proceeded in phases until the program closed on May 31, 2021.

39.     Benworth FL was approved by the SBA as a PPP lender in 2020. Although a relatively small-scale lender before 2020, Benworth FL seized on PPP as a lucrative opportunity to misappropriate fees paid by the government for each PPP loan. Thus, the more loans Benworth FL funds, the more money they make.

40.     Benworth FL had the "golden goose" – access to the Federal Reserve's PPPLF to fund loans; however, they needed the loan volume, technology, servicing, and approval mechanisms to move loans from origination to funding. Enter: the Womply Enterprise.

41.     Benworth FL, with the help, guidance, encouragement, and software of Womply, dramatically expanded its loan volume. According to one lawsuit, Benworth FL ultimately processed more than 305,000 PPP loans totaling over $4 billion in loan volume, which generated over $680 million in revenue for Benworth FL. The vast majority of the loan volume was generated in just the final few months of the PPP through Benworth FL's collaboration with Womply. Through the operation of the overall PPP Fraud Enterprise, Benworth FL's PPP lending operation became *national* in scope. It was no longer limited to Florida, but also extended to borrowers, fraudsters, and identity thieves across the country, including in New York.

42.     Womply entered the PPP arena in early 2021. Before that, Womply positioned itself as a tech company offering small business marketing and financial tools. In February 2021, as the second round of PPP was launched, Womply rolled out its PPP Fast Lane, a web-based application portal targeting sole proprietors, independent contractors, and small businesses who needed help accessing PPP funds.

11

43. Womply relentlessly advertised that if qualified consumers applied through PPP Fast Lane, they "would receive loan funds," emphasizing speed and ease. Womply blitzed social media and the internet with ads promising "faster" and "better" loan processing, and urging people to apply quickly before funds ran out. As a result, by the FTC's count, over 3.25 million people initiated PPP applications via Womply.

44. Womply's platform promised more than just data collection. Womply took on the responsibility, duty, and the obligation to perform up-front eligibility screening and fraud checks (to the extent any were done) on each loan. Once this purported up-front eligibility screening was done, the applications were passed on to partner lenders like Benworth FL for funding.

45. Womply acted as a high-volume PPP LSP, except it operated outside the normal LSP regulatory framework because it was never approved, licensed, or authorized by the SBA to perform these services.

46. Womply's key lender partner was Benworth FL. Starting in February 2021, Womply funneled an inconceivably large number of applications to Benworth FL, which relied on Womply to handle the initial vetting. In March 2021 alone, Womply referred 889,275 applications to lenders. By program's end, Womply had sent 70% of the 3.7 million PPP Fast Lane applications to lenders after its pre-qualification process – a staggering throughput. Benworth FL received a large share of these referrals, rapidly making it one of the highest-volume PPP lenders in the nation.

47. Critically, both Womply and Benworth FL had strong financial incentives to maximize loan volume. Each PPP-funded loan fueled the PPP Fraud Enterprise through government-paid processing fees: for Benworth FL, an origination fee from the SBA, in some instances as high as 5% of the loan amount for loans under $50,000; and for Womply, a referral fee, kickback, and revenue-sharing of fees with the lender that funded the loan. The more loans

12

that were approved and funded—even fraudulent or duplicative loans—the more money the enterprise stood to make.

48.    Internal communications and subsequent investigations have shown that this profit motive led to willful blindness and grossly inadequate fraud prevention. The PPP Fraud Enterprise prioritized speed over accuracy. Legitimate applicants who required extra verification or support were often neglected or delayed by Womply, while fraudulent applications sailed through due to automated processes and superficial checks.

49.    In the words of the FTC, Womply's customer support and fraud resolution channels were "useless for thousands of consumers," and technical glitches went unfixed, resulting in many eligible borrowers never receiving funds.

50.    Fraudsters quickly took notice. A report by the U.S. House Select Subcommittee on the Coronavirus Crisis (the "House Subcommittee") found that individuals seeking to defraud PPP "identified … Womply as [a platform] with lower fraud risk controls that [was] letting a lot more fraud go through," and that Womply internally knew it was being heavily targeted. One criminal enterprise in Florida, for example, stole identities to apply for PPP loans via Womply, successfully obtaining funds that were then used to buy guns and drugs.

51.    Police reports confirmed that these gang members chose Womply because it was "easy" to get loans "without much scrutiny." This was not an isolated incident – it was emblematic of a broader phenomenon. By mid-2021, government oversight bodies were sounding the alarm that fintech-linked PPP loans had far higher rates of fraud.

52.    The House Subcommittee concluded that Womply's failure to implement robust compliance procedures, despite handling millions of applications, contributed to the "widespread fraud" in the program.

53.    As is common among criminal enterprises fighting for their share of ill-gotten bounty, when questioned by the House Subcommittee, the Benworth FL and Womply blamed each other for the fraudulent loans. Womply has publicly asserted that lenders like Benworth FL were responsible for final underwriting and bore the blame for approving bad loans. Benworth FL, in turn, has downplayed its role, suggesting it merely funded loans that SBA's system green-lighted after receiving a referral from Womply, and that unknown third parties duped everyone.

54.    Both Womply and Benworth FL, together with their principals, shared responsibility: even as red flags mounted, *neither* implemented the minimum safeguards one would expect for a program of this magnitude. They had a "meeting of the minds" to aggressively push loans through and "ignore the alarm bells," because doing so served their financial interests to the tune of hundreds of millions of dollars.

55.    Notably, lenders must adhere to Bank Secrecy Act ("BSA") and anti-fraud rules during PPP lending. This included Know Your Customer ("KYC") procedures and fraud screening, especially for new customers. Benworth FL and Womply either outsourced these obligations to the automated PPP Fast Lane system, or neglected them entirely.

56.    Because the fees on PPP loans were paid by the government, and not the individual borrowers, Womply and Benworth FL could easily rubber stamp and fund fraudulent applications, while still collecting the associated fees, all with no recourse.

57.    Consequently, many of the PPP loans processed and referred by Womply, and originated by Benworth FL, were made to bogus borrowers or synthetic identities. According to the House Subcommittee, multiple high-volume PPP lenders "relied on Womply to review PPP applications for eligibility and potential fraud, even though the fintech lacked prior experience …

14

[in] large scale financial crime compliance or creating scalable automated fraud prevention technology."

58.    In other words, to monetize on the national disaster and capture as many government-paid fees as possible, Benworth FL, intentionally, knowingly, and without regard for foreseeable consequences, abdicated critical oversight to Womply – a company ill-equipped (and apparently disinclined) to catch fraud at the volume it generated. This systemic failure set the stage for Plaintiff's injury.

## The Fraudulent PPP Loan

59.    In response to Plaintiff's request for additional information regarding the reduction in his SSR through the Treasury Offset Program ("TOP"), by letter dated September 25, 2024, addressed to Plaintiff's Residence, the Social Security Administration (the "SSA") enclosed a copy of a letter dated September 18, 2024, from the U.S. Department of the Treasury, Bureau of the Fiscal Service (the "Treasury Dept. Letter"). A true and correct copy of the Treasury Dept. Letter, with SSA cover letter dated September 25, 2024, is annexed hereto as **Exhibit A**.

60.    The Treasury Dept. Letter, which Plaintiff had not received from the Treasury Department, was addressed to Plaintiff at 15614 80TH ST # 2, HOWARD BEACH, NY 11414-2503 (the "Howard Beach Address").

61.    Notably, the Howard Beach Address is in Queens County, and is not Plaintiff's Residence (which is located in Nassau County):

U.S. Department of the Treasury
Bureau of the Fiscal Service
P.O. Box 1686
Birmingham, AL 35201-1686



PLEASE RETAIN FOR YOUR RECORDS

09/18/24

    WILLIAM KOLBERT
15614 80TH ST # 2
HOWARD BEACH, NY 11414-2503

*See* Ex. A.

15

62.     The Treasury Dept. Letter advised that it applied "all or part" of Plaintiff's SSR payment to a "delinquent debt" categorized as a "Non-Tax Federal Debt," which Plaintiff purportedly owed to the SBA:



**What Happened to My Payment?**

The U.S. Department of the Treasury, Bureau of the Fiscal Service (Fiscal Service), applied all or part of your payment to delinquent debt that you owe. This action is authorized by federal law. Below is your payment information:

Payment From: Social Security Administration
Payee Name: WILLIAM KOLBERT
Original Payment Amount: $3177.10
Payee TIN (Last Four): 7591
Beneficiary TIN (Last Four): 7591

Payment Date: 09/18/24
Payment Type: EFT
Claim Account Number: ▮

**Who Do I Owe?**

We applied your payment to debt that you owe to the following agency:

Small Business Administration
409 3RD ST SW
WASHINGTON    DC  20416

TOP Trace Number: ▮7884
Account #: ▮0001
Applied To This Debt: $476.57
Type of Debt: Non-Tax Federal Debt

*See* Ex. A.

63.     Plaintiff does not reside at the Howard Beach Address, and he does not receive mail there. Plaintiff has not lived, or received mail, in Queens County, or at any address outside of Nassau County, in over 30 years.

64.     Accordingly, Plaintiff did not receive the Treasury Dept. Letter – or any other notices regarding the purported "delinquent debt" owed to the SBA – that were mailed to the Howard Beach Address, which is nearly 30 miles from Plaintiff's Residence.

65.     Using the limited information provided in the Treasury Dept. Letter, Plaintiff subsequently conducted internet searches to determine the source of the purported debt. A true and correct copy of the internet research search results Plaintiff obtained regarding the purported SBA debt is annexed hereto as **Exhibit B**.

66.     As a result of this research, upon information and belief, the source of the purported debt is the Fraudulent PPP Loan originated by Benworth FL on or about May 2, 2021, in the amount of $18,803.00:

16

Loan Detail

| | |
|---|---|
| Loan Number | ████8905 |
| Date Approved | May 2, 2021 |
| Loan Status | Charged Off |
| Loan Status Date | Aug. 10, 2023 |
| Term | 33 Months |
| Lender | Benworth Capital |
| Initial Approval Amount | 18,803.00 |
| Current Approval Amount | 18,803.00 |
| Payroll Proceed | 18,803.00 |

*See* Ex. B.

67. Plaintiff has never requested or applied for a loan of any kind with any of the Defendants.

68. Plaintiff did not request, apply for, or authorize the Fraudulent PPP Loan, he had no prior knowledge of its existence, and he did not receive or benefit from any proceeds of the Fraudulent PPP Loan.

69. Plaintiff also did not request, apply for, or authorize the Fraudulent PPP Loan on behalf of any business entity under his ownership, control, or authority to operate in his name ("Authorized Business Entities"); nor did he authorize any other individual to submit an application to, or obtain a loan from, any of the Defendants on his behalf, or on behalf of any Authorized Business Entities.

70. None of the proceeds of the Fraudulent PPP Loan were received or used by, or for the benefit of, Plaintiff, or any Authorized Business Entities.

71. Upon information and belief, the Fraudulent PPP Loan was obtained through a single member LLC fraudulently created in Plaintiff's name, and without Plaintiff's knowledge or authorization (the "Fraudulent LLC"). *See* Ex. B. Notably, it appears the perpetrator(s) used the

17

Howard Beach Address for the Fraudulent PPP Loan and/or the Fraudulent LLC, knowing Plaintiff would never receive mail sent to that address:

Business Detail

| | |
|---|---|
| Name | WILLIAM KOLBERT |
| Address | 15614 80th St # 2 |
| City | Howard Beach |
| State | New York |
| ZIP Code | 11414-2503 |
| Rural/Urban | Urban |
| Hubzone | No |
| Labor Market Information (LMI) | No |
| Business Age Description | Existing or more than 2 years old |
| Jobs Reported | 1 |

| | |
|---|---|
| NAICS | 621511: Medical Laboratories |
| Business Type | Single Member LLC |
| Race/Ethnicity | Unanswered |
| Gender | Unanswered |
| Veteran | Unanswered |

72.     It also appears the business industry classification for the Fraudulent LLC was listed under NAICS code 621511,[1] used for "Medical Laboratories." *See* Ex. B.

73.     Plaintiff is not in or associated with the medical industry, and he has never created or authorized a business entity in his name or under his control that could be classified as a "medical laboratory."

74.     Plaintiff had no prior knowledge of the Fraudulent LLC's existence, he did not create or authorize the creation of the Fraudulent LLC, and he did not use the Howard Beach Address for any purpose in or around May of 2021. To date, Plaintiff has no additional knowledge or information regarding the Fraudulent LLC.

---

[1] Upon information and belief, the North American Industry Classification System ("NAICS") "was developed . . . as the standard for use by Federal statistical agencies in classifying business establishments for the collection, tabulation, presentation, and analysis of statistical data describing the U.S. economy." "There is no central government agency with the role of assigning, monitoring, or approving NAICS codes for establishments. . . . The U.S. Census Bureau has no formal role as an arbitrator of NAICS classification. . . . Generally, the U.S. Census Bureau's NAICS classification codes are derived from information that the business establishment provided on surveys, census forms, or administrative records." Source: U.S. CENSUS BUREAU, NORTH AMERICAN INDUSTRY CLASSIFICATION SYSTEM (NAICS), "Frequently Asked Questions," https://www.census.gov/naics/#q1 (Last accessed Dec. 17, 2024).

18

**Plaintiff Reports Identity Theft**

75.     Plaintiff does not know who obtained the Fraudulent PPP Loan or created the Fraudulent LLC in his name, or how the perpetrator(s) obtained his personal identifying information to do so.

76.     Plaintiff has not provided this information to any other individual, or authorized any other individual to use such information for the purpose of creating an LLC or applying for a loan with any of the Defendants.

77.     Plaintiff also does not know how the Fraudulent PPP Loan became associated with him personally, such that his SSR benefits could be subject to TOP offset for its repayment, as it has never appeared on any of Plaintiff's credit reports over the last several years, nor does it appear on Plaintiff's credit report to date.

78.     Plaintiff never received any information, correspondence, or notices from any of the Defendants regarding the Fraudulent PPP Loan.

79.     Plaintiff also never received any information, correspondence, or notices of any kind regarding the Fraudulent LLC.

80.     Before obtaining a copy of the Treasury Dept. Letter from the SSA on or about September 25, 2024, Plaintiff never received any information, correspondence, or notices from the SBA, Treasury Department, SSA, or any other government agency regarding the Fraudulent PPP Loan and purported "delinquent debt," and he was therefore deprived of any opportunity to dispute the debt before the TOP offset was implemented and his SSR benefits were garnished.

81.     Upon information and belief, any information, correspondence, or notices regarding the Fraudulent PPP Loan and/or the Fraudulent LLC, if they were sent, were mailed to the Howard Beach Address. Accordingly, Plaintiff did not receive them.

19

82.     On September 30, 2024, Plaintiff filed an Identity Theft Report with the FTC, under FTC Report Number 178185118 (the "FTC Report").

83.     Also on September 30, 2024, Plaintiff completed a "Declaration of Identity Theft," which he submitted to the SBA with a copy of the FTC Report and his New York State driver's license (collectively, the "ID Theft Packet"). True and correct copies of Plaintiff's email to the SBA dated September 30, 2024, submitting the ID Theft Packet for review, along with the completed ID Theft Packet attached to the email, are annexed collectively hereto as **Exhibit C**.

84.     On October 11, 2024, the SBA confirmed receipt of Plaintiff's email and ID Theft Packet, and advised that it "will refer [Plaintiff's] ID Theft complaint to SBA's Office of Inspector General for investigation," while noting:

> SBA does not have the regulatory authority to adjudicate fraud allegations. SBA will not provide information regarding the status of any possible criminal investigations being conducted by SBA's Office of Inspector General or other law enforcement agencies in connection to your case. SBA is also unable to release any documents related to an ongoing criminal investigation.

A true and correct copy of the SBA acknowledgment email dated October 11, 2024, is annexed hereto as **Exhibit D**.

85.     Accordingly, Plaintiff has no knowledge or information regarding any criminal investigation into the Fraudulent PPP Loan or the Fraudulent LLC, or whether any such criminal investigation is being conducted.

86.     The SBA has also not released or disclosed any additional information to Plaintiff regarding the Fraudulent PPP Loan or the Fraudulent LLC, to the extent any such information is in the SBA's possession.

87.     Beyond the monetary loss, Plaintiff has suffered significant anxiety and reputational harm. As a CPA, Plaintiff's reputation for integrity in financial matters is paramount. The existence of a federal loan default under his name is a blight on his licensure.

88.     Plaintiff also experienced the hardship of a reduced SSR payment; money he relies on for basic living expenses. He has had to expend time and money on legal counsel. But for Defendants' willful, intentional, and fraudulent conduct, Plaintiff would not have been entangled in this nightmare.

89.     Plaintiff's plight was not a freakish accident; it was the natural and foreseeable consequence of Defendants' systemic failure to prevent PPP fraud, and deliberate scheme to monetize on the avalanche of fraudulent loans they were knowingly processing, approving, and funding. By early 2021, Womply and Benworth FL both *knew* scammers were widely using their platform, and that innocent people's identities were at risk.

90.     Despite their knowledge, the PPP Fraud Enterprise continued churning out loans at breakneck speed, demonstrating a brazen desire for the scheme's continuance. It was entirely foreseeable – indeed *known*, that if a loan was made using a stolen identity, the government would later seek to collect from the named individual, thereby directly harming that person.

91.     Plaintiff was an intended target of the Defendants' racketeering enterprise: the scheme relied on using unwitting individuals – whose identities had been stolen – as PPP loan "borrowers" to channel money to fraudsters, and millions of dollars in fees to the PPP Fraud Enterprise.

92.     In this way, Plaintiff himself was directly victimized by the PPP Fraud Enterprise; just as the government and the Federal Reserve Bank's lending facilities were also defrauded.

93.     In short, the PPP Fraud Enterprise enriched itself by facilitating loans to phantom borrowers. The true losers in the immediate sense were the U.S. Treasury (which paid out the loan and fees) and people like Plaintiff (whose identities and benefits were abused). Defendants, in furtherance of the enterprise, deliberately built the system that allowed the rogue actor to succeed.

**The Benworth Enterprise**

94.     Upon information and belief, Benworth FL is a Florida-based hard money lender that was initially established on or about April 1, 2008, as a Florida corporation called Benworth Capital Partners Incorporated, and it was subsequently converted to a Florida LLC on or about February 1, 2012.

95.     Benworth FL was a licensed mortgage lender/servicer in the State of Florida, operating under NMLS ID 374363, and License No. MLD359, issued on or about June 13, 2011. True and correct copies of the relevant Florida Department of State Filing Information for Benworth FL, and the NMLS Consumer Access database information for Benworth FL, as of December 26, 2024, are annexed collectively hereto as **Exhibit E**.

96.     The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), signed into law on March 27, 2020, was enacted to provide emergency assistance for individuals, families, and businesses affected by the coronavirus pandemic. Through the CARES Act, the SBA received funding and authority to establish the PPP as a new loan program, to assist small businesses adversely impacted by the pandemic. The PPP provided loans to small businesses to help them keep their workers on the payroll during the economic downturn caused by the pandemic.

97.     The PPPLF, implemented by the Federal Reserve to bolster the effectiveness of the SBA's PPP, extended credit to eligible financial institutions that originated PPP loans, taking the loans at face value as collateral.

98.     Upon information and belief, beginning in or about May 2020, Benworth FL was approved for PPPLF financing to fund PPP loans. Upon further information and belief, Benworth FL obtained this funding through credit advances drawn on PPPLF agreements with the Federal Reserve Bank of San Francisco (the "Federal Reserve Bank"), and subsequently defaulted on these

22

agreements due to fraud, insolvency, and other misconduct, which are currently the subject of a pending lawsuit by the Federal Reserve Bank discussed further below.

99.    Upon information and belief, Benworth FL received approximately $4.3 billion in advances from the Federal Reserve Bank under the PPPLF, which Benworth FL used to fund at least 300,000 PPP loans. Upon further information and belief, Benworth FL earned at least $680 million in fees, accrued interest, and other amounts from the loans in its PPP portfolio.

100.    Upon information and belief, on or about May 3, 2024, Benworth FL voluntarily surrendered its mortgage lender servicer license. *See* Ex. E.

101.    Benworth PR was formed in Puerto Rico on June 28, 2021, just shy of sixty days following origination of the Fraudulent PPP Loan. Upon information and belief, Mr. Navarro caused Benworth FL to transfer most or all of its assets, employees, and operations to Benworth PR, and Benworth PR is now operating as Benworth FL's alter ego.

102.    Benworth PR is a licensed mortgage lender/servicer in Puerto Rico and Florida, operating under NMLS ID 2234263, Florida License No. MLD2534 (issued on or about January 19, 2024), and Puerto Rico License No. IH-253 (issued on or about September 22, 2021). True and correct copies of the relevant Puerto Rico and Florida Department of State Filing Information for Benworth PR, and the NMLS Consumer Access database information for Benworth PR, as of December 26, 2024, are annexed collectively hereto as **Exhibit F**.

103.    Upon information and belief, pursuant to Loan Servicing Agreements ("LSAs") between Benworth FL and Benworth PR executed in 2021, all loan servicing functions for Benworth FL's PPP loan portfolio, which Benworth FL previously performed and received compensation for, have been delegated to Benworth PR.

23

104. Upon further information and belief, the LSAs were executed by Mr. Navarro on behalf of Benworth FL, and by Mrs. Navarro on behalf of Benworth PR; however, the first LSA Mrs. Navarro executed on Benworth PR's behalf – dated May 31, 2021 – was dated almost a month before Benworth PR was actually formed. *See* Ex. F.

105. According to Mr. Navarro's self-reported employment information appearing in the NMLS database, from April 2008-present, he has acted as President of Benworth FL; and from June 2021-present, he has acted as Director of Benworth PR. A true and correct copy of the NMLS Consumer Access database information for Mr. Navarro, as of December 26, 2024, is annexed hereto as **Exhibit G**.

106. Mr. Navarro holds mortgage loan originator licenses in Florida and Puerto Rico, through Benworth PR, issued on or about March 15, 2011 (License No. LO3865), and June 30, 2022 (License No. MLO-946), respectively. *See* Ex. G.

107. According to Mrs. Navarro's self-reported employment information appearing in the NMLS database, from April 2008-present, she has acted as Vice President of Benworth FL; and from June 2021-present, she has acted as President of Benworth PR. A true and correct copy of the NMLS Consumer Access database information for Mrs. Navarro, as of December 26, 2024, is annexed hereto as **Exhibit H**.

108. Mrs. Navarro holds mortgage loan originator licenses in Florida and Puerto Rico, through Benworth PR, issued on or about July 26, 2022 (License No. LO111219), and June 30, 2022 (License No. MLO-947), respectively. *See* Ex. H.

109. Benworth Financial was initially established on or about May 15, 2019, as a Florida limited liability company called Pay Advance USA, LLC. On or about July 2, 2019, Pay Advance USA, LLC changed its name to Benworth Financial.

24

110.    Upon information and belief, Mr. Navarro is the sole member and manager of Benworth Financial.

111.    Upon information and belief, the Benworth Entities all operate a shared website under the domain benworthcapital.com (the "Benworth Website").

112.    Upon information and belief, the Benworth Entities are each alter egos of one another, acting under the same ownership, management, and control.

113.    Upon further information and belief, the Benworth Entities are exclusively owned, managed, and controlled by the Navarros, who established Benworth PR and Benworth Financial as alter egos of Benworth FL in order to effectuate fraudulent transfers of Benworth FL's assets to Benworth PR, Benworth Financial, and themselves, in an attempt to shield those assets from collection as a result of illegal activities conducted by, or at the direction of, the Navarros, in furtherance of the Benworth Enterprise.

114.    Specifically, the "About" section of the Benworth Website refers generally to "Benworth Capital," without differentiating between Benworth FL and Benworth PR, stating:

> Headquartered in Coral Gables, Florida, we opened our doors in 2008, when many banks were closing theirs because of the global financial crisis. . . . Following our success in Florida, we opened an office in San Juan, Puerto Rico in 2021. . . .
>
> Currently, we finance property in Florida. It's the market we know best (and love). . . .
> Anyone (with cash) can fund a loan but we're different than a great uncle or the cash-rich entrepreneur down the street. Benworth Capital is licensed to lend. And that's a big deal, especially in Florida, because it's the law. It's an even bigger deal for borrowers because that means our borrowers are protected by U.S. regulations that oversee our industry.

*See* https://benworthcapital.com/about/ (emphasis added). A true and correct copy of the "About Us" page of the Benworth Website, as it appeared on December 26, 2024, is annexed hereto as **Exhibit I**.

25

115. While Benworth FL was formed in 2008, and is headquartered in Coral Gables, Florida, it voluntarily surrendered its Florida mortgage lender license on May 3, 2024. *See* Ex. E.

116. Benworth PR, which was formed in Puerto Rico thirteen years later in 2021, and is headquartered there, is currently licensed to lend in Florida. *See* Exs. E, F.

117. The bottom of the "About Us" page of the Benworth Website references both Benworth PR and Benworth Financial, noting that Benworth Financial is a "licensed Consumer Finance Company #CF9901387":

© 2024 Benworth Capital Partners PR LLC NMLS #2234263 ⌂ Equal Housing Lender. Benworth Financial, LLC is a licensed Consumer Finance Company #CF9901387.

Disclaimers: Benworth Capital Partners PR, LLC makes loans solely for business purposes (and not for personal or consumer use) and is exempt from licensing in all states in which it operates. Benworth Capital Partners PR, LLC does not lend on owner-occupied properties. Listed rates, terms, and conditions are offered only to qualified borrowers, may vary by loan product, deal structure, property type, or other applicable considerations, and are subject to change at any time without notice. Furthermore, any Letter of Intent issued by Benworth Capital Partners PR, LLC shall, at Benworth Capital Partners PR, LLC's discretion, be subject to revocation, modification and cancellation up and to the moment the transaction is completed. No information on this site is intended to, or shall, created a legally binding commitment or obligation on the part of Benworth Capital Partners PR, LLC, and all terms are expressly subject to Benworth Capital Partners PR, LLC's credit, legal, and investment approval process.

*See* Ex. I.

118. A consumer finance company license issued by the State of Florida "authorizes the holder to solicit, make and collect loans to consumers in this state [of Florida] for an amount not exceeding $25,000 at an interest rate greater than 18%. The license is not required for banks and certain other financial institutions doing business under state or federal laws." *See* https://flofr.gov/divisions-offices/division-of-consumer-finance/consumer-finance-companies.

119. Accordingly, upon information and belief, Benworth Financial is also licensed to lend in Florida, subject to certain restrictions.

### The Womply Enterprise

120. Womply is a self-proclaimed TSP formed on or about February 22, 2011, as a provider of marketing services and technology for small businesses.

121. Upon information and belief, Womply is not a bank, financial institution, or lender. Womply was never an SBA-authorized LSP. Accordingly, Womply was not authorized, permitted,

or allowed to share the processing fees paid by the government to lenders for the origination, processing, servicing, and funding of PPP loans.

122.    Beginning in or about April 2020, Womply acted as an unlicensed referral agent between PPP loan applicants and lenders, taking illegal kickbacks. Upon information and belief, Womply had no prior experience with, or involvement in, loan referrals or processing.

123.    Beginning in or about February 2021, Womply launched its "PPP Fast Lane" system, which it aggressively advertised and marketed both directly to consumers and small businesses, and through referral partners including social media influencers.

124.    Womply ads appearing on NYC buses advertised that applicants could "[g]et up to $50k in PPP," and urged them to "Apply now!," but noted that "Womply is not a lender":



125.    With PPP Fast Lane, in addition to referral services, Womply also purportedly offered marketing, technology, application review, eligibility verification, document analysis, fraud prevention, and other services to PPP lenders, including Benworth FL, to facilitate the processing and funding of PPP loans. Upon information and belief, Womply is not a licensed mortgage lender or loan provider in any state.

126.    Upon information and belief, in furtherance of its kickback scheme with Benworth FL to personally benefit from as many PPP loans as possible, with the highest profit from the illegal, improper, and unauthorized shared fees, together with other receivables, Womply overwhelmingly approved and referred fraudulent applications over legitimate and eligible applicants.

127.    Womply also induced its lending partners to fund as many PPP loans as possible, and penalized them if they did not fund enough in a certain time period. Specifically:

> Agreements between Womply and its lending partners . . . reveal that Womply often took at least half—and in some cases up to 90 percent—of all the taxpayer-funded fees allocated to lenders by SBA to compensate it for processing PPP loans. Under these agreements, Womply was entitled to fees both for referring applicants to PPP lenders and for providing its PPP Fast Lane pre-qualification review, eligibility verification, and fraud detection services. . . . Additionally, multiple Womply contracts contain provisions that imposed "Under-Funding Fees" that required lenders to pay Womply additional funds as a penalty for failing to fund a certain value of PPP loans in a calendar week.

*See* Ex. L (below) at 47.

128.    "[T]he vast majority of [Womply's] revenue—$1.9 billion in 2021—was 'PPP Technology Service Revenue' from the PPP Fast Lane." *See* Ex. L at 47.

129.    Womply and its CEO, Scammell, were aware of rampant fraud in the applications they were processing, that Womply's technology platform and processing services were incapable of and failed to detect fraud and identity theft in applications Womply reviewed, and that Womply was specifically targeted by criminal gangs and fraudsters seeking easy access to PPP loans; and continued knowingly approving and referring fraudulent applications for PPP funding in order to collect the substantial fees Womply was allotted under its fee agreements.

130.    On March 18, 2024, the FTC filed a complaint against Womply and Scammell, in the United States District Court for the Northern District of California, under Case No. 3:24-cv-

28

01661, titled *Federal Trade Commission v. Oto Analytics, Inc., et al.* (the "FTC Lawsuit"). *See* FTC Lawsuit, Complaint, a true and correct copy of which is annexed hereto as **Exhibit J**.

131.    Womply and Scammell each made deceptive claims to consumers and engaged in deceptive practices "in or affecting commerce . . . associated with . . . a government benefit," that violated the FTC Act and the COVID-19 Consumer Protection Act. *See id.*

132.    Specifically, the FTC Lawsuit alleges that Womply "advertised, marketed, or distributed PPP financing services to small business consumers throughout the United States," that Scammell "formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Womply, including the acts and practices described in this Complaint," and that Scammell also "managed the day-to-day business of Womply for years and has knowledge of and involvement in the company's advertising, marketing, and provision of PPP financing services to small business consumers." *See* Ex. J, FTC Lawsuit, Complaint at 3-4.

133.    The FTC Lawsuit alleges in detail Scammell's direct role in Womply's violation of consumer protection laws and deceptive practices associated with the PPP:

> Defendant Scammell controlled and directly participated in Womply's advertising and marketing of its PPP loan services. Throughout the duration of PPP Fast Lane, he frequently sent and received messages regarding the marketing of Womply's services. Defendant Scammell reviewed and provided feedback on draft marketing emails to consumers and content on Womply's website, and he wrote and edited language to be used in Womply's advertising. . . .
> Despite being flooded with customer service requests and complaints about stalled applications, Defendants consistently increased their spending on advertisements in order to increase traffic to PPP Fast Lane throughout at least April 2021. Defendants also used referral programs to generate new PPP loan applications, offering what Defendant Scammell called "aggressive rewards" to those who referred new applicants, and using "very strict time bound campaigns to drive urgency and capture attention." In addition to Womply's own customers who could be paid hundreds of dollars for referring their friends and family to PPP Fast Lane, Defendants sought out accountants, as well as gig companies and social media influencers popular with gig workers, to refer their clients, workers, and audience.

*See* Ex. J, FTC Lawsuit, Complaint at 14-15.

29

134.    "Between at least February 2021 and May 2021, Defendants [Womply and Scammell] disseminated advertisements for PPP loans, or otherwise made statements to consumers, that claimed consumers who qualified for PPP loans would receive loan funds if they applied with Womply." *See* Ex. J, FTC Lawsuit, Complaint at 5.

135.    Womply and Scammell "also made these claims in advertisements on social media" in sponsored posts:



*See* Ex. J, FTC Lawsuit, Complaint at 6-9.

136.    While Womply implemented an aggressive marketing campaign targeting consumers and small businesses to apply for loans through PPP Fast Lane, promising "faster" and "better" processing, and high-level customer service and support, its "customer support channels were useless for thousands of consumers seeking assistance with their applications." *See* Ex. J, FTC Lawsuit, Complaint at 5-10.

137.    The FTC Lawsuit further notes:

Despite Defendants' promises that small business consumers would get PPP loan funds if they applied with Womply, of more than 3.25 million PPP loan applications initiated by consumers, Defendants failed to achieve funding for more than 1.99 million of them (61%). Many of the consumers who never received funding were eligible for PPP loans, but Defendants failed to fix known technical issues with their system or otherwise provide the assistance necessary to process consumers' applications.

*See* Ex. J, FTC Lawsuit, Complaint at 10.

138.    The FTC's allegations also highlight Womply's disfavor of legitimate PPP applicants who required more hand-holding and effort than fraudulent applicants:

Because of the time-sensitive nature of the PPP and its limited funding, speedy application processing was critical for consumers. . . . [E]ven to the extent consumers did ultimately obtain PPP loans through Womply, in numerous instances Defendants' delays in processing their applications deprived struggling small business consumers of emergency funds they needed immediately.

Concerned applicants also contacted Womply when they had not heard about their applications within 24 hours as promised. . . . Consumers complained to Womply after not hearing anything about their applications for more than twenty-four hours, only to find when they logged into Womply's portal that their applications had been cancelled.

*See* Ex. J, FTC Lawsuit, Complaint at 13.

139.    Upon information and belief, some Womply applicants' loans were marked disbursed by the SBA, but the funds were never received by the applicant, and Womply failed and refused to provide information or assistance in response to the applicants' requests. *See* Ex. J, FTC Lawsuit, Complaint at 11.

31

140.    On or about April 3, 2024, Womply and Scammell agreed to pay $26 million to settle the FTC Lawsuit, which settlement included a permanent injunction prohibiting Womply, Scammell, and their officers, agents, and employees, from making deceptive, false, and/or unsubstantiated claims in connection with "advertising, marketing, promoting, distributing, servicing, or offering any financial product or service." *See* FTC Lawsuit, Stipulated Order for Permanent Injunction and Monetary Judgment (ECF Doc. No. 10), a true and correct copy of which is annexed hereto as **Exhibit K**; *see also* https://www.ftc.gov/legal-library/browse/cases-proceedings/womply-ftc-v.

**The Congressional Investigation of PPP Fraud Involving Womply and Benworth FL**

141.    A two-year congressional investigation into rampant fraud and misconduct in the PPP program, perpetuated and facilitated by unregulated fintechs and their lending partners, put Womply and Benworth FL squarely in the crosshairs, and left the two entities pointing fingers at each other in an attempt to escape liability for their roles in facilitating the disbursement of billions of dollars in PPP funds to ineligible and/or fraudulent applicants.

142.    While Womply, Benworth FL, and their principals each had express knowledge of widespread fraud in the loan program, they continued approving and funding fraudulent loans without taking any measures to identify or prevent such fraud, and earned hundreds of millions in profits at the expense of individuals and taxpayers.

143.    The Fraudulent PPP Loan is one such loan, which Womply and Benworth FL jointly and individually failed to properly vet, and which neither wants to take responsibility for.

144.    According to the report by the House Select Subcommittee on the Coronavirus Crisis (the "House Subcommittee"), issued in connection with the House Subcommittee's investigation of fraud in PPP loan programs (the "Subcommittee Report"):

32

The Select Subcommittee's investigation found that fintechs were given extraordinary responsibility in administering the nation's largest pandemic relief program—a responsibility that some of the fintechs that facilitated the highest volumes of loans were either unable or unwilling to fulfill. Despite fintechs' claims that their use of technology and innovation would allow them to better administer the PPP than traditional financial institutions, many of these companies appear to have failed to stop obvious and preventable fraud, leading to the needless loss of taxpayer dollars. The . . . investigation found that many fintechs, largely existing outside of the regulatory structure governing traditional financial institutions and with little to no oversight from lenders, took billions in fees from taxpayers while becoming easy targets for those who sought to defraud the PPP.

The investigation found that two unvetted and unregulated fintechs that, together, facilitated nearly one in every three PPP loans funded in 2021—Womply and Blueacorn—failed to implement systems capable of consistently detecting and preventing fraudulent and otherwise ineligible PPP applications. Their lending partners, who were tasked with supervising the activities of these fintechs, often did little to oversee the activities of the companies to which they delegated their responsibilities.

*See* Subcommittee Report dated December 2022, at 1 (emphasis added); a true and correct copy

of which is annexed hereto as **Exhibit L**.

145.    Notably, "[i]nternal communications obtained by the Select Subcommittee show

that fintechs and their lending partners both anticipated and observed high levels of fraud in the

PPP." *See* Ex. L at 17.

146.    The Subcommittee Report summarized Womply's role in the PPP as follows:

Womply, also known as Oto Analytics, Inc., was founded in 2011 as a provider of reputation management, email marketing, and business intelligence services for small businesses. . . .

The fintech—which had never before involved itself in loan processing or high volume fraud prevention screening—began its involvement in the PPP in April 2020 as a referral agent. . . . Upon receipt of the referral, lenders would conduct all other tasks associated with processing, managing, and tracking the PPP loans, including verifying borrower identity and auditing borrowers. . . .

Beginning in February 2021, Womply initiated a "PPP Fast Lane" service, which it claimed would provide PPP lenders with technological, marketing, underwriting, prequalification review, eligibility verification, and other services. . . .

33

In a presentation to Select Subcommittee staff, Womply explained that, as part of its new PPP Fast Lane service, the fintech's staff (1) conducted automated eligibility checks; (2) identified and verified their PPP borrowers' identities through automated and manual KYC management; (3) conducted automated and manual bank and tax document analysis to confirm PPP program eligibility; and (4) implemented automated and manual anti-fraud tools and measures to detect application fraud, in service of BSA requirements. Applicants that passed Womply's pre-qualification reviews were then forwarded to one of its partner lenders.

*See* Ex. L at 46.

147.    Following its investigation, the House Subcommittee concluded:

Womply has described itself as a "technology service provider," despite performing functions usually associated with LSPs [lender service providers], and has used its purported status to avoid accountability [for approval of fraudulent PPP loans]. Evidence obtained by the Select Subcommittee indicates that Womply likely should have been considered an LSP and therefore been subject to SBA regulation. While Womply did provide some technology services, its core functionalities appear to closely resemble the SBA's criteria for an LSP. . . . Evidence further indicates that Womply independently conducted pre-qualification reviews on PPP applications based on SBA and lender criteria before referral to lenders.

*See* Ex. L at 59.

148.    The House Subcommittee further noted that "Womply used the same reasoning to avoid responsibility for approving fraudulent loans through its PPP Fast Lane Service." *Id.* at 60.

149.    "PPP loan applicants submitted a total of over 3.7 million applications in 2021 through Womply, with most likely going through their PPP Fast Lane Program. Of that 3.7 million, 70 percent . . . were sent to lenders after passing Womply's pre-qualification reviews and underwriting processes." *See* Ex. L at 46.

150.    "In March 2021 alone, Womply referred 889,275 PPP loan applications to lenders." *See id.*

151.    "Multiple high volume PPP lenders relied on Womply to review PPP applications for eligibility and potential fraud, even though the fintech lacked prior experience in conducting

34

high volume small business lending, managing large scale financial crime compliance, or creating scalable automated fraud prevention technology." *See* Ex. L at 45.

152. Of particular relevance to Plaintiff's situation, the House Subcommittee investigation revealed that "individuals looking to commit fraud identified Bluevine, Blueacorn, and Womply as 'fintechs with lower fraud risk capabilities that were letting a lot more fraud go through,'" and that "Womply communications obtained by the Select Subcommittee show that the fintech knew that it was a top target for fraud." *See* Ex. L at 61.

153. Specifically:

Womply- and Blueacorn-facilitated PPP loans were crucial to one violent drug dealing enterprise in central Florida. <u>Police and media reporting show that gang members allegedly created limited liability companies, solicited individuals through social media, and, in some cases, stole identities to apply for PPP loans, which were then approved.</u> Investigators believe the PPP loans were then used to finance the criminal enterprises, including the purchase of guns and drugs. Police documents allege that the gang members quickly identified Womply and Blueacorn as easy targets to obtain PPP loans without much scrutiny.

*See* Ex. L at 62 (emphasis added).

154. The Subcommittee Report also revealed Scammell's history of illegal and unethical conduct, which could (and probably should) have precluded him – and Womply – from conducting business with the SBA, or participating in the PPP, as follows:

Mr. Scammell—who served as Womply's CEO and ran its fraud prevention operations—was previously convicted of financial crime and barred from the securities industry. Despite this, Mr. Scammell's company was allowed to oversee the distribution of billions of dollars of taxpayer funds, with Mr. Scammell serving as the highest ranking Womply executive that had "responsibilities related to the KYC process and anti-fraud measures implemented by Womply for the Fast Lane Program."

In 2009, Scammell was charged with stealing proprietary and confidential information from his girlfriend related to a potential merger between Disney and Marvel Entertainment, and trading on that information using bank accounts belonging to his brother. On August 11, 2011, the SEC filed a civil action alleging that Mr. Scammell engaged in unlawful insider trading through that conduct. On June 15, 2012, Scammell consented to the entry of a permanent injunction

prohibiting him from participating in the securities industry. On April 21, 2014, in a parallel criminal case, Mr. Scammell pleaded guilty to "'knowingly and with intent to defraud' engag[ing] in a fraudulent scheme" related to insider trading and was sentenced to three months of imprisonment and $120,000 in restitution, in addition to the $801,000 he was to pay under a civil settlement with the SEC. . . .

The SEC stated that Mr. Scammell provided misleading information regarding Womply in the course of their 2011 investigation, . . . that Mr. Scammell continued his dishonest behavior even after his civil and criminal punishments[,] . . . and accused Mr. Scammell of lying to federal regulators about Womply's financial condition in an attempt to frustrate government's efforts . . . . Additionally, according to the SEC, Mr. Scammell also improperly used Womply investor funds for his personal legal defense.

*See* Ex. L at 51-52.

155. Womply and Scammell also refused to comply with SBA requests for information to aid in its investigation into potential fraud related to PPP loans, with the Subcommittee Report noting that "Womply declined requests to help the federal government prevent fraud in the program and ensure that loans were going to only eligible Americans." *See* Ex. L at 52-55.

156. On December 8, 2022, the SBA published a press release regarding findings from the Subcommittee Report on PPP fraud, stating that it "immediately suspended non-lenders Blueacorn and Womply, companies that worked with PPP lenders, from working with the SBA in any capacity," and also "launched a full investigation of the lenders – [including] Benworth . . . as well as the individuals and other related entities named in the report." *See* SBA Press Release 22-98 (Dec. 8, 2022), available at https://www.sba.gov/article/2022/dec/08/us-small-business-administration-statement-house-select-subcommittee-coronavirus-crisis-report.

157. By providing services fitting the SBA's criteria for an LSP, Womply bears individual responsibility for its failure to properly vet PPP applications it reviewed and processed, including its failure to implement fraud prevention measures, particularly when it had express knowledge of its systems' vulnerability to fraud.

158.    As for its part in perpetrating PPP fraud, while Benworth FL attempted to shift blame solely to Womply by claiming that it "relied on Womply to prevent fraud related to identity theft and the use of fake documents by using its systems to validate a PPP applicant's identity, authenticity, and type of documents submitted, calculations for the PPP loan amount, and bank account information, among other underwriting services,"[2] it also approved and funded loans despite "express[ing] serious concerns about Womply's fraud prevention and eligibility verification program capabilities" in and around the time the Fraudulent PPP Loan was originated. *See* Ex. L at 49.

159.    Specifically:

[A] series of May 2021 emails between Womply and Benworth, the fintech's second-largest PPP lending partner, in which Benworth's senior leadership expressed serious concerns about Womply's fraud prevention and eligibility verification program capabilities . . . show that, in late April and early May 2021, Womply discovered what Benworth described as "rampant fraud" in the over 200,000 PPP loan applications Womply had referred to Benworth. Subsequently, Benworth became concerned that Womply's application screening processes were inadequate and had exposed it to "a dangerous amount of liability."

*See* Ex. L at 49.

160.    Mr. Navarro acknowledged Benworth FL was aware that "banks involved in disbursing PPP loans referred by Womply had previously voiced concerns about the high incidence of fraud in Womply-reviewed loans," which led Benworth FL to being "on the brink of being closed 3 times"; and to giving Benworth FL's own PPPLF lender (the Federal Reserve Bank of San Francisco) "assurances that [it] ha[d] every protocol in place to mitigate fraud," even though it did not. *See* Ex. L at 50.

161.    On April 8, 2021, approximately one month before the Fraudulent PPP Loan was funded, "Womply proposed changes to its pre-qualification, fraud prevention, and other screening

---

[2] *See* Ex. L at 47.

processes to better address fraud." More than a month later, and after the Fraudulent PPP Loan was funded, "Benworth's CEO characterized Womply's new proposed fraud review process as 'unproven' and 'last minute,' and pointed out that these changes would not detect fraud in the 200,000 loans that Womply had already referred to the lender." *See* Ex. L at 50-51.

162.    By that time, Benworth FL had already funded the Fraudulent PPP Loan, despite its "multiple concerns with Womply's performance," which it acknowledged included documentation errors, missing supporting documents in application packages, and receipt of complaints and subpoenas relating to loans Womply referred to Benworth FL. *See* Ex. L at 51.

163.    Despite ample evidence that Mr. Navarro and Benworth FL were aware of rampant fraud issues in the PPP applications Benworth FL was receiving, approving, and funding – for at least a month before the Fraudulent PPP Loan was funded – Mr. Navarro and Benworth FL took no action to prevent or mitigate any such fraud, and continued knowingly funding fraudulent PPP loans referred by Womply, including the Fraudulent PPP Loan attributed to Plaintiff. *See*, *generally*, Ex. L.

164.    Instead, using funds drawn from the Federal Reserve System, Benworth FL, acting at Mr. Navarro's direction, continued knowingly funding fraudulent PPP loans referred by Womply – reaping substantial profits for Benworth FL and the Navarros.

165.    As an SBA lender under the PPP, SBA regulations require Benworth FL to "exercise[] day-to-day responsibility for evaluating, processing, closing, disbursing, servicing, liquidating, and litigating its SBA portfolio," which requirements exist independent of Benworth FL's attempt to delegate these functions to Womply, an unlicensed entity, and which responsibilities Benworth failed to exercise. *See* Ex. L at 60.

166.    As discussed further below, Benworth FL's failure to comply with SBA regulations and PPP requirements resulted in a default under its agreements with the Federal Reserve Bank of San Francisco, regarding nearly $4.3 billion in PPPLF credit advances provided to Benworth FL, which it used to fund the Fraudulent PPP Loan and some 300,000 other PPP loans.

167.    The Subcommittee Report and investigation clearly demonstrate that, to the extent Benworth FL delegated application review/eligibility determination, fraud prevention/mitigation, and/or other underwriting functions to Womply, and to the extent Womply undertook providing those functions, Womply purposefully and knowingly failed to carry out those functions in accordance with SBA and PPP regulations and requirements, and continued pre-approving and referring unqualified and fraudulent PPP applicants to Benworth for funding, which Womply knew were unqualified, fraudulent, and/or improperly reviewed and vetted.

168.    The Subcommittee Report and investigation further demonstrate that, to the extent Benworth FL delegated application review/eligibility determination, fraud prevention/mitigation, and/or other underwriting functions to Womply, and to the extent Womply undertook providing those functions, Benworth FL purposefully and knowingly failed to satisfy its independent responsibility to oversee and supervise Womply's activities, and to ensure those functions were carried out in accordance with SBA and PPP regulations and requirements, and continued approving and funding unqualified and fraudulent PPP applicants referred by Womply, which Benworth FL knew were unqualified, fraudulent, and/or improperly reviewed and vetted.

### RELATED LAWSUITS ALLEGING FRAUDULENT TRANSFERS

169.    Multiple lawsuits have been filed alleging fraudulent transfers from Benworth FL to Benworth PR and/or the Navarros, in an illegal attempt to shield the assets of Benworth FL, and

the proceeds of the Benworth Enterprise, from creditors and lawsuits arising out of its actions and misconduct involving fraudulent PPP loans.

**The Womply Lawsuit**

170.    On January 24, 2023, Womply commenced an action against Benworth PR, Benworth FL, and the Navarros, in the United States District Court for the District of Puerto Rico under Case No. 3:23-cv-01034-GMM, titled *Oto Analytics, LLC v. Benworth Capital Partners PR LLC, et al.* (the "Womply Lawsuit"), seeking to rescind alleged fraudulent asset transfers from Benworth FL to Benworth PR and/or the Navarros, which Womply alleges were intended to prevent Womply from collecting its fees owed under a breached agreement with Benworth FL.

171.    The Womply Lawsuit alleges that, "[w]ith Womply's technology, Benworth FL processed and funded more than ***305,000 PPP loans*** with a principal amount of approximately ***$4 billion***, generating more than ***$680 million*** in revenue for Benworth FL." *See* Womply Lawsuit, Complaint (ECF Doc. No. 1) (emphasis in original), a true and correct copy of which is annexed hereto as **Exhibit M**.

172.    Womply alleges that it "developed and maintained a website through which small businesses searching for PPP assistance could be connected with and submit application materials to PPP lenders," and then provided the PPP lenders (including Benworth FL) with a technology platform to review, process, and service PPP loans. Womply further alleges that Benworth FL breached its fee agreement with Womply for use of these services, through which Benworth FL processed thousands of PPP loans. *See* Ex. M, Womply Lawsuit, Complaint at 3-4.

173.    On June 11, 2024, Womply obtained a final arbitration award in separate JAMS arbitration proceedings it commenced against Benworth FL in or about August 2021 (the

40

"Arbitration"), which awarded Womply nearly $118 million in unpaid fees, interest, and costs owed under its fee agreement with Benworth FL.

174.    In the Womply Lawsuit, Womply alleges that during the course of Arbitration proceedings, it discovered that the Navarros formed Benworth PR for the purpose of preemptively and fraudulently transferring and shielding assets of Benworth FL, in order to prevent Womply from collecting on any judgment or award obtained in the Arbitration. *See* Ex. M, Womply Lawsuit, Complaint at 2.

175.    Thus, in connection with the fraudulent transfers, the Womply Lawsuit alleges that "[t]he separation of Benworth FL and Benworth PR as distinct corporate entities is an illusion—they are effectively the same company." *See* Ex. M, Womply Lawsuit, Complaint at 5.

176.    The Womply Lawsuit further alleges that "Benworth FL sought to avoid accountability for its failure to conduct a good faith review of applicant information before deciding to fund PPP loans" by misrepresenting to the House Subcommittee – in connection with the House Subcommittee's investigation of fraud in PPP loan programs – "that it relied on Womply to determine applicant eligibility," when "it was Benworth FL that decided which Womply-referred PPP loans to submit to the SBA for approval and, if approved, to fund." *See* Ex. M, Womply Lawsuit, Complaint at 7.

### The Federal Reserve Bank Lawsuit

177.    On July 10, 2024, after learning about the Womply Lawsuit, the Federal Reserve Bank of San Francisco (the "Federal Reserve Bank") commenced its own lawsuit against Benworth PR, Benworth FL, and the Navarros, in the United States District Court for the District of Puerto Rico under Case No. 3:24-cv-01313-MAJ, titled *Federal Reserve Bank of San Francisco v. Benworth Capital Partners PR LLC, et al.* (the "Federal Reserve Bank Lawsuit"). A true and

correct copy of the Complaint in the Federal Reserve Bank Lawsuit (ECF Doc. No. 1) is annexed hereto as **Exhibit N**.[3]

178.    The Federal Reserve Bank Lawsuit seeks "damages for breach of contract, collection of money, conversion, and rescission of fraudulent transfers of various assets from Benworth FL to Benworth PR and the Navarros." *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 1 (emphasis added).

179.    The Federal Reserve Bank, which is part of the Federal Reserve System, provided Benworth FL with PPPLF financing pursuant to PPPLF Letters of Agreement dated May 4, 2020, January 14, 2021, and January 30, 2023 (the "Letters of Agreement"), through credit advances totaling approximately $4.3 billion. *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 4.

180.    Specifically, the Federal Reserve Bank alleges that "Benworth FL received Advances from the Federal Reserve Bank from time to time in an aggregate principal amount of approximately $4.3 billion, secured by approximately 300,000 Pledged PPP Loans and the other PPP Collateral. Upon information and belief, Benworth FL processed, funded, and managed this loan portfolio, earning accrued interest income and various other fees in relation to those loans." *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 9.

181.    Markedly:

> [T]he Reserve Bank has become aware that Benworth FL has failed to comply with the terms of the PPP for at least some portion of the outstanding Pledged PPP Loans, which has caused Benworth FL's outstanding Advances to become recourse obligations . . . . Benworth FL has represented to the Reserve Bank that for a period of years, it did not have appropriate documentation to support its requests for guaranty purchases for all of the relevant PPP loans, either due to Womply's withholding of the appropriate documentation . . . , or due to other problems internal to Benworth FL. These facts have caused the Reserve Bank to determine that

---

[3] On August 20, 2024, the District Court consolidated the Womply Lawsuit and the Federal Reserve Bank Lawsuit under Case No. 3:23-cv-01034-GMM.

<u>Benworth FL has failed to comply with the terms of the PPP for at least some portion of its PPP portfolio</u>, causing the Advance amounts to become recourse.

*See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 8 (emphasis added).

182.    The Federal Reserve Bank further alleges that "Benworth FL fraudulently transferred various assets, including the Reserve Bank's collateral, to Benworth PR and the Navarros, who are exercising dominion and control over those assets. As a result, Benworth FL was left with virtually no capital to fulfill its current obligations to the Reserve Bank." *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 2.

183.    According to the Federal Reserve Bank Lawsuit, "[a]lthough Benworth PR was formed as a separate entity from Benworth FL, it is effectively the same company as Benworth FL, and any corporate separateness is illusory." *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 11. "Benworth PR provides certain services to process and/or service Benworth FL's mortgage and PPP loans, as well as other services such as fraud monitoring and loan forgiveness, all of which Benworth FL previously performed itself." *Id.*

184.    The Federal Reserve Bank further alleges that "Benworth FL has moved all of its employees to a Florida branch of Benworth PR," and pursuant to LSAs executed by the Navarros on behalf of Benworth FL and Benworth PR in 2021, "Benworth PR services Benworth FL's mortgage and PPP loans" and will receive all of the PPP loan income that Benworth FL would have received for servicing the loans to maturity. *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 12-13.

185.    Notably, Benworth PR did not even exist as an entity on the date of the first LSA purportedly between Benworth FL and Benworth PR. Although the first LSA was dated May 31, 2021, Benworth PR was not formed until nearly a month later, on June 28, 2021. *See* Ex. F.

186.    Additionally, "[f]rom time to time, Benworth FL made transfers to Benworth PR. These transfers were purportedly advances in payment for loan servicing and related services that Benworth PR would render to Benworth FL pursuant to the LSAs." *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 13. In sum, the Federal Reserve Bank alleges that "[b]etween 2021 and 2023, Benworth FL transferred over $50 million to Benworth PR, which left Benworth FL unable to pay its debts as they came due, insolvent, and with inadequate capital." *Id.*

187.    The Federal Reserve Bank further alleges that "Benworth FL also made transfers to the Navarros," including a portion of dividends totaling more than $48 million paid to Mr. Navarro between 2021 and 2023, at least $800,000 paid to Mr. Navarro in 2024, and additional assets diverted to Mrs. Navarro to avoid payment of prior judgments. *See* Ex. N, Federal Reserve Bank Lawsuit, Complaint at 13-14.

188.    Upon information and belief, the Navarros formed Benworth Financial in 2019, also for the purpose of fraudulently diverting and shielding assets of Benworth FL. Upon further information and belief, the Navarros have fraudulently transferred assets of Benworth FL to Benworth Financial in order to avoid paying judgments and other debts owed by Benworth FL, and/or operated Benworth Financial as an alter ego of Benworth FL.

189.    On April 2, 2025, the U.S. District Court for the District of Puerto Rico (Hon. Gina R. Méndez-Miró) denied Benworth FL's motion to dismiss the Federal Reserve Bank Lawsuit. In denying the motion to dismiss, Judge Méndez-Miró effectively validated the factual underpinnings of the Federal Reserve Bank's claims, which mirror many of the allegations here. The Federal Reserve Bank's success in overcoming a motion to dismiss underscores the plausibility of Defendants' extensive fraud in perpetrating the PPP Fraud Enterprise, and supports Plaintiff's contention that Defendants engaged in a pattern of racketeering activity causing harm to multiple

44

victims (the government, Womply, Federal Reserve Bank, and individuals like Plaintiff). In sum, these findings and proceedings confirm that Defendants' fraudulent scheme was not a one-off error or mere negligence, but a deliberate enterprise that generated enormous profits through fraudulent means, followed by concerted efforts to conceal those profits.

## FIRST CAUSE OF ACTION
**Racketeer Influenced And Corrupt Organizations Act (RICO) (18 U.S.C. § 1962(c))**
*AS TO ALL DEFENDANTS*

190.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

191.    **The RICO "Enterprise"**: Defendants, together with others, formed an association-in-fact enterprise engaged in and affecting interstate commerce, herein referred to as the "PPP Fraud Enterprise." This enterprise consisted of, at minimum, the following members: (a) the Benworth Entities and their principals (the Navarros), who acted in concert; (b) Womply and its principal (Scammell); and (c) other potential participants not yet identified (such as the unknown runners who procured and/or submitted fraudulent applications, and any intermediaries or facilitators who knowingly assisted the scheme).

192.    The PPP Fraud Enterprise was an ongoing organization with a framework and goals beyond any single predicate act. Its common purpose was to maximize the volume of PPP loans, irrespective of glaring indications of fraud, for financial gain and the subsequent retention and concealment of the illicit profits therefrom. The enterprise functioned as a continuing unit from the inception of the PPP program, which continues to date with efforts to shield funds and avoid accountability, and through ongoing servicing of the PPP loans.

193.    Each Defendant had a distinct role in the structure of the PPP Fraud Enterprise, and purported to conduct legitimate business dealings separate from the enterprise's affairs.

45

194. Womply provided the technology platform and marketing to bring in applicants, while Benworth FL provided the lending license and access to the PPPLF, implemented by the Federal Reserve to fund the loans.

195. The Navarros orchestrated how the Benworth Entities would handle the influx of loans, the distribution of proceeds, and the ongoing servicing, and Scammell orchestrated Womply's intake side of the operations.

196. Defendants coordinated these actions through verbal, written, and digital agreements as well as regular communications about loan origination, approval, funding, and related activities. Additionally, Womply's systems were integrated with Benworth FL's loan processing systems.

197. The enterprise also enlisted the use of sham entities and accounts (like the Fraudulent LLC and other fake borrowers) as tools to derive significant financial benefit from the fraud they carried out. The enterprise also included professionals and intermediaries (such as payment processors, loan servicing agents, banking institutions for deposits, etc.) who, wittingly or unwittingly, facilitated the movement of funds derived from the enterprise's illegal actions.

198. Each Defendant (a "RICO person") participated in the enterprise, but the enterprise's identity is broader; it possessed an existence beyond the commission of individual racketeering acts. For instance, the enterprise maintained ongoing business functions that continued over time, some of which were legitimate or administrative activities and not inherently criminal. These activities included processing loan applications, managing a loan portfolio, marketing to consumers, servicing loans, providing customer support (albeit poorly), and generating routine reports, notices, and correspondence.

199.    The enterprise recruited and employed individuals to perform various tasks (*e.g.*, software engineers and support staff at Womply, loan officers and clerical staff at Benworth FL, servicing agents at Benworth PR) that went beyond simply committing predicate acts. In short, the PPP Fraud Enterprise had continuity in structure and personnel that survived individual transactions.

200.    **Conduct of the Enterprise's Affairs**: Each Defendant conducted or participated, directly or indirectly, in the affairs of the PPP Fraud Enterprise through a pattern of racketeering activity, as described herein. Defendants had a common purpose: to profit from as many PPP loans as possible, including loans that they knew or deliberately ignored were fraudulent.

201.    Defendants coordinated their conduct in furtherance of this scheme. For example, Womply and Scammell controlled the intake, flow, and approval of applications and, consistent with Scammell's history of criminal fraudulent conduct, intentionally failed to implement fraud filters to keep volume and loan approvals high. Upon receipt of any referrals from the Womply Enterprise, members of the Benworth Enterprise rubber-stamped and funded the loans in assembly-line fashion, using funds from the government to finance them.

202.    When obvious signs of fraud emerged, each Defendant intentionally, knowingly, and without regard to victims such as Plaintiff, chose to continue the scheme rather than stop. The Womply Enterprise kept sending referrals and continued, and even expanded, its aggressive marketing and advertising campaign to obtain additional applications; while the Benworth Enterprise kept rubber-stamping and funding all referrals, and even expanded operations, which continue to date with the ongoing servicing of the loans.

203.    The "affairs" of the enterprise – obtaining government-backed money through fraudulent loans, distributing profits, and later shielding those profits – were distinct from the

47

normal affairs of a legitimate lender or software company. Defendants allowed the enterprise's affairs to subsume their own by failing to separate fraudulent from legitimate loans.

204.    **Pattern of Racketeering Activity**: The PPP Fraud Enterprise engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5). This pattern included multiple related and continuous predicate acts indictable under federal law, including but not limited to (i) bank fraud (18 U.S.C. § 1344), (ii) wire fraud (18 U.S.C. § 1343), (iii) mail fraud (18 U.S.C. § 1341), and (iv) fraud in connection with identification documents (identity theft) (18 U.S.C. § 1028).

205.    These predicate acts occurred from 2020 through 2021 and, for certain acts like fraudulent asset transfers, well into at least late 2023. The acts were related by a common scheme and participants. Notably, the acts were neither isolated nor sporadic; they formed a continuous scheme with similar purposes and results—namely, defrauding the federal government's relief program and unwitting victims, such as Plaintiff, and then concealing the proceeds.

206.    **Closed-Ended Continuity**: The racketeering spanned a substantial period. The scheme began at the beginning of 2020, right after Benworth FL obtained its consumer finance company license on January 22, 2020, as if it was already organizing the individual components of the enterprise to perpetrate the scheme. Shortly thereafter, Benworth FL started processing PPP loans.

207.    In 2021, Benworth FL realized it could ramp up operations volume and generate even more profits with Womply's assistance in joining the enterprise, since the end goal of the enterprise was always more profit, legitimate or otherwise.

208.    At that point, Defendants' scheme escalated with an enormous volume of loans, and continued with follow-up acts including fraudulent transfers of illicit gains and related assets

48

into late 2023 and beyond, shielding them from lawsuits and collection efforts by the Federal Reserve Bank and the FTC, among others. Thus, the enterprise's racketeering activity extended over multiple years, from at least early 2020 through at least late 2023, which satisfies closed-ended continuity.

209. Even focusing on the peak 2021 period, the sheer number of fraudulent transactions (hundreds of thousands) and the number and type of victims (including the U.S. government, taxpayers, and identity theft victims like Plaintiff) demonstrate a pattern, not a one-off event.

210. The predicate acts are related in that they all (i) served the scheme of fraudulently obtaining and illegally sharing government-paid fees received from the PPP-funded loans, and (ii) had the same perpetrators and similar victims.

211. **Open-Ended Continuity**: Defendants' pattern of conduct also continues to date, and poses a threat of continued or even perpetual criminal activity. The enterprise did not voluntarily cease any fraudulent conduct. The funding of new PPP loans stopped only because the PPP program expired in May 2021, when the money allocated to the PPPLF to fund PPP loans was exhausted, in large part due to the widespread fraud perpetuated by the PPP Fraud Enterprise and others like it.

212. The manner in which Defendants concealed and retained their ill-gotten gains – for example, by transferring money, assets, and resources to Benworth PR and to personal accounts to avoid repayment obligations – indicates an ongoing capacity for wrongdoing.

213. Moreover, fraudulent, criminal, and illegal activity continues through the servicing of each fraudulent loan (and the profits generated therefrom), which was also fraudulently transferred to Benworth PR, and the submission of related servicing reports to the U.S. Government.

214.    The House Subcommittee explicitly noted that Defendants "only ceased <u>certain</u> unlawful acts … because the [PPP] program ended" and that they "continued working in financial services" with the means and incentive to resume unlawful conduct in other contexts. Indeed, absent intervention, the enterprise has redirected, and could continue to redirect, its fraudulent methods and conduct to new programs, and continue defrauding creditors and hiding its assets to shield itself from liability.

215.    As such, the predicate acts, by their nature, were part of the enterprise's regular way of doing business, continue to be an integral part of its business, and threaten to recur in future business activities. This satisfies open-ended continuity.

216.    **Predicate Acts**: The predicate acts of racketeering activity committed by members of the enterprise in violation of the foregoing statutes involve Benworth FL's approval and conduct as a PPP lender subject to SBA regulations, credit advances granted to Benworth FL under the PPPLF, fraudulent transfers between the Benworth Entities and the Navarros, agreements and kickback schemes between Benworth FL and Womply, Benworth FL and Benworth PR, and other members of the Benworth Enterprise and/or the Womply Enterprise, and fraudulent PPP loans funded using Federal Reserve Bank funds, including:

   a. **Bank Fraud (18 U.S.C. § 1344)**: Executing or attempting to execute a scheme to defraud the Federal Reserve Bank in violation of 18 U.S.C. § 1344, in connection with credit advances granted to Benworth FL under the PPPLF, and fraudulent transfers by and between members of the Benworth Enterprise in order to misrepresent insolvency and avoid repayment. Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at their direction, the Navarros knowingly and intentionally executed or attempted to execute a scheme to defraud by (i) drawing on PPPLF credit provided by the Federal Reserve System to fund fraudulent PPP loans, including the Fraudulent PPP Loan, using Plaintiff's stolen identity and fraudulent or stolen identity information for other borrowers; and (ii) making intentional and material misrepresentations to the Federal Reserve Bank regarding (a) Benworth FL's agreements with the Federal Reserve Bank in connection with credit advances it received under the PPPLF, and (b) Benworth FL's assets and solvency in light of fraudulent transfers the Navarros

caused and/or facilitated from Benworth FL to Benworth PR, and from Benworth FL directly to the Navarros and/or other members of the Benworth Enterprise.

b.  **Wire Fraud (18 U.S.C. § 1343)**: Devising or intending to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and transmitting by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme in violation of 18 U.S.C. § 1343, in connection with thousands of fraudulent PPP loans originated by Benworth FL, in concert with Womply, using credit advances from the Federal Reserve Bank obtained through the PPPLF, for the Navarros' and Scammell's personal gain, and at their direction; which occurred in relation to, or involving a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution. Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at their direction, and acting in concert with the Womply Enterprise and Scammell, the Navarros knowingly and intentionally transmitted, or caused to be transmitted, by means of wire, radio, or television communication in interstate commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing a scheme or artifice to defraud, including, but not limited to (i) online PPP loan applications, approvals, and disbursement instructions for thousands of PPP loans, including the Fraudulent PPP Loan associated with Plaintiff, even when the Defendants had knowledge of widespread fraud in the applicant pool; (ii) email communications among the Defendants and with third parties to coordinate the funding of fraudulent PPP loans, and funneling of PPP-related funds and profits; and (iii) continued marketing and advertising via internet and social media channels to attract more PPP applicants, despite knowledge of ongoing fraud.

c.  **Mail Fraud (18 U.S.C. § 1341)**: Devising or intending to devise a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and placing in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or depositing or causing to be depositing any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or taking or receiving therefrom, any such matter or thing, or knowingly causing to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, for the purpose of executing such scheme in violation of 18 U.S.C. § 1341, in connection with thousands of fraudulent PPP loans originated by Benworth FL, in concert with Womply, using credit advances from the Federal Reserve Bank obtained through the PPPLF, for the Navarros' and Scammell's personal gain, and at their direction; which occurred in relation to, or involving a benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency regarding the COVID-19 pandemic, and affected a financial institution. Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at

51

their direction, the Navarros knowingly and intentionally used, or caused to be used, the U.S. mail in furtherance of a scheme to defraud, through actions including, but not limited to, mailing, or causing to be mailed, documents, notices, letters, and/or other communications regarding PPP loan applications, approvals, purported borrower obligations, and other materials integral to the fraudulent scheme, to interstate addresses (including erroneous or fictitious addresses including the Howard Beach Address) with knowledge that such mailings furthered the Enterprise's fraudulent objectives.

   d. **Identity Theft and Related Fraud (18 U.S.C. § 1028)**: Knowingly possessing, using, and/or transferring an identification document, authentication feature, or false identification document knowing that such document or feature was stolen or produced without lawful authority, with the intent that such document or feature be used to defraud the United States, and/or knowingly transferring, possessing, and/or using, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law, in violation of 18 U.S.C. § 1028. Individually and/or through members of the Benworth Enterprise, agents, or other individuals acting at their direction, the Navarros knowingly participated in, permitted, and facilitated the unauthorized possession, use, and transmission of Plaintiff's personal identifying information fraudulently obtained through identity theft, in connection with the submission, approval, and/or funding of the Fraudulent PPP Loan in Plaintiff's name, without Plaintiff's knowledge or authorization.

217.   The predicate acts described above were related to each other and to the enterprise's scheme. They had similar purposes (to defraud the government, deceive victims like Plaintiff, and obtain money illicitly), results (successful issuance of fraudulent loans and ongoing generation and retention of proceeds), participants (the same Defendants and their agents), and victims (the U.S. Treasury/SBA, the Federal Reserve Bank, and identity-theft victims like Plaintiff). They were not isolated events, but part of the ongoing PPP Fraud Enterprise.

218.   **Role of Each Defendant**: Each Defendant agreed to and knowingly participated in the scheme's execution:

   a. Benworth FL knowingly approved and funded PPP loans without proper verification and made misrepresentations to the SBA certifying compliance and loan validity via wires, thereby generating related loan fees and interest. It further engaged in post-loan fraud by moving assets to avoid obligations. Benworth FL conducted the enterprise's affairs by leveraging its lending license and relationships

to knowingly, intentionally, and without regard to its victims, carry out the fraudulent loan funding.

b. Benworth PR and Benworth Financial were instrumental in the conspiracy to launder and shield proceeds. While they did not originate PPP loans, they *received fraudulent transfers* of money that were the fruits of the racketeering. For example, after PPP ended, large sums from Benworth FL's accounts were diverted to Benworth PR (a newly formed entity) to obstruct recovery. These entities served as repositories for illicit funds and thus furthered the scheme's goal of enriching the Navarros at others' expense. They also participated in enterprise decisions, and continue to service the loans, generating additional profits for the enterprise.

c. The Navarros, as individuals, were the masterminds on the lending side. Mr. Navarro, in particular, had direct knowledge (by April 2021, at the latest) about the high fraud rates from internal reports as well as directly from Womply; yet he encouraged the continued loan volume escalation. Mr. Navarro also authorized the funding of thousands of loans that he knew or had reason to suspect were fraudulent, including Plaintiff's Fraudulent PPP Loan. He additionally orchestrated the later asset transfers. Mrs. Navarro, as a co-owner and member of Benworth PR, and beneficiary of these fraudulent transfers, joined in and assented to this course of conduct. The Navarros explicitly agreed to the common plan and took overt acts (*e.g.*, signing agreements, authorizing wires, etc.) in furtherance of the enterprise.

d. Womply, by and through Scammell and its agents and runners, knowingly marketed PPP Fast Lane as a swift pipeline, while choosing to forgo fraud screening to avoid slowing the flow. Womply's automated system "pre-approved" loans with minimal checks, and even when Scammell was made aware that Womply was a specific target for fraudulent loan applications and had already referred countless such approvals to Benworth FL, Womply did not stop referrals, and actually ramped up operations even further. Womply's PPP Fast Lane application process was fraudulently geared to conceal from applicants and lenders that Womply's review criteria was not actually bona fide, and in fact hardly existed, if at all (which was deceptive given their process). Womply also misrepresented to consumers that applying through PPP Fast Lane was safe and reliable, while those claims were false. Each deceptive ad and each data transmission of a fraudulent loan by Womply is a racketeering act attributable to Womply.

e. Scammell, personally, directed and oversaw Womply's conduct and activities related to the PPP program and PPP Fast Lane. As the FTC alleges (and Plaintiff echoes), Scammell made the decision to prioritize volume over integrity and approved of the misleading marketing and advertising communications to PPP Fast Lane users (*e.g.*, guaranteeing "you will get funds," which wasn't true). Evidence obtained by the House Subcommittee proves Scammell knew of the widespread fraud by April 2021 (before Plaintiff's Fraudulent PPP Loan was referred to Benworth FL), yet he continued to promote and approve PPP Fast Lane applications and refer them to lenders, including the Fraudulent PPP Loan. Under Scammell's direction and control, Womply continued auto-processing and approving

53

applications that, in a normal setting, would be flagged for fraud or held for review. As evidence of fraud was mounting, Scammell also liaised with Benworth FL's principals, and in violation of banking laws such as KYC, they agreed not to slow down. Scammell thus conducted the enterprise's affairs by directing Womply's participation in the scheme.

219.    **Causation of Injury and Resulting Damages**: As a direct and proximate result of Defendants' conduct in violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business or property. Plaintiff's injuries include the $476.57 in SSR benefits garnished to repay a fraudulent debt, attorneys' fees and costs expended to clear his name and seek relief, damage to his credit and financial reputation (including having a defaulted SBA loan associated with his identity), and the loss of time and professional opportunities while dealing with the fallout. These injuries were proximately caused by Defendants' racketeering acts.

220.    The Fraudulent PPP Loan was a product of Defendants' scheme, and led directly to the debt for which Plaintiff's SSR benefits were offset. But for the Fraudulent PPP Loan authorized and perpetrated by Defendants and the Fraudulent PPP Enterprise, Plaintiff's SSR benefits would not have been seized and garnished to repay a delinquent debt falsely attributed to Plaintiff.

221.    It is foreseeable, and indeed inevitable, that if lenders issue loans to identity thieves, the innocent person whose identity was stolen will suffer financial consequences. Plaintiff was the intended victim of the scheme, as Defendants knew their fraudulent loan approvals would victimize either the government, or innocent third parties, or both.

222.    Unlike a remote third-party, Plaintiff's injury flows straight from the Fraudulent PPP Loan that Defendants facilitated in his name. There were no independent intervening causes that broke the chain of causation – Defendants' lax controls and fraudulent loan approvals allowed the theft to succeed, which in turn caused Plaintiff's damages. That the government initially paid

the loan proceeds and then sought recovery does not render Plaintiff's injury indirect; to the contrary, Plaintiff himself bore the brunt of the harm when his SSR benefits were taken.

223.    Thus, Plaintiff's injury is fairly traceable to Defendants' wrongdoing, and is the type of harm to business or property by reason of racketeering that RICO was intended to prevent. Plaintiff is therefore a proper RICO claimant with standing under 18 U.S.C. § 1964(c).

224.    **Recovery of Damages**: Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages for the injuries he has sustained, plus the costs of this suit and reasonable attorneys' fees. These damages include the garnished SSR benefit amount, the economic value of time and money spent mitigating the fraud, attorneys' fees incurred, and compensation for reputational and credit harm, plus applicable interest as permitted by law, in an amount to be established at trial.

**SECOND CAUSE OF ACTION**
**Racketeer Influenced And Corrupt Organizations Act (RICO) (18 U.S.C. § 1962(d))**
*AS TO ALL DEFENDANTS*

225.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

226.    **Agreement to Violate RICO**: Defendants knowingly agreed and conspired with each other to conduct and participate in the affairs of the PPP Fraud Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). The members of the PPP Fraud Enterprise are associated in fact through explicit agreements relating to sourcing, referring, originating, and profiting from fraudulent PPP loans that were processed by Womply and funded by Benworth FL, in knowing violation of applicable regulations and laws, and utilizing federal funds provided through the SBA and the Federal Reserve's PPPLF.

227.    At minimum, by early 2021, each Defendant understood the essential nature of the scheme and agreed to facilitate it. There was a "meeting of the minds" among the Defendants that

55

they would subvert ordinary PPP-loan controls and continue pushing loans, even fraudulent ones, to reap profits. The widespread and repeated failures to implement fraud controls, utter disregard for an avalanche of fraudulent loans, coupled with extensive profit-taking from obviously fraudulent loans, demonstrate this agreement.

228.    **Nature of the Conspiracy**: Each of the Defendants, as members of the PPP Fraud Enterprise, conspired to violate the provisions of 18 U.S.C. § 1962(c) detailed in the First Cause of Action, by agreeing with one another and with other unnamed co-conspirators to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity. By way of example: Two bank robbers walk into a bank. One of them has two left shoes, the other two right ones. To effectively escape with the bank's money, they agree, "You give me one of your shoes and I will give you one of mine." Like this example, no single entity within the enterprise could operate without the other; they needed one another to underwrite, fund, and share in government-paid loan fees.

229.    Thus, Womply and Benworth FL entered into partnership agreements to process PPP loans at high volume and illegally share the associated fees. The conspiracy continued with communications and directives between Scammell and the Navarros to not let "slower" verification processes hinder throughput. Furthered by conscious parallel conduct, neither side reported the glaring fraud to authorities, because both were benefiting. Defendants subsequently engaged in joint efforts to avoid accountability, by coordinating narratives representing that any fraud was all due to unknown third parties. Defendants' joint efforts and agreements were intended to ensure the enterprise succeeded in generating and keeping as much profit as possible from origination of PPP loans, regardless of legality.

56

230.   **Knowing Participation**: Each Defendant agreed to and perpetuated at least one predicate act by the enterprise, and knew that the overall scheme involved a pattern of such acts:

a. The Benworth Enterprise: The Benworth Entities, by and through the Navarros, agreed among themselves and with the members of the Womply Enterprise, to rapidly expand PPP lending using Womply's automated PPP Fast Lane platform, knowing the platform would not reject fraudulent applications. As directed by Mr. Navarro, Benworth FL and its employees and agents agreed to loosen or not enforce normal underwriting standards. Despite being alerted to widespread instances of targeted fraud, they collectively agreed to, and did in fact, ignore it. The Navarros also agreed to and carried out the conspiratorial, fraudulent plan of transferring funds and assets to defeat creditors.

b. The Womply Enterprise: Womply, by and through Scammell, agreed with Benworth FL and the Navarros to funnel referrals for PPP loans, regardless of their qualifications, by making misrepresenting guaranteed funding to consumers, and effectively approving the origination of dubious government-funded loans. Scammell and other Womply executives, employees, and agents exchanged communications acknowledging high fraud rates in the loan applications submitted via the PPP Fast Lane platform, but collectively decided to proceed unimpeded. the Furthering the conspiratorial objective of the enterprise, Womply and Scammell also agreed to accept illegal kickback payments from Benworth FL, taken out of processing fees paid by the government in connection with the fraudulent loans.

c. Unknown Parties: Although not named, the enterprise also included unknown fraudsters and runners, with whom Defendants agreed to share the illegal kickbacks in exchange for providing applicants using fake or fraudulently obtained information.

231.   **Overt Acts**: In furtherance of the conspiracy, Defendants committed numerous overt acts in violation of 18 U.S.C. § 1962(c), including processing and funding the Fraudulent PPP Loan and other fraudulent loans, using and transmitting false identities and loan data, accepting and illegally sharing SBA fee payments, and transferring PPP proceeds to related entities.

232.   Each act was done to advance the common scheme, irrespective of fraud or victims: more loans = more profits.

233.   **Injury Caused by Conspiracy**: The conspiracy itself, and the racketeering acts committed pursuant to it, were the direct and proximate cause of Plaintiff's injuries. The moment

Defendants agreed to lower or disregard all fraud safeguards, and flood the system with fraudulent loan applications using stolen identities, Plaintiff's fate as a victim was sealed. But for this conduct by Defendants in furtherance of the conspiracy, and additional subsequent overt acts that flowed from Defendants' initial agreement, Plaintiff's SSR benefits would not have been garnished to repay a delinquent loan he never knew about.

234.    These injuries were not only foreseeable consequences of the conspiracy, but were necessary to its success. Indeed, by victimizing individuals like Plaintiff, and leaving the government with the task of collecting on the fraudulent debt, Defendants outsourced the risk and fallout of their fraud. The harm to Plaintiff thus flowed from the very purpose of the conspiracy. Had Defendants not conspired to flood the system with fraudulent loans, Plaintiff would not have been harmed. But in conspiring to do so, Defendants made Plaintiff's injury a certainty, as the Fraudulent PPP Loan was simply one cog in a wheel of many fraudulent loans that generated fees and profits for the enterprise.

235.    **Damages**: Plaintiff is entitled to recover treble damages, including attorneys' fees and costs, jointly and severally from each Defendant, pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Negligence**
*AS TO ALL DEFENDANTS*

236.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

237.    Defendants, in conducting nationwide operations affecting consumers and relating to lending, financial assistance, and government benefits in connection with a presidentially declared major disaster or emergency (the COVID-19 pandemic), owed a duty of care to Plaintiff and all potentially affected consumers to exercise reasonable care in managing the PPP loan application, referral, underwriting, and approval process. This duty included implementing and

58

adhering to reasonable safeguards against fraud and identity theft, at least meeting minimum SBA and industry standards, and otherwise acting as reasonably prudent financial service providers under the circumstances.

238.    Because Defendants undertook to provide PPP loan application and origination services to members of the public (including those in New York), they assumed a duty to handle personal information and loan transactions with due care so as not to foreseeable injure others. It was eminently foreseeable that a failure to implement basic identity verification or fraud controls in the PPP process would result in identity thieves obtaining loans in innocent persons' names, thereby harming those persons (through credit damage, repayment demands, or as here, seizure of benefits). Defendants had a special relationship with the pool of potential loan applicants (and those whose identities might be submitted) by virtue of soliciting and handling sensitive personal data and facilitating access to government funds. This created an obligation to use at least ordinary care to avoid causing harm to individuals through mismanagement of that data and process.

239.    Defendants breached this duty by failing to exercise reasonable care in performing such services and safeguarding against fraud and identity theft. Defendants knew or should have known about rampant fraud in the PPP applicant pool they were handling—particularly the applications referred by Womply to Benworth FL. They also knew or should have known that Womply's systems were incapable of, or were otherwise failing to, adequately detect fraud and identity theft in PPP applications that Womply pre-approved and referred to Benworth FL, and which Benworth FL then approved for funding. Despite this knowledge, Defendants took no timely or sufficient action to mitigate fraud risks: Womply continued to invite and process applications with minimal checks, and Benworth FL continued to rubber-stamp those applications without

independent verification. Among the specific ways Defendants fell below the standard of care, upon information and belief, are:

    a. **Failing to implement robust "Know Your Customer" (KYC) procedures** consistent with banking industry norms for loan applications, such as multi-factor identity authentication, manual review of identification documents, cross-checking applicant data, such as ensuring that the person named as borrower actually authorized the application, and that identifying details like address and social security number matched known records for that person. Basic KYC and anti-fraud measures were either not in place or not enforced, allowing obvious identity theft, like Plaintiff's long-time Nassau address as opposed to the loan's Queens address, to go undetected.

    b. **Ignoring or dismissing fraud alerts and flags.** Numerous PPP applications contained indicia of fraud, such as identical IP addresses for multiple applicants, absurd or repetitive business names, and mismatches between an applicant's purported business and their background. Womply's own system likely flagged some issues, as noted in House findings, yet Womply pushed them through to lenders regardless. Benworth FL, in turn, either did not review the applications beyond what Womply did or willfully ignored anomalies. A reasonably careful lender would have halted processing upon detecting these irregularities.

    c. **Volume-over-safety approach.** Defendants negligently instituted business practices that prioritized speed and volume, such as 24-hour approval guarantees, at the expense of accuracy and due diligence. This created an environment where employees or algorithms were effectively told to approve first and ask questions

later (or never). Such an approach in a high-stakes program like PPP fell below the standard of care, which required vigilant fraud prevention given widespread reports, by mid-2020 and early 2021, of PPP fraud incidents across the nation.

d. **Violation of SBA rules/guidance.** To the extent the SBA's PPP rules and guidance required lenders and their agents to undertake certain verification steps, Defendants failed to follow these. For example, SBA's Interim Final Rules and FAQs for PPP instructed lenders to confirm the identity of borrowers and to guard against ineligible or duplicate applications. Defendants' systematic failure to do so is evidence of negligence per se – violating a regulation designed to protect the class of persons including Plaintiff against the type of harm that occurred – identity theft leading to wrongful debt.

e. **Negligent supervision and training.** The Navarros and Scammell negligently supervised their respective organizations. They did not adequately train employees or configure systems to detect fraud. They ignored internal reports of issues like customer service representatives forwarding identity theft complaints or the SBA notifying them of suspect loans. Proper supervision would have caught Plaintiff's Fraudulent PPP Loan either at application, which was Womply's domain, or before funding, which was Benworth's domain.

240.    As a direct and proximate result of Defendants' breach of their duties, Plaintiff has suffered significant financial and personal harm. Plaintiff's SSR benefits were improperly garnished under the Treasury Offset Program to repay the Fraudulent PPP Loan—a loan Plaintiff never knew of or authorized. He lost at least $476.57 of needed funds, causing financial distress. He has incurred attorneys' fees and costs in investigating the fraud, clearing his name with

61

agencies, and bringing this action to halt further harm. He has suffered reputational harm and anxiety, knowing that a fraudulent debt was attributed to him in government records, which could affect his licensing as a CPA. He also suffered the loss of time and mental anguish dealing with government bureaucracy to report the identity theft and attempt to resolve it. These damages were the foreseeable and natural consequence of Defendants' negligence: when lenders negligently allow a fraudulent loan, the victim's finances and peace of mind will inevitably be harmed.

241.    No culpable conduct by Plaintiff contributed to his injuries. Plaintiff was at all times careful with his personal information and had no knowledge of Defendants' actions until after the damage was done. The entire causal chain—from stolen identity, to loan issuance, to garnishment—was set in motion and enabled by Defendants' negligence. Indeed, Plaintiff's situation exemplifies exactly the type of harm that diligent fraud controls by Defendants could have prevented.

242.    Accordingly, Plaintiff is entitled to recover all actual and consequential damages flowing from the harm caused by Defendants' breach of duty, in an amount to be determined at trial, including but not limited to the garnished funds (with interest), compensation for emotional distress and reputational harm, and reasonable costs and fees incurred.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
*AS TO ALL DEFENDANTS*

243.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

244.    As described in detail above, each of the Defendants has engaged in improper, unlawful, and/or unjust acts in furtherance of a criminal enterprise, all of which resulted in the Fraudulent PPP Loan, to the harm and detriment of Plaintiff.

245. The government has involuntarily garnished Plaintiff's SSR benefits to effect repayment of the Fraudulent PPP Loan that Plaintiff did not know about or authorize, and has no lawful responsibility to repay.

246. Defendants have benefited from and been unjustly enriched at Plaintiff's expense by these payments, and by fees and other profits flowing from the referral, processing, origination, servicing, and existence of the Fraudulent PPP Loan, from which Plaintiff derived absolutely no benefit whatsoever.

247. Defendants have further been unjustly enriched at Plaintiff's expense by receiving and retaining the proceeds of their racketeering activities and fraudulent conduct that resulted in the Fraudulent PPP Loan.

248. Defendants have retained, and continue to retain, the benefit conferred by Plaintiff and at Plaintiff's expense, without compensating Plaintiff for the benefit received, violating the principles of justice, equity, and good conscience.

249. As a result of Defendants' unjust enrichment, Plaintiff is entitled to restitution and disgorgement of any benefits Defendants have obtained and retained at Plaintiff's expense and to his detriment, in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Declaratory Judgment (28 U.S.C. §§ 2201, 2202)**
*AS TO ALL DEFENDANTS*

250. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

251. Plaintiff brings this claim for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

252.    An actual controversy exists between the parties regarding the legal rights and obligations of Plaintiff with respect to the Fraudulent PPP Loan and any related agreements fraudulently executed in connection therewith, without Plaintiff's knowledge or authorization.

253.    Given that (i) the Fraudulent LLC was created using Plaintiff's stolen identity and personal identifying information, without Plaintiff's knowledge or authorization, and (ii) the Fraudulent PPP Loan was also originated using Plaintiff's stolen identity and personal identifying information, in the name of the Fraudulent LLC of which Plaintiff had no knowledge, all without Plaintiff's knowledge or authorization, Plaintiff cannot be legally responsible for repayment of the debt incurred in connection with the Fraudulent PPP Loan.

254.    Accordingly, Plaintiff requests a judicial declaration:

   a.  Dissolving the Fraudulent LLC created in Plaintiff's name;

   b.  Declaring any actions taken or agreements or contracts executed by, or on behalf of, the Fraudulent LLC void *ab initio*, including the Fraudulent PPP Loan and any related contracts or agreements;

   c.  Declaring that Plaintiff has no legal responsibility for repayment of the Fraudulent PPP Loan; and

   d.  Returning to Plaintiff any government benefits (including SSR), or other funds taken and/or retained from Plaintiff for the purpose of repayment of the Fraudulent PPP Loan.

## SIXTH CAUSE OF ACTION
### Deceptive Acts – N.Y. Gen. Bus. Law § 349
#### AS TO BENWORTH FL, WOMPLY, AND SCAMMELL

255.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

256.    New York law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." GBL § 349.

257. "To maintain a cause of action under § 349, a plaintiff must show: (1) that the defendant's conduct is 'consumer-oriented'; (2) that the defendant is engaged in a 'deceptive act or practice'; and (3) that the plaintiff was injured by this practice." *See Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010).

258. "The 'consumer-oriented' requirement may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers.'" *Id.* The FTC Lawsuit, Federal Reserve Bank Lawsuit, and House Subcommittee Report all clearly demonstrate that Defendants have been, and continue to be, engaged in consumer-oriented deceptive conduct affecting consumers at large. *See* Exs. J-L, N.

259. Plaintiff has personally been injured by these practices, which resulted in the Fraudulent PPP Loan and garnishment of Plaintiff's SSR benefits. *See* Exs. A-C.

260. As the FTC Lawsuit alleges: "Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' [Womply and Mr. Scammell] violations of the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest." *See* FTC Lawsuit, Complaint at 18.

261. Benworth FL and Womply engaged in deceptive acts and practices affecting consumers at large, including Plaintiff. Their conduct was consumer-oriented in that they offered and provided services to assist ordinary individuals and small businesses with obtaining PPP loans, a service that was marketed to the general public, especially small business owners and sole proprietors, which include consumers. Even though PPP loans are a form of commercial financing, the scale and method by which Womply and Benworth FL operated—advertising to millions of individuals through internet and social media, and processing applications en masse—places their practices squarely within the realm of consumer-oriented conduct. Moreover, the fraud facilitated

by Defendants has affected many consumers in New York and elsewhere, such as identity theft victims and unsophisticated borrowers misled by Womply's claims. The FTC's lawsuit and the Congressional report demonstrate that thousands of consumers were negatively impacted by Defendants' practices.

262.    Benworth FL and Womply engaged in deceptive acts or practices by misrepresenting and omitting material facts in the course of their PPP operations. Womply's advertising and website promised applicants a fast and reliable avenue to obtain PPP funds, implicitly representing that Womply would properly handle their application and safeguard their information. In truth, Womply's process was riddled with issues: applications disappeared or were cancelled without explanation, customer support was virtually nonresponsive, and—critically—Womply did not implement adequate fraud checks, meaning that applying through Womply exposed victims to identity theft or misuse. These were deceptive omissions - failure to disclose the high fraud risk and Womply's lack of controls, and misrepresentations - suggesting to consumers their applications were in good hands, when they were not. Benworth FL likewise, in dealing with PPP applicants, whether directly or indirectly through Womply, misrepresented the safety and legitimacy of the loan process. Benworth allowed its name and status as an SBA-approved lender to be used in conjunction with Womply's outreach, which gave a misleading impression of credibility and due diligence. Furthermore, when fraud complaints arose, Benworth misled investigators about who was responsible, falsely claiming it relied on Womply to vet applications , thereby concealing its own deceptive practice of rushing loans out. Collectively, Defendants portrayed their PPP services as legitimate and secure while knowingly operating a system that was flooding with fraud. Such conduct is inherently deceptive and against the public interest.

263.    Plaintiff was injured by these deceptive practices. Although Plaintiff did not directly interact with Womply or Benworth FL by applying, Plaintiff is within the class of persons foreseeably harmed by Defendants' public-facing deceptive conduct. The consumer-oriented deception—advertising a trusted PPP application service while running a fraudulent scheme—facilitated the theft of Plaintiff's identity and the issuance of the fraudulent loan. In a sense, Defendants' deceptive promise of "we'll get you a loan fast" not only drew in legitimate applicants but also emboldened criminals, which Defendants either encouraged or didn't warn against. The eventual garnishment of Plaintiff's benefits and the headache he endured are the direct result of the proliferation of fraudulent loans that Defendants' deception allowed. But for Defendants' deceptive acts (failing to disclose the rampant fraud, misrepresenting the integrity of their process), regulatory authorities and consumers might have intervened sooner or avoided using Womply/Benworth, which could have prevented loans like Plaintiff's. At minimum, Defendants' deception was a necessary condition for Plaintiff's injury in that it was part of the causal chain that led to unchecked fraud and Plaintiff's victimization.

264.    Additionally, Plaintiff is himself a "consumer" of sorts with respect to the unintended "service" Defendants foisted upon him. He was forced to deal with a loan account in his name with Benworth FL, which is akin to an unwanted product. New York courts have allowed identity theft victims to use GBL § 349 against entities whose practices enabled the theft (for example, negligent issuance of credit cards) because those practices were consumer-oriented and caused injury. Similarly here, Defendants' practices were directed to the public and resulted in harm to Plaintiff.

265.    Defendants' acts amount to and/or pose a threat of continued criminal activity affecting consumers at large because Defendants: (i) continued their unlawful activity related to

67

the PPP and fraudulent PPP loans over a period of several years despite direct knowledge of the fraudulent nature of the loans; (ii) perpetuated additional unlawful activity related to the PPP by effectuating fraudulent transfers intended to defraud the Federal Reserve Bank and other potential creditors; (iii) only ceased certain unlawful acts or practices with respect to the PPP because the program ended; (iv) continued working in financial services after the end of the PPP; and (v) maintain the means, ability, and incentive to resume their unlawful conduct with respect to small business and consumer lending and financial services.

266.    Accordingly, pursuant to GBL § 349(h), Plaintiff is entitled to recover (i) actual damages or fifty dollars, whichever is greater; or, in the Court's discretion, an amount not to exceed three times the actual damages, up to one thousand dollars; and (ii) reasonable attorneys' fees incurred in bringing this action.

**SEVENTH CAUSE OF ACTION**
**Rescission of Fraudulent Transfers**
*AS TO THE BENWORTH ENTITIES AND THE NAVARROS*

267.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

268.    To the extent the Navarros effected fraudulent transfers from Benworth FL to Benworth PR, to themselves, and/or to other members of the Benworth Enterprise to shield those assets from recovery by creditors, Plaintiff respectfully joins in the Federal Reserve Bank's requests to rescind those transactions and transfers, as alleged in the Federal Reserve Bank Lawsuit, which claims Plaintiff respectfully incorporates in their entirety herein. *See* Ex. N.

**DEMAND FOR JURY TRIAL**

269.    Pursuant to Fed. R. Civ. P. 38, Plaintiff respectfully requests a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully demands judgment awarding all actual, statutory, and/or punitive damages, recovery of attorneys' fees and costs, and any other relief available pursuant to applicable law.

Dated: Brooklyn, New York
       May 17, 2025

                    **PETROFF AMSHEN LLP**
                    *Attorneys for Plaintiff,*
                    William Kolbert

                    */s/ Steven Amshen*
                    Steven Amshen, Esq.
                    1795 Coney Island Avenue, Third Floor
                    Brooklyn, New York 11230
                    Telephone: (718) 336-4200
                    Email: samshen@petroffamshen.com