# EXHIBIT J

JULIA HEALD, NY Bar No. 5437561
KATHERINE WORTHMAN, DC Bar No. 488800
PAOLA HENRY, NY Bar No. 5612890
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mailstop CC-10232
Washington, D.C. 20580
Phone:   (202) 326-3589 (Heald)
Email:   jheald@ftc.gov; kworthman@ftc.gov; phenry@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Francisco Division

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> OTO ANALYTICS, INC., also d/b/a WOMPLY, a corporation, and <br><br> TOBY SCAMMELL, individually and as an officer of OTO ANALYTICS, INC., <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission") for its Complaint alleges:

1.     The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the COVID-19 Consumer Protection Act, Pub. L. No. 116-260, § 1401, 134 Stat. 1182, 3275-76.   For these violations, the FTC seeks relief, including a

COMPLAINT

1

permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the COVID-19 Consumer Protection Act.

## SUMMARY OF THE CASE

2. Defendants enticed millions of small business consumers seeking emergency financial assistance during the COVID-19 pandemic to apply for forgivable Paycheck Protection Program ("PPP") loans through their platform. Touting individualized, timely customer service, Defendants promised small business consumers that Defendants would process their loan applications fast, such as within 24 hours of submission, and that loan funds would ultimately be secured for them.

3. But in millions of cases, Defendants failed to obtain PPP loans for small business consumers. In numerous cases, Defendants also failed to process PPP applications in the promised time frame. Defendants were aware that Womply did not provide small business consumers with the promised results, yet continued making deceptive claims and bringing in new customers.

4. Defendants' deceptive practices have violated the FTC Act and the COVID-19 Consumer Protection Act.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

COMPLAINT

2

**DIVISIONAL ASSIGNMENT**

7.     Defendants marketed their services throughout the United States, including throughout the county of San Francisco, the location of their principal place of business during the relevant time period.

**PLAINTIFF**

8.     The FTC is an independent agency of the United States Government created by the FTC Act.   15 U.S.C. §§ 41–58.   The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.   The FTC also enforces the COVID-19 Consumer Protection Act, which prohibits deceptive practices in or affecting commerce that are associated with a government benefit relating to COVID-19, Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401(b)(2).

**DEFENDANTS**

9.     Defendant Oto Analytics, Inc., also doing business as Womply ("Womply"), is a Delaware corporation, with its principal place of business between at least February 2021 and May 2021 at 548 Market Street, Suite 73871, San Francisco, CA 94104, and now operating virtually.   Womply transacts or has transacted business in this District and throughout the United States.   At all times relevant to this Complaint, acting alone or in concert with others, Womply has advertised, marketed, or distributed PPP financing services to small business consumers throughout the United States.

10.     Defendant Toby Scammell is the Chief Executive Officer and a Director of Womply.   At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Womply, including the acts and practices described in this Complaint.   Defendant

COMPLAINT

3

Scammell has managed the day-to-day business of Womply for years and has knowledge of and involvement in the company's advertising, marketing, and provision of PPP financing services to small business consumers. In connection with the matters alleged herein, Defendant Scammell transacts or has transacted business in this District and throughout the United States.

## COMMERCE

11. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Background on SBA's
### Paycheck Protection Program

12. The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), P.L.116-136, was enacted in March 2020 to provide immediate, emergency assistance to individuals and businesses affected by the COVID-19 pandemic. Under the CARES Act, eligible small businesses could obtain forgivable loans under a temporary, emergency Small Business Administration ("SBA") loan program called the Paycheck Protection Program ("PPP").

13. PPP loans were designed to help small businesses struggling, because of the pandemic, to keep their workers on payroll, as well as cover mortgage interest payments, rent, utilities, and other essential expenses. Many small businesses that applied for PPP loans desperately needed immediate funds to stay afloat.

14. Additionally, unlike most loans, PPP loans could be forgiven if the small business owners used the loan proceeds for payroll costs and other eligible expenses—thus effectively transforming the loan into a free federal grant.

15. The PPP was an extraordinarily time-sensitive program, operating on a first-come, first-served basis. When the PPP ran out of funds in May 2021, SBA ceased accepting new PPP loan applications.

## Defendants Misrepresented That Consumers Would Obtain PPP Loans if They Applied with Womply.

16. Between at least February 2021 and May 2021, Defendants disseminated advertisements for PPP loans, or otherwise made statements to consumers, that claimed consumers who qualified for PPP loans would receive loan funds if they applied with Womply. Defendants advertised both directly to consumers—often targeting workers in the gig economy and other one-person businesses like freelance workers and independent contractors—and by disseminating claims through referral partners including social media influencers and certified public accountants.

17. For example, in an email announcing "PPP Fast Lane"—Womply's automated PPP loan application system launched in February 2021—to referral partners, Defendants stated, and asked the recipients to spread the word, that consumers who applied for PPP loans with Womply would "[g]et maximum PPP stimulus" of up to $41,000 deposited directly into their bank accounts and that the application process would take "as little as five minutes." In sample emails Defendants provided their referral partners for dissemination to consumers, Defendants proclaimed that PPP Fast Lane was "Bigger," "Better," and "Faster," and promised consumers "up to 20x more money":

PPP Fast Lane:
- **Bigger**: Get up to 20x more money (max of $49,999 per person)

- **Better**: Use your 2020 filed taxes, 2020 draft taxes, or 2019 tax filings. Previous EIDL loans, PPP loans, or EIDL advances are ok.

- **Faster**: We need one page from your tax docs plus a connected bank account

Ex. A

18.     Defendants also made these claims in advertisements on social media.   For example, Defendants claimed that consumers would "[g]et [their] PPP loan" if they applied with Womply; that "[t]he government wants TO GIVE YOU MONEY" and directed consumers to "[a]pply for your PPP business loan through Womply and receive: [y]our PPP loan with as much help as Womply can provide"; proclaimed "We Can Get You PPP!"; and exhorted "[g]et the help you need, fast, with Womply . . . [w]e'll help you apply for a PPP loan of up to $41,666 in only 5 minutes":



Ex. B



Ex. C



Ex. D

19.    Defendants also assured consumers that they would provide individually tailored and timely customer service, including "[r]eal human support," with "helpful, friendly support agents available to walk you through your application and answer your questions."

20.     Despite Defendants' promises that small business consumers would get PPP loan funds if they applied with Womply, of more than 3.25 million PPP loan applications initiated by consumers, Defendants failed to achieve funding for more than 1.99 million of them (61%).

21.     Many of the consumers who never received funding were eligible for PPP loans, but Defendants failed to fix known technical issues with their system or otherwise provide the assistance necessary to process consumers' applications.

22.     Defendants' customer support channels were useless for thousands of consumers seeking assistance with their applications.   In late March 2021, after receiving more than 4,800 telephone calls that month to Womply's customer service line and facing increasing requests by email that Defendants frequently did not resolve, Defendants *entirely disconnected* their telephonic customer service.

23.     For consumers who tried to use chat support, Defendants often took hours or days to respond.   In chat conversations, including during business hours, consumers often received automated responses telling them to leave a message because no one was available to assist them.   In thousands of instances, no one from Womply ever replied to consumers' chat messages.

24.     Thousands of small business consumers complained that they did not receive PPP loan funds, despite contacting Womply for assistance.   For example:

- One small business consumer, who was told her loan had been funded but never got the money, emailed Defendants over several weeks pleading for help. Womply never assisted her and responded only weeks later with a form email saying that it "cannot advise [her] on this matter."   The consumer replied that she had to shut down her business due to lack of PPP loan funds.

COMPLAINT

10

- Another small business consumer asked, "Why does the [SBA] website say my loan was disbursed when I haven't received it? Why do I feel like I'm being scammed?" She explained that she had been seeking assistance from Womply for more than two months, but "[e]very single time I get a response it's never specific to my situation and it never helps me."

**Defendants Misrepresented That Womply Would Review and Process PPP Loan Submissions Fast and Within 24 Hours.**

25. Between at least February 2021 and May 2021, Defendants disseminated advertisements for PPP loans, or otherwise made statements to consumers, that consumers would have their PPP loan applications reviewed and processed by Womply within 24 hours. Defendants touted their speed, telling consumers that Womply was "faster than a bank," and invited applications through Womply's "PPP Fast Lane."

26. Soon after Defendants began accepting applications through PPP Fast Lane, in early March 2021, Defendants told consumers "[w]ithin a couple of days every new Fast Lane submission will be processed within 24 hours." Over at least the next ten days, Defendants continued to make similar but varied versions of these claims in their direct email marketing, in advertising emails they prepared for referral partners, and in Womply's app, telling applicants that "[m]ost applications are now processed in under 24 hrs," that applicants "can sign [their] First Draw [PPP] loan application[s] as soon as [they're] ready, typically within 24hrs," that applications "without problems" were all processed within 24 hours, and that Defendants' reviews would soon speed to just *3 hours*, resulting in same-day finalization of applications in most cases.

27. Several days later, in late March 2021, Defendants then repeated the original claim they had made two weeks earlier, promising that, "within a couple of days," *every* application would be processed within 24 hours.

28. After consumers finished providing Womply with the requested information for their PPP loan applications, Defendants told consumers that Womply would "review [their] application in the next 24hrs" and follow up with a final application to sign, or if there were any questions or issues with the application, Womply would notify them:



Ex. E

29. Unfortunately for applicants, Defendants' representations about timing, including that consumers were applying in a fast lane and that most consumers' applications would be processed within 24 hours, had little to no basis and were often false. Numerous consumers complained that their applications were not processed within 24 hours. When advised of these

COMPLAINT

12

complaints by a referral partner, Defendants acknowledged that Womply in fact took several days to process new applications.   Indeed, Defendants did not collect or preserve any data giving them a reasonable basis to claim that they would operate "faster" and process applications within 24 hours.   And in some instances, when asked by applicants why there had been no update within 24 hours, Defendants even admitted that they could not estimate the time it would take to process applications.

30.     Because of the time-sensitive nature of the PPP and its limited funding, speedy application processing was critical for consumers.   The PPP was a temporary program that ended when loan funds ran out in mid-2021, and as a result, numerous consumers subjected to delayed processing of their applications lost their opportunity to obtain PPP loans entirely.   Further, even to the extent consumers did ultimately obtain PPP loans through Womply, in numerous instances Defendants' delays in processing their applications deprived struggling small business consumers of emergency funds they needed immediately.

31.     Concerned applicants also contacted Womply when they had not heard about their applications within 24 hours as promised.   For example, one referral partner of Womply's alerted the Company that he had heard from numerous consumers who had "not had any response about their applications yet, well beyond the 24 hours advertised," and noted that he was personally experiencing the same problem even after speaking with customer support. Another told Defendants he was "getting more and more messages from people saying they've had radio silence since applying for fast lane last week," and that, as a result, many were "questioning whether I scammed them into applying."   Consumers complained to Womply after not hearing anything about their applications for more than twenty-four hours, only to find when they logged into Womply's portal that their applications had been cancelled.

**Defendants' Knowledge of Law Violations**

32.     Defendant Scammell controlled and directly participated in Womply's advertising and marketing of its PPP loan services. Throughout the duration of PPP Fast Lane, he frequently sent and received messages regarding the marketing of Womply's services.   Defendant Scammell reviewed and provided feedback on draft marketing emails to consumers and content on Womply's website, and he wrote and edited language to be used in Womply's advertising.

33.     Defendants, including Defendant Scammell, knew that consumers were misled by claims that they would receive PPP loans, and that numerous small business consumers did not receive loans despite seeking help from Womply's customer service.   Defendant Scammell personally received thousands of consumer complaints directly by email and forwarded by lenders, SBA, and Womply's referral partners.   For example, the CEO of one of the lenders with whom Womply contracted warned Defendant Scammell that Defendants needed to "blunt this idea of 'instant' or near-instant consumer-like funding."   Defendant Scammell personally prepared a document informing a lender that nearly one third of PPP Fast Lane customers' applications could not be processed by Womply; of those whose applications were processed by Womply, the applications were not forwarded to lenders in more than one quarter of cases; and of the applications forwarded to and approved by lenders, almost one fifth of applications submitted to SBA were not approved, and that even when applications were approved by SBA, five percent were not funded by lenders.   Despite this, Defendants continued to solicit applications and represent that consumers who applied with Womply would receive loans.

34.     Defendants, including Defendant Scammell, knew that small business consumers were desperate and went to extraordinary lengths to still get Defendants' help, including by requesting help with their Womply applications by emailing an employee of the third-party

COMPLAINT

14

company operating much of the PPP Fast Lane technology, direct messaging on LinkedIn employees of a different third-party company assisting Defendants, and even using Google forms meant for lenders.   When asked about referring to Womply's customer service the consumers who sought help using LinkedIn, Defendant Scammell responded simply: "You should ignore them."   Another Womply executive responded similarly when she and Defendant Scammell learned about consumers' use of Google forms to request help with their applications, explaining that they were already aware that "customers will use very clever ways to get personalized assistance," and as a rule did not respond.

35.     Despite being flooded with customer service requests and complaints about stalled applications, Defendants consistently increased their spending on advertisements in order to increase traffic to PPP Fast Lane throughout at least April 2021.   Defendants also used referral programs to generate new PPP loan applications, offering what Defendant Scammell called "aggressive rewards" to those who referred new applicants, and using "very strict time bound campaigns to drive urgency and capture attention."   In addition to Womply's own customers who could be paid hundreds of dollars for referring their friends and family to PPP Fast Lane, Defendants sought out accountants, as well as gig companies and social media influencers popular with gig workers, to refer their clients, workers, and audience.

36.     Based on the facts and violations of law alleged in this Complaint, Plaintiff has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things, Defendants continued their unlawful acts or practices despite knowledge of numerous complaints, only ceased their unlawful acts or practices with respect to the PPP because the PPP stopped operating, continued working in financial services

after the end of the PPP, and maintain the means, ability, and incentive to resume their unlawful conduct with respect to small business financing assistance.

## VIOLATIONS OF THE FTC ACT

37.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

38.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

### False, Misleading, or Unsubstantiated Claims Regarding Obtaining PPP Loans

39.     In numerous instances in connection with the advertising, marketing, or promotion of PPP Loan Services, Defendants have represented, directly or indirectly, expressly or by implication, that they will obtain PPP loans for eligible consumers who submit PPP loan applications through Womply.

40.     The representation set forth in Paragraph 39 is false or misleading or was not substantiated at the time the representation was made.

41.     Therefore, the making of the representation as set forth in Paragraph 39 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II

### False, Misleading, or Unsubstantiated Claims Regarding Application Time

42.     In numerous instances in connection with the advertising, marketing, or promotion of PPP Loan Services, Defendants have represented, directly or indirectly, expressly

or by implication, that they will review or process consumers' PPP loan applications fast, such as within twenty-four hours.

43. The representation set forth in Paragraph 42 is false or misleading or was not substantiated at the time the representation was made.

44. Therefore, the making of the representation as set forth in Paragraph 42 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE COVID-19 CONSUMER PROTECTION ACT

45. Enacted on December 27, 2020, the COVID-19 Consumer Protection Act makes it unlawful, for the duration of the public health emergency declared on January 31, 2020 pursuant to Section 319 of the Public Health Service Act, for any person, partnership, or corporation to "engage in a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the [FTC] Act (15 U.S.C. 45(a)) that is associated with . . . a government benefit related to COVID–19." Public Law 116-260, 134 Stat 1182, Title XIV, Section 1401(b)(2).

46. The PPP was a government benefit related to COVID-19.

47. The COVID-19 Consumer Protection Act provides that "[a] violation of subsection (b) shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the [FTC] Act," 15 U.S.C. § 57a(a)(1)(B).

### Count III

### Misrepresentations Associated with a
### Government Benefit Related to COVID-19 Regarding Obtaining Loans

48. In numerous instances in connection with the advertising, marketing, or promotion of PPP Loan Services, Defendants have represented, directly or indirectly, expressly

or by implication, that they will obtain PPP loans for eligible consumers who submit PPP loan applications through Womply.

49. The representation set forth in Paragraph 48 is false or misleading or was not substantiated at the time the representation was made.

50. Therefore, Defendants' representation set forth in Paragraph 48 constitutes a deceptive act or practice associated with a government benefit related to COVID-19.

**Count IV**

**Misrepresentations Associated with a
Government Benefit Related to COVID-19 Regarding Application Processing Time**

51. In numerous instances in connection with the advertising, marketing, or promotion of PPP Loan Services, Defendants have represented, directly or indirectly, expressly or by implication, that they will review or process consumers' PPP loan applications fast, such as within twenty-four hours.

52. The representation set forth in Paragraph 51 is false or misleading or was not substantiated at the time the representation was made.

53. Therefore, Defendants' representation set forth in Paragraph 51 constitutes a deceptive act or practice associated with a government benefit related to COVID-19.

**<u>CONSUMER INJURY</u>**

54. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

Wherefore, the FTC requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.      Award monetary and other relief within the Court's power to grant; and

C.      Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:   ___March 18, 2024___

 /s/ Julia Heald
_____

Julia Heald
Katherine Worthman
Paola Henry
Federal Trade Commission

Washington, DC 20580
(202) 326-3589 (Heald)
(202) 326-2929 (Worthman)
(202) 326-2673 (Henry)