# EXHIBIT N

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FEDERAL RESERVE BANK OF SAN FRANCISCO, | Civil No. _____ |
| Plaintiff, | |
| v. | RE: BREACH OF CONTRACT; COLLECTION OF MONEY; FRAUDULENT TRANSFERS; CONVERSION |
| BENWORTH CAPITAL PARTNERS PR LLC, BENWORTH CAPITAL PARTNERS LLC, BERNARDO NAVARRO and CLAUDIA NAVARRO, | |
| Defendants. | |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** the Federal Reserve Bank of San Francisco (the "Reserve Bank"), by and through its undersigned legal counsel, and respectfully alleges, and prays as follows:

## NATURE OF ACTION[1]

1. This is a civil action against defendants Benworth Capital Partners PR LLC, a Puerto Rico limited liability company ("Benworth PR"), Benworth Capital Partners LLC, a Florida limited liability company ("Benworth FL" and, together with Benworth PR, "Benworth"), Bernardo Navarro ("Mr. Navarro"), and Claudia Navarro ("Ms. Navarro" and, together with Mr. Navarro, the "Navarros" and, collectively with Benworth, the "Defendants") for, among other relief, damages for breach of contract, collection of money, conversion, and rescission of fraudulent transfers of various assets from Benworth FL to Benworth PR and the Navarros.

---

[1] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in this *Complaint*.

2.      The Reserve Bank provided approximately $4.3 billion in credit advances to Benworth FL and holds a properly perfected, valid first-priority security interest in certain PPP loans pledged as collateral to secure those advances, as well as all "proceeds and products" thereof and other collateral. Benworth FL is in default under the agreements that provide for such credit advances and the Reserve Bank has a senior priority right to collect against its collateral whether in the possession of Benworth FL or any of the other Defendants.

3.      As alleged below and upon information and belief, Benworth FL fraudulently transferred various assets, including the Reserve Bank's collateral, to Benworth PR and the Navarros, who are exercising dominion and control over those assets. As a result, Benworth FL was left with virtually no capital to fulfill its current obligations to the Reserve Bank. To ensure that the Reserve Bank is able to pursue and vindicate its rights under the Program Agreements, either through access to its undisputed collateral or other assets that could be used to satisfy Benworth FL's outstanding debts, the Reserve Bank is compelled to institute this action.

4.      The Reserve Bank requests that the Court grant it judgment against all Defendants in an amount exceeding $66,980,967.08 as of July 10, 2024 and order the rescission of the Fraudulent Transfers, as well as other declaratory and equitable relief as provided for in this *Complaint*.

## **THE PARTIES**

5.      The Reserve Bank is part of the U.S. central bank system known as the Federal Reserve System. Its principal place of business is San Francisco, California. It serves the Twelfth District of the Federal Reserve System, which comprises nine western states and three territories.

6.      Defendant Benworth FL is a limited liability company organized under the laws of Florida with its principal place of business in Coral Gables, Florida.

2

7. Defendant Benworth PR is a limited liability company organized under the laws of Puerto Rico with its principal place of business in San Juan, Puerto Rico.

8. Defendants Mr. Navarro and Ms. Navarro are individuals who are residents of Puerto Rico. Mr. Navarro and Ms. Navarro are married.

9. Upon information and belief, Mr. Navarro is the sole member, founder, president, and CEO of Benworth FL. Mr. Navarro is also a member of Benworth PR and holder of 1% of the equity interests thereof.

10. Ms. Navarro is a member of Benworth PR and holder of 99% of the equity interests thereof. Upon information and belief, Mr. Navarro is employed by Benworth PR and oversees its business operations.

11. Both Mr. Navarro and Ms. Navarro are listed as authorized persons for Benworth PR on the Puerto Rico Registry of Corporations and Entities.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over the present case pursuant to 12 U.S.C. § 632, which provides that the district courts of the United States have original jurisdiction over all civil suits to which any Federal Reserve bank is a party, and pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the Plaintiff, whose principal place of business is San Francisco, California, and Defendants, who are citizens of and/or have their principal places of business in Florida and/or Puerto Rico. None of Defendants have the same citizenship as Plaintiff.

13. The amount in controversy exceeds the jurisdictional threshold of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

3

14. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) because the Navarros are residents of Puerto Rico and Benworth PR is an entity organized under the laws of the Commonwealth of Puerto Rico.

15. Moreover, venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred within this District.

## RELEVANT FACTS

### A. The Reserve Bank and Benworth's Relationship Under the PPPLF

16. In March of 2020, in response to the Coronavirus (COVID-19) pandemic, the United States Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") to provide fast and direct economic assistance for American workers, families, small businesses, and industries.

17. The CARES Act established the Paycheck Protection Program (the "PPP"), which was implemented by the United States Small Business Administration (the "SBA") with support from the Department of the Treasury. The PPP provided small businesses with funds to pay payroll costs and benefits, as well as interest on mortgages, rent, and utilities.

18. In April of 2020, to support the effectiveness of the PPP and the flow of credit to households and businesses, the Board of Governors of the Federal Reserve System, with the approval of the Secretary of the Treasury, authorized the establishment of the Paycheck Protection Program Liquidity Facility (the "PPPLF"), which extended credit to eligible financial institutions that originated PPP loans.

19. Benworth FL was one such PPP-eligible lender. It obtained PPPLF financing pursuant to the *Paycheck Protection Program Liquidity Facility Letters of Agreement* dated May 4, 2020, January 14, 2021, and January 30, 2023 (collectively, the "Letters of Agreement").

4

20.	The Letters of Agreement incorporate the *Reserve Bank's Operating Circular No. 10* (as amended and supplemented from time to time, the "Operating Circular" and, together with the Letters of Agreement, the "Program Agreements"), which together set forth the relevant terms and conditions that govern Benworth FL's relationship with the Reserve Bank. *See* the *Program Agreements* attached hereto as **Exhibits A–B.**

21.	Under the Program Agreements, Benworth FL was authorized to request credit advances ("Advances") from the Reserve Bank. Those Advances were secured by PPP loans pledged as collateral to the Reserve Bank (the "Pledged PPP Loans") and set to mature on the maturity dates of the Pledged PPP Loans, subject to the terms of the Program Agreements.[2]

22.	The Reserve Bank filed a UCC Financing Statement in the state of Florida on May 11, 2020, to perfect its lien over the PPP Collateral. *See* UCC Financing Statement attached hereto as **Exhibit C**.

23.	Notably, the PPP Collateral includes all "[p]roceeds and products" of the Pledged PPP Loans. This includes PPP borrower collections, payments received from the SBA for principal balances on account of loan forgiveness and guaranty purchase, and the interest paid by the PPP borrowers and SBA on the principal amount of the Pledged PPP Loans (which accrues at the rate of 1.00% per annum).

24.	The applicable non-default interest rate under the Program Agreements is thirty-five (35) basis points. In the ordinary course, Benworth FL receives the payments associated with the Pledged PPP Loans, including the principal plus the one hundred (100) basis points of interest,

---

[2] Specifically, the Reserve Bank has properly perfected, valid, first-priority liens on (i) "all [Benworth FL's] rights, title, and interest in property (wherever located)" that is identified on a collateral schedule, identified on the Reserve Bank's books and records as pledged to, or subject to a security interest, or that is in the possession or control of the Reserve Bank, (ii) "all documents, books and records, including programs, tapes, and related electronic data processing software, evidencing or relating to" the foregoing, and (iii) "all proceeds and products" of the foregoing, "including but not limited to interest, dividends, insurance, rents and refunds" (collectively, the "PPP Collateral").

and remits the principal plus thirty-five (35) basis points to the Reserve Bank in accordance with and subject to the terms of the PPPLF. Under the Program Agreements, all interest, including the sixty-five (65) basis points retained by the PPPLF borrower, is property and collateral of the Reserve Bank until all Advances are repaid in full. Additionally, interest on any Advance that is not repaid when due (whether by acceleration or otherwise) is calculated at a rate five hundred (500) basis points higher than the otherwise applicable interest rate.

25.     Under the Program Agreements, upon the occurrence of an event of default, the maturity date of all Advances is accelerated and all Advances become due and owing.

26.     Unless otherwise provided under the Program Agreements, if a PPPLF borrower such as Benworth FL fails to pay an Advance on its maturity date, the Reserve Bank shall first seek repayment from realization on the PPP Collateral. To the extent of any deficiency of the collateral against the amount advanced, the Reserve Bank may thereafter pursue any other remedies available under the Program Agreements, including seeking payment directly from Benworth FL (*i.e.*, the deficiency becomes a recourse obligation).

27.     However, if a PPPLF borrower such as Benworth FL "(i) has breached any of the representations, warranties, or covenants made under the [Program Agreements] or (ii) has engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advance under the PPPLF," all Advances made to the PPPLF borrower immediately become recourse obligations, regardless of the value of the PPP Collateral.

28.     In addition, failure by a PPPLF borrower to meet any of the requirements of the Program Agreements, including if the PPP Collateral fails to satisfy the requirements for guaranty purchase of PPP loans by the SBA, may, at the sole discretion of the Reserve Bank, void the

6

non-recourse provisions of the Program Agreements and any related provisions.[3] The Reserve Bank's rights therefore become full recourse with respect to the portion of any Advance equal to the amount of the valuation of the non-conforming PPP Collateral.

29.    When an obligation becomes recourse, the Reserve Bank may pursue various remedies "separately, successively, or concurrently," including debiting the account of the PPPLF borrower's correspondent, taking possession of its collateral, or "pursu[ing] any other remedy available to collect, enforce, or satisfy" any unpaid obligation against any of the borrower's assets.

30.    On or about December 27, 2023, Benworth FL informed the Reserve Bank of certain developments impacting its financial position, including with respect to litigation proceedings it is involved in with Oto Analytics, LLC (d/b/a Womply) ("Womply"). Benworth FL acknowledged to the Reserve Bank at that time that it did not have access to sufficient funds to pay the Interim Award (as defined and discussed below), or any commensurate or larger final award that may be awarded.

31.    As a result of the foregoing and other facts disclosed by Benworth FL to the Reserve Bank, the Reserve Bank determined that various events of default had occurred under the Program Agreements.

32.    Events of default included, but were not limited to, (i) that the Reserve Bank "deem[ed] itself insecure with respect to the financial condition of" Benworth FL and Benworth FL's ability to perform its obligations under the Program Agreements as provided for under the Operating Circular, and (ii) Benworth FL's Insolvency (as defined under the Operating Circular), in each case, based on Benworth FL's inability to pay the Final Award and financial statements,

---

[3] Under the PPP, the SBA agrees to guaranty PPP loans (through an agreement to purchase the loans) that have not been forgiven by the SBA or paid in full by the borrower, provided the lender has complied with SBA requirements and required lending practices.

reports, and other information disclosed by Benworth FL to the Reserve Bank. As a consequence of these events of default, the entire amount outstanding on Benworth FL's Advances from the PPPLF has become due and owing.

33.     In addition, the Reserve Bank determined that Benworth FL had breached multiple representations, warranties, or covenants it made under the Program Agreements, causing the Advances to Benworth FL to become recourse obligations. These breaches included, but were not limited to, a breach of the representation that no event of default had occurred or was continuing, and a breach of the covenant to promptly notify the Reserve Bank when events of default occurred. As a result of these breaches, the amounts outstanding on all of Benworth FL's Advances have become recourse obligations.

34.     Moreover, the Reserve Bank has become aware that Benworth FL has failed to comply with the terms of the PPP for at least some portion of the outstanding Pledged PPP Loans, which has caused Benworth FL's outstanding Advances to become recourse obligations, independent of the aforementioned breaches of the Program Agreements' representations, warranties, and covenants. In particular, the SBA has already denied over $60 million of Benworth FL's requests for guaranty purchase of Pledged PPP Loans. Benworth FL has represented to the Reserve Bank that for a period of years, it did not have appropriate documentation to support its requests for guaranty purchases for all of the relevant PPP loans, either due to Womply's withholding of the appropriate documentation, discussed below, or due to other problems internal to Benworth FL. These facts have caused the Reserve Bank to determine that Benworth FL has failed to comply with the terms of the PPP for at least some portion of its PPP portfolio, causing the Advance amounts to become recourse.

35. On February 27, 2024, the Reserve Bank memorialized and provided notice of the events of default and breached covenants that caused the Advances to become immediately due and payable and the obligations to become full recourse in a letter sent to Benworth FL (the "Default Notice").[4] *See Default Notice* attached hereto as **Exhibit D.**

36. Pursuant to the Program Agreements, Benworth FL received Advances from the Reserve Bank from time to time in an aggregate principal amount of approximately $4.3 billion, secured by approximately 300,000 Pledged PPP Loans and the other PPP Collateral. Upon information and belief, Benworth FL processed, funded, and managed this loan portfolio, earning accrued interest income and various other fees in relation to those loans.

37. As of July 10, 2024, the amount outstanding under the Program Agreements consists of an aggregate principal amount of $66,980,967.08, plus interest, and other fees, costs and reimbursable amounts under the Program Agreements.

38. As Benworth FL's secured lender, the Reserve Bank (both directly and through counsel) has engaged in discussions with Mr. Navarro and other Benworth FL representatives about the status of the PPP Collateral including the servicing of the Pledged PPP Loans, in particular after it learned of Benworth's litigation with Womply, discussed below.[5]

**B. Benworth's Relationship with Womply**

39. As alleged in the Womply Complaint (as defined below), starting in February 2021, Benworth FL contracted to use Womply's services related to the PPP loans originated by Benworth FL. Under the parties' agreements, Benworth FL was to pay Womply certain fees for these

---

[4] Additionally, on or around June 14, 2024, to further protect its collateral and upon notice to Benworth FL, the Reserve Bank exercised its right to move Benworth FL to a "direct pay" structure whereby the SBA remits payments associated with loan forgiveness reimbursement and loan guarantee amounts for the Pledged PPP Loans directly to the Reserve Bank instead of Benworth FL. Payments made on the Pledged PPP Loans by PPP borrowers continue to be remitted to Benworth FL.
[5] Certain of the allegations in this *Complaint* derive from those discussions.

9

services. Womply alleges it is owed approximately $200 million in unpaid fees and interest from Benworth FL.

40.     In August 2021, Womply commenced JAMS arbitration against Benworth FL in San Francisco, California (the "Arbitration"), seeking payment of unpaid fees that Benworth FL allegedly owes Womply under the parties' agreements.

41.     On December 21, 2023, the arbitrator overseeing the Arbitration issued an interim award (the "Interim Award") that, if finalized and not set aside, would require Benworth FL to pay Womply over $86 million on account of unpaid fees, plus contractual interest and Womply's costs of collection of the debt.[6]  On June 11, 2024, the arbitrator issued a final award requiring Benworth FL to pay Womply nearly $118 million in unpaid fees, interest, and costs.[7]

42.     Benworth FL informed the Reserve Bank that Womply has been in possession of numerous loan files related to Benworth FL's PPP loan portfolio that it has failed to turn over to Benworth for a number of years (with requests for these documents dating back to 2021). Benworth FL informed the Reserve Bank that it requires these loan files in order to continue servicing loans. Benworth FL also stated that these files are necessary to process guaranty purchase applications that are pending or are on appeal with the SBA with respect to the Pledged PPP Loans, and to make new guaranty purchase requests.

43.     The prompt resolution of the guaranty purchase applications before the SBA is of particular importance, as the SBA will only provide payment to Benworth on a given PPP loan

---

[6] *See* Plaintiff Oto Analytics, LLC's Motion to Lift Stay, *Oto Analytics, LLC v. Benworth Capital Partners PR LLC et al.*, No. 23-01034 (D.P.R. Dec. 26, 2023).

[7] Benworth FL subsequently moved to correct the final award to clarify that the arbitrator was not deciding whether Womply would be entitled to post-award interest. Womply agreed to the clarification and the arbitrator entered a corrected final award on June 26, 2024 reflecting that change (the "Final Award"). On July 1, 2024, Womply filed a petition in the United States District Court for the Northern District of California to confirm the Final Award and enter judgment in conformity. *See* Petition to Confirm Arbitration Award and For Entry of Judgment, *Oto Analytics, LLC v. Benworth Capital Partners LLC*, No. 3:24-cv-03975 (N.D. Cal. July 1, 2024).

that is not eligible for forgiveness once the corresponding guaranty purchase application is approved. If the application is not approved, Benworth may not receive any payment on the loan. Therefore, upon information and belief, the fate of these applications before the SBA directly and materially impacts Benworth FL's ability to repay its creditors, including the Reserve Bank.

44.     Pursuant to the Final Award, Womply is required to promptly transmit these loan files to Benworth FL or reinstate Benworth FL's access to those files via Womply's technology platform, to the extent it has not yet done so.

45.     Based on information gained through discovery in the Arbitration, Womply filed an action in this Court to, among other things, "unwind" a transfer of approximately $171 million from Benworth FL to Benworth PR, which the Navarros own and control. Womply further seeks the attachment of the Defendants' assets including funds that were fraudulently transferred to Benworth PR and/or the Navarros.[8]

### C.  The Fraudulent Transfers

#### i.      *The Creation of Benworth PR*

46.     The Navarros incorporated Benworth PR on June 28, 2021. Upon information and belief, Benworth PR was formed three months after the Navarros relocated from Florida to Puerto Rico.

47.     Although Benworth PR was formed as a separate entity from Benworth FL, it is effectively the same company as Benworth FL, and any corporate separateness is illusory.

48.     The website www.benworthcapital.com lists both Benworth FL's Florida address and Benworth PR's Puerto Rico address as points of contact, does not differentiate between

---

[8] *See* Womply Complaint (as defined herein).

Benworth FL and Benworth PR, and refers to Benworth PR as Benworth FL's "office in San Juan, Puerto Rico."

49.      Mr. Navarro's public LinkedIn profile states that "Benworth Capital" is "a Florida-headquartered private equity licensed mortgage lender" and that it "also has offices in Puerto Rico."

50.      A March 20, 2024 press release about Benworth PR's refinancing of a property in Florida states that "[e]xpanding its footprint, Benworth [FL] opened an office in San Juan, Puerto Rico, in 2021."[9]

51.      Upon information and belief, Benworth PR engages in the same business as Benworth FL. In particular, upon information and belief, Benworth PR provides certain services to process and/or service Benworth FL's mortgage and PPP loans, as well as other services such as fraud monitoring and loan forgiveness, all of which Benworth FL previously performed itself.

52.      Upon information and belief, Benworth FL has now ceased all operations except to the extent it facilitates the servicing of the Pledged PPP Loans (which are owned by Benworth FL), which currently constitutes Benworth FL's sole business and source of revenue.

53.      Upon information and belief, Benworth FL has moved all of its employees to a Florida branch of Benworth PR.

   ii.      *Benworth FL Transfers Assets to Benworth PR*

54.      Upon information and belief, pursuant to Loan Servicing Agreements ("LSAs") executed in 2021, Benworth PR services Benworth FL's mortgage and PPP loans and provides other services such as fraud monitoring and loan forgiveness, all of which Benworth FL previously performed itself. The LSAs were signed by Mr. Navarro on behalf of Benworth FL and

---

[9] CIK Investments Press Release (Mar. 20, 2024), https://benworthcapital.com/cik-investments-press-release/.

Ms. Navarro on behalf of Benworth PR. With respect to the Pledged PPP Loans, the LSAs contemplate that Benworth FL pays Benworth PR a "PPP loan forgiveness Fee" of $500.00 per file, a "PPP loan Fraud Monitoring Fees and Guaranteed Purchase" fee of $50.00 per file, and sixty-five (65) basis points of interest for "PPP loan Servicing." Benworth FL thus appears to have agreed to pay Benworth PR all of the PPP loan income—in the form of sixty-five (65) basis points of interest—that Benworth FL could expect to receive for continuing to service the Pledged PPP Loans to maturity.

55.     The first LSA is dated as of, and was presumably signed on or about, May 31, 2021. According to the corporate registry maintained by the Department of State of the Government of Puerto Rico, Benworth PR was formed nearly a month later, on June 28, 2021.

56.     From time to time, Benworth FL made transfers to Benworth PR. These transfers were purportedly advances in payment for loan servicing and related services that Benworth PR would render to Benworth FL pursuant to the LSAs.

57.     Between 2021 and 2023, Benworth FL transferred over $50 million to Benworth PR, which left Benworth FL unable to pay its debts as they came due, insolvent, and with inadequate capital.[10]

### iii.     Benworth FL Transfers Assets to the Navarros

58.     From time to time, Benworth FL also made transfers to the Navarros. For example, Mr. Navarro caused Benworth FL to pay dividends to himself as sole shareholder of at least

---

[10] Because the Reserve Bank does not have access to Benworth's and the Navarros' complete financial statements, nor their transaction or accounting records, the Reserve Bank does not have specific, transaction-level information on any transfers that may have been made to cover 2021 and 2022. But in light of the limited information Benworth FL has provided regarding the transfers made for 2023, the Reserve Bank understands total transfers exceeded $50 million for these three years. When the Reserve Bank questioned these transfers, Benworth FL claimed that they were advances on Benworth PR's allocation of the anticipated PPP loan net income, and that Benworth FL had historically provided advances to Benworth PR for such allocations as well as working capital. Benworth FL claimed that Benworth PR's allocation amounted to 86% of all PPP loan net income during 2021, 2022, and 2023 and that Benworth FL allocated to Benworth PR $50 million for 2023 alone.

$48,240,502.75, a portion of which was paid between 2021 and 2023. He also caused Benworth FL to pay dividends to himself of at least $804,860.89 between January 1, 2024 and May 23, 2024.

59.     Mr. Navarro has, in the past, been accused of diverting assets to Ms. Navarro to avoid paying a debt. *See TotalBank Florida Bank Corp. v. Bernardo Enrique Navarro*, Case No. 2012-012858 (Fla. Cir. Ct. Miami-Dade Cnty.), filed April 2, 2012; *Oto Analytics, LLC v. Benworth Capital Partners PR LLC et al.,* Case No. 23-01034 (D.P.R.), filed January 24, 2023, as amended on July 1, 2024 (the "Womply Complaint"). In *TotalBank*, a default judgment was entered against Mr. Navarro, which he claimed he could not satisfy. The court allowed the judgment creditor to take the deposition of Ms. Navarro to determine whether Mr. Navarro's assets, including his interest in Benworth FL, were being diverted to Ms. Navarro. The Womply Complaint similarly alleges that Mr. Navarro caused Benworth FL to transfer fees owed to Womply for referral and technology services "to Benworth PR, which is majority owned by Ms. Navarro, so that the Navarros could keep Womply's fees for themselves."

### D.  The Fraudulent Transfers Have Harmed Creditors Including the Reserve Bank

60.     Upon information and belief, the transfers made from Benworth FL to Benworth PR (the "PR Transfers") and the Navarros during the period of 2021 through 2024, including, without limitation, those identified in paragraphs 57-59 above (collectively, the "Fraudulent Transfers"), and the dominion and control exercised by Benworth FL and the Navarros over Benworth PR during this period, defrauded Benworth's FL's creditors and/or impaired their claims against it, including those of the Reserve Bank, and produced or worsened the insolvency of Benworth FL.

61.     Additionally, upon information and belief, the funds that comprise the Fraudulent Transfers include, in whole or in part, cash proceeds of the Pledged PPP Loans and,

14

therefore, constitute a portion of the PPP Collateral over which the Reserve Bank holds a first-priority lien.

62.    Based on the facts and circumstances available to the Reserve Bank, multiple badges of actual fraud are present with respect to the Fraudulent Transfers:

> a.    Upon information and belief, the Fraudulent Transfers were made when Benworth FL was insolvent, undercapitalized, and unable to pay its debts as they became due, or they caused Benworth FL to become insolvent, undercapitalized, and unable to pay its debts as they became due.

> b.    The Fraudulent Transfers occurred in close proximity to Womply's claim against Benworth FL for over $100 million of unpaid fees. The Fraudulent Transfers also occurred during a period in which Benworth FL was aware that Womply was withholding from Benworth FL various documents and records necessary to properly service the Pledged PPP Loans, which Benworth asserts has resulted in the SBA's denial of numerous guaranty purchase applications. In short, at the time of the Fraudulent Transfers, Benworth PR was aware of risks that affected the Reserve Bank's ability to be repaid from the proceeds of the PPP Collateral.

> c.    Upon information and belief, the Fraudulent Transfers were made at a time when Benworth FL's income was significantly, if not solely, derived from the interest income earned from its PPP loan portfolio.

> d.    The Fraudulent Transfers were to insiders. Corporate officers and directors are quintessential insiders because they have the ability to influence corporate decision making. *In re Badger Freightways, Inc.*, 106 B.R. 971, 982 (Bankr. D.

15

Ill. 1989) (citing 11 U.S.C. § 101(30)(B)(i), (ii)); *see also In re Babcock Dairy Co. of Ohio, Inc.*, 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986) (an insider "must exercise sufficient authority over the corporate debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."). "If the debtor is a corporation, then a controlling person, a relative of a controlling person, a partnership in which the debtor is a general partner, and a general partner of the debtor are all insiders." *In re Badger Freightways, Inc.*, *supra*, at 980–981 (citation omitted). In this case, the PR Transfers were to insiders because Benworth FL is wholly owned by Mr. Navarro and Benworth PR is (a) 1% owned by Mr. Navarro, who oversees the business operations thereof, and (b) 99% owned by his wife, Ms. Navarro. The Fraudulent Transfers to the Navarros were also to insiders because the Navarros are the only equity members of Benworth FL and Benworth PR.

e. The Defendants did not disclose the Fraudulent Transfers to the Reserve Bank. The Reserve Bank only became aware of the Fraudulent Transfers when it first learned of the Womply Complaint on or about December 27, 2023, and through responses to certain due diligence requests provided by Benworth FL in 2024.

f. Upon information and belief, Benworth FL, Mr. Navarro and/or Ms. Navarro have control over Benworth PR's assets and continue to exercise dominion and control over Benworth PR's assets. *See W Holding Co.*, *supra; see also Nine v. Avilés*, 53 D.P.R. 494 (1938); *Texas Co. (P.R.), Inc. v. Estrada*, 50 D.P.R. 743 (1936) (the fact that the transferee was controlled by the defendants is "a

16

suspicious circumstance which together with others may be considered to show the existence of fraud . . . .").

g. As applicable to the PR Transfers, the value of the services Benworth FL received from Benworth PR, if any, is not reasonably equivalent to the value of the PR Transfers. Upon information and belief, pursuant to the LSAs, Benworth FL paid Benworth PR amounts for loan servicing in excess of what Benworth FL could have paid other service providers. Further, Benworth FL agreed to pay Benworth PR for these services nearly a month before Benworth PR was formed.

h. As applicable to the PR Transfers, upon information and belief, Benworth FL lacked any reasonable business justification for making various payments to Benworth PR in 2021 for all or a large majority of the purported value of loan services to be provided by Benworth PR, prior to Benworth PR's rendering substantially any of such services.

63. Upon information and belief, as a result of the Fraudulent Transfers, Benworth FL does not have access to sufficient funds to service the Pledged PPP Loans and pay its debt to the Reserve Bank.

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT AND COLLECTION OF MONEY

64. The Reserve Bank repeats and incorporates by reference all the preceding paragraphs as if fully set forth herein.

65. Benworth FL defaulted on its obligations to the Reserve Bank under the Program Agreements, which obligations are secured by the Reserve Bank's properly perfected, valid first-

17

priority liens on the PPP Collateral. As set forth in the Default Notice, the Reserve Bank has a direct claim against Benworth FL for all unpaid amounts owing under the Program Agreements.

66.     Under the terms of the Program Agreements, Benworth FL owes the Reserve Bank at least $66,980,967.08 as of July 10, 2024. This debt is due, payable, and enforceable. The Reserve Bank also is entitled to a claim for accrued and unpaid interest, costs and expenses including, without limitation, attorney's fees, agent's fees, other professional fees and disbursements and other obligations owing under the Program Agreements.

67.     As a result, the Reserve Bank requests that this Court issue a judgment ordering payment of the amount owed by Benworth FL under the Program Agreements in the principal amount of $66,980,967.08, plus accrued interest from the applicable date of each of the Advances, including, as applicable, default interest, until the date the Reserve Bank receives payment in full, as well as such additional costs as are owing under the Program Agreements, whether satisfied through access to the PPP Collateral or other assets of the Defendants.

**SECOND CAUSE OF ACTION: ACTUAL FRAUDULENT TRANSFER**

68.     The Reserve Bank repeats and incorporates by reference all the preceding paragraphs as if fully set forth herein.

69.     The Navarros formed Benworth PR on June 28, 2021. The Fraudulent Transfers were made shortly before and/or shortly after the incorporation of Benworth PR.

70.     During the period of 2021 to 2024, Benworth FL transferred millions of dollars to Benworth PR and the Navarros without receiving a reasonably equivalent value in exchange for the transfers.

71.     Upon information and belief, including the badges of fraud set out in paragraph 62 above, each of which are realleged herein, Defendants made the Fraudulent Transfers with the

18

actual intent to hinder, delay, or defraud Benworth FL's creditors, including the Reserve Bank. *See In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir.1986) (transfer with intent to place property beyond reach of a creditor constitutes transfer with intent to hinder, delay or defraud creditors).

## THIRD CAUSE OF ACTION: CONSTRUCTIVE FRAUDULENT TRANSFER

72.     The Reserve Bank repeats and incorporates by reference all the preceding paragraphs as if fully set forth herein.

73.     The Navarros formed Benworth PR on June 28, 2021. The Fraudulent Transfers were made shortly before and/or shortly after the incorporation of Benworth PR.

74.     During the period of 2021 to 2024, Benworth FL transferred millions of dollars to Benworth PR and the Navarros without receiving a reasonably equivalent value in exchange for the transfers.

75.     Upon information and belief, during or following the Fraudulent Transfers, Benworth FL was insolvent, engaged in disputes with creditors for which its remaining assets were unreasonably small in relation to the potential outcome of the disputes, including the Arbitration and the incurrence of debt under the Program Agreements, and unable to pay its debts as they came due.

76.     Upon information and belief, Benworth FL intended to incur (or believed or reasonably should have believed that it would incur) debts beyond its ability to pay as they became due.

77.     The Fraudulent Transfers caused or worsened the insolvency of Benworth FL. Therefore, the Fraudulent Transfers have inflicted damages to the Reserve Bank, as it is now unable to collect from Benworth FL the amounts currently due and owing under the Program Agreements.

## FOURTH CAUSE OF ACTION: FRAUDULENT TRANSFERS, RESCISSORY ACTION AND DAMAGES

78.     The Reserve Bank repeats and incorporates by reference all the preceding paragraphs as if fully set forth herein.

79.     Article 298 of the Puerto Rico Civil Code of 2020 provides that "[t]ransactions in fraud of creditors are rescindable." *See* 31 L.P.R.A. § 6231 (translation ours). Article 299 of the Puerto Rico Civil Code of 2020 similarly provides that "the rescissory action is the one that the creditor may bring to rescind the effects of a legal transaction carried out in fraud of his credit." *See* 31 L.P.R.A. § 6232 (translation ours).

80.     The rescissory action seeks to restore the assets to the patrimony from which they originated when the transaction, being fraudulent, harmed the right of creditors to collect from the assets of the debtor. To rescind a conveyance in fraud of creditors, plaintiffs must allege that: "(a) they are creditors; (b) [the debtor] alienated his property in fraud of them; (c) they were injured by such alienation; and (d) the plaintiffs have no other remedy to recover their credit." *Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 441 (1st Cir. 1985) (citation omitted). The Reserve Bank meets all elements for rescission of a conveyance.

81.     *First*, the Reserve Bank is a creditor of Benworth FL pursuant to the PPPLF and the Program Agreements. *See supra* paragraphs 19–37; *see also* Default Notice, Ex. D.

82.     *Second,* the Fraudulent Transfers defrauded Benworth FL's creditors, including the Reserve Bank, for various reasons.[11] The Fraudulent Transfers occurred between 2021 and 2024,

---

[11] 31 L.P.R.A. § 6231 provides that "[i]t is presumed that a transaction is in fraud of creditors when: (a) [i]t is dated after the credit of a harmed creditor or is carried out to prevent the consequences of a fraudulent act; (b) [i]t consists of excluding an asset from the debtor's assets or preventing its incorporation, even if they are rights in expectation or mere faculties, or providing new guarantees for prior debts; (c) [i]t causes or worsens the insolvency of the debtor; or

after the establishment of the Program Agreements, such that Benworth FL was aware of the Reserve Bank's status as a secured creditor and its ability to seek repayment immediately upon an event of default. *See* 31 L.P.R.A. § 6231(a) (transaction presumed to be in fraud of creditors where "[i]t is dated after the credit of the harmed creditor or is carried out to prevent the consequences of a fraudulent act"). Additionally, by transferring assets to Benworth PR and/or the Navarros, Benworth FL effectively excluded from its assets the PPP Collateral, including the cash proceeds of the Pledged PPP Loans. *See id.* § 6231(b) (transaction presumed to be in fraud of creditors where "[i]t consists of excluding an asset from the debtor's assets or preventing its incorporation, even if they are rights in expectation or mere faculties, or providing new guarantees for prior debts"). Further, the Fraudulent Transfers were made when Benworth FL was insolvent, undercapitalized, and unable to pay its debts as they became due, or they caused Benworth FL to become insolvent, undercapitalized, and unable to pay its debts as they became due. *See id.* § 6231(c) (transaction presumed to be in fraud of creditors where "[i]t causes or worsens the insolvency of the debtor"). And finally, the Fraudulent Transfers were made to insiders of Benworth FL because the Navarros are the only equity members of Benworth FL and Benworth PR, and Benworth FL is wholly owned by Mr. Navarro and Benworth PR is (a) 1% owned by Mr. Navarro, who oversees the business operations thereof, and (b) 99% owned by Ms. Navarro. *See id.* § 6231(d) (transaction presumed to be in fraud of creditors where it is made with the intention of undermining the creditors' action, which is presumed in gratuitous transactions between relatives and in onerous ones if carried out after a judgment or after an execution order is issued).

---

(d) [i]t is made with the intention of undermining the creditors' action, which is presumed in transactions between relatives within the fourth degree of consanguinity or second of affinity, in gratuitous transactions, and in onerous ones if carried out after a judgment or after an execution order has been issued against the grantor" (translations ours).

21

83.    *Third*, the Reserve Bank has been harmed by the Fraudulent Transfers. The Defendants completed the Fraudulent Transfers while being aware that they were gratuitous or there was no adequate consideration for them and, furthermore, the Reserve Bank's rights and capacity to collect would be hindered. Indeed, as discussed above, Benworth FL is insolvent because of the Fraudulent Transfers and/or does not have access to sufficient funds to pay its debt to the Reserve Bank.

84.    *Fourth*, Benworth FL's insolvency and its acknowledgement to the Reserve Bank that it would not have sufficient funds to pay the Final Award to Womply, let alone the Reserve Bank's significant debt on top of any such award, *see supra* paragraph 30, demonstrates that any attempts to collect from Benworth FL would be futile. As such, the Reserve Bank has no other recourse for payment of the amounts due and owing under the Program Agreements and no other legal remedy but to request rescission of the Fraudulent Transfers.

85.    Consequently, the rescissory action of the Fraudulent Transfers is appropriate to annul those legal transactions that affect the Reserve Bank's rights as a secured creditor of Benworth FL.

86.    In the scenario of Defendants' inability to pay the Reserve Bank, Defendants shall be liable for damages caused to the Reserve Bank in the amount of not less than $66,980,967.08 as of July 10, 2024. *See* Castán Tobeñas, Spanish Civil Law, Common and Foral, Madrid, Reus, 1992, Volume 3, p. 336 (when the acquirer has acted in bad faith (with knowledge of the fraud) and cannot, for whatever reason, return the alienated goods, he must compensate the creditors for the damages caused by the alienation).

87. The Reserve Bank respectfully requests that the Court rescind the Fraudulent Transfers. In the alternative, the Court should issue a judgment ordering the Defendants to pay the Reserve Bank damages amounting to not less than $66,980,967.08 as of July 10, 2024.

## FIFTH CAUSE OF ACTION: DECLARATORY RELIEF
### ALTER EGO OR SUCCESSOR LIABILITY

88. The Reserve Bank repeats and incorporates by reference all the preceding paragraphs as if fully set forth herein.

89. This is a claim for declaratory relief brought under the provisions of 28 U.S.C. §§ 2201 and 2202.

90. The *Declaratory Judgment Act* authorizes all United States courts to issue declaratory relief in cases within their jurisdiction. This act specifically provides that:

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under Section 7428 of the Internal Revenue Code of 1986, a proceeding under Section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in Section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

91. Benworth FL owes the Reserve Bank a debt of at least $66,980,967.08, plus interest, and other fees, costs and reimbursable amounts under the Program Agreements.

92. An actual controversy exists regarding whether Benworth PR is liable for Benworth FL's debt to the Reserve Bank.

23

93.     Benworth PR should be held liable for Benworth FL's debt to the Reserve Bank, because Benworth PR is the *alter ego* of Benworth FL and/or because Benworth PR is the successor to Benworth FL.

94.     Under Puerto Rico law, a corporation is the *alter ego* of its shareholders where "there [i]s not an adequate separation between the personalities" of the corporation and the shareholders. *DACO v. Alturas de Fl. Dev. Corp.*, 132 D.P.R. 905, 925 (1993) (English translation).

95.     The intertwining of interests and ownership between Benworth FL and Benworth PR blurs the lines to such an extent that Benworth PR cannot be considered an independent and separate legal entity. Instead, it functions more as an extension of Benworth FL, with decision-making powers and financial resources shared in a manner that undermines the notion of corporate separateness.

96.     Separately, "the successor liability doctrine was devised to safeguard disadvantaged creditors of a divesting corporation in four circumstances." *See Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252 (1st Cir. 1997) (citations omitted). "An acquiring corporation may become liable under the successor liability doctrine for the divesting corporation's outstanding liabilities if: (1) the new corporate entity expressly or impliedly assumed the divesting entity's debts; (2) the parties structured the asset divestiture to effect a de facto merger of the two corporations; (3) the divesting corporation transferred its assets with actual fraudulent intent to avoid, hinder, or delay its creditors; or (4) the acquiring corporation is a "mere continuation" of the divesting corporation." *Id.*

97. Facts that support holding Benworth PR liable for Benworth FL's debt to the Reserve Bank under *alter ego* and/or successor liability include, but are not limited to, the following:

    a. Benworth PR was not formed for a reasonable business purpose.

    b. The Navarros formed Benworth PR when they were aware of serious risks to Benworth FL's financial situation, including that Womply was withholding documents related to PPP loan servicing that could materially impact Benworth FL's ability to receive payments from the SBA for approved guaranty purchase applications and that the Reserve Bank had a substantial secured claim that would become a recourse obligation upon an event of default.

    c. Benworth FL transferred millions of dollars to Benworth PR for services that are not of a reasonably equivalent value pursuant to the LSAs, which were signed by the Navarros, and the first of which was entered into before Benworth PR was incorporated.

    d. The Fraudulent Transfers have left Benworth FL undercapitalized and unable to satisfy its debts to the Reserve Bank.

    e. Benworth PR, which was formed three months after the Navarros moved from Florida to Puerto Rico, is a mere continuation of Benworth FL.

    f. Benworth FL and Benworth PR engage in the same business.

    g. Benworth PR services Benworth FL's loan portfolios, which Benworth FL previously did itself.

    h. Both Benworth PR and Benworth FL are wholly owned by the Navarros.

    i. The website www.benworthcapital.com lists both Benworth FL's Florida

address and Benworth PR's Puerto Rico address as points of contact, does not differentiate between Benworth FL and Benworth PR, and refers to Benworth PR as Benworth FL's "office in San Juan, Puerto Rico."

j.      Mr. Navarro's public LinkedIn profile states that "Benworth Capital" is "a Florida-headquartered private equity licensed mortgage lender," and that it "also has offices in Puerto Rico."

k.      A March 20, 2024 press release about Benworth PR's refinancing of a property in Florida states that, "[e]xpanding its footprint, Benworth [FL] opened an office in San Juan, Puerto Rico, in 2021."

l.      Upon information and belief, Benworth FL has moved all of its employees to a Florida branch of Benworth PR.

m.      Upon information and belief, Mr. Navarro oversees the business operations of both Benworth PR and Benworth FL without regard to their separate existence.

n.      Upon information and belief, the Navarros have control over the assets of both Benworth PR and Benworth FL.

98.     Declaring that Benworth PR is the *alter ego* of and/or successor to Benworth FL is necessary to prevent the Reserve Bank from being deprived of more than $66,980,967.08, plus interest, now due and owing under the Program Agreements.

99.     As a result, the Reserve Bank respectfully requests that the Court declare that: (i) Benworth PR is the *alter ego* of and/or the successor to Benworth FL, and (ii) Benworth PR is liable for Benworth FL's debt to the Reserve Bank.

## SIXTH CAUSE OF ACTION: DECLARATORY RELIEF
## <u>VEIL PIERCING</u>

100.    The Reserve Bank repeats and incorporates by reference all the preceding paragraphs as if fully set forth herein.

101.    "A plaintiff may pierce the corporate veil by presenting evidence showing that "the corporation is being used to sanction fraud, provide injustice, evade obligations, defeat public policy, justify inequity, protect fraud or defend crime." *Rivera v. Reed*, No. 09–1160(GAG), 2010 WL 683406, at *2 (D.P.R. Feb. 22, 2010) (citing *Colon v. Rinaldi*, 2006 WL 3421862 at *6 (D.P.R.2006)). The general rule is that a corporate entity may be disregarded in the interests of public convenience, fairness, and equity. *Brotherhood of Locomotive Engrs. v. Springfield Terminal Ry.*, 210 F.3d 18, 26 (1st Cir.2000) (citing *Town of Brookline v. Gorsuch,* 667 F.2d 215, 221 (1st Cir.1981)).

102.    In certain circumstances, the "corporate veil" may be pierced and individual liability imposed upon the individuals for which the corporate entity served merely as an alter ego. *Nieto–Vincenty*, 22 F.Supp.3d 153, 162 (2014). Veil piercing is also supported "[w]here the directors or officers use the corporation to commit fraud." *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 322 (D.P.R. 1996) (citing *South P.R. Sugar Corp. v. Sugar Board*, *supra.*).

103.    Benworth FL owes the Reserve Bank a debt of at least $66,980,967.08, plus interest, and other fees, costs and reimbursable amounts under the Program Agreements.

104.    An actual controversy exists regarding whether the Navarros are personally liable for Benworth FL's and Benworth PR's debt to the Reserve Bank and/or for rescinding the Fraudulent Transfers.

105.    The facts supporting piercing the veil between Benworth PR and Benworth FL, on the one hand, and the Navarros, on the other hand, include but are not limited to:

27

a.  The Navarros have extensive and/or pervasive control over Benworth PR because they are the only equity members of Benworth PR, they are the only people listed as authorized persons for Benworth PR on the Puerto Rico Registry of Corporations and Entities, and Mr. Navarro oversees the business operations of Benworth PR.

b.  Mr. Navarro has extensive and/or pervasive control over Benworth FL because he is the sole member, founder, president, and CEO of Benworth FL.

c.  The Navarros have abused Benworth's corporate form to perpetrate a fraud against creditors including the Reserve Bank.

d.  Benworth PR was not formed for a reasonable business purpose.

e.  The Navarros formed Benworth PR when they were aware of serious risks to Benworth FL's financial situation, including that the Reserve Bank had a substantial secured claim that would become a recourse obligation upon an event of default.

f.  Benworth FL transferred millions of dollars to Benworth PR for services that are not of a reasonably equivalent value pursuant to the LSAs, which were signed by the Navarros, and the first of which was entered into before Benworth PR was incorporated.

g.  The Fraudulent Transfers have left Benworth FL undercapitalized and unable to satisfy its debts to the Reserve Bank.

h.  Benworth PR, which was formed three months after the Navarros moved from Florida to Puerto Rico, is a mere continuation of Benworth FL.

i.  Benworth FL and Benworth PR engage in the same business.

28

j.      Benworth PR services Benworth FL's loan portfolios, which Benworth FL previously did itself.

k.      Both Benworth PR and Benworth FL are wholly owned by the Navarros.

l.      The website www.benworthcapital.com lists both Benworth FL's Florida address and Benworth PR's Puerto Rico address as points of contact, does not differentiate between Benworth FL and Benworth PR, and refers to Benworth PR as Benworth FL's "office in San Juan, Puerto Rico."

m.      Mr. Navarro's public LinkedIn profile states that "Benworth Capital" is "a Florida-headquartered private equity licensed mortgage lender," and that it "also has offices in Puerto Rico."

n.      A March 20, 2024 press release about Benworth PR's refinancing of a property in Florida states that, "[e]xpanding its footprint, Benworth [FL] opened an office in San Juan, Puerto Rico, in 2021."

o.      Upon information and belief, Benworth FL has moved all of its employees to a Florida branch of Benworth PR.

p.      Upon information and belief, Mr. Navarro oversees the business operations of both Benworth PR and Benworth FL without regard to their separate existence.

q.      Upon information and belief, the Navarros have control over the assets of both Benworth PR and Benworth FL.

The Reserve Bank respectfully requests that the Court enter a declaratory judgment determining that (i) Benworth FL's corporate fiction should be discarded and the Navarros should be held personally responsible for satisfying Benworth FL's obligations and debt to the Reserve Bank and should be subject to all equitable remedies imposed on Benworth FL; and (ii) to the extent

29

Benworth PR is liable for Benworth FL's debt to the Reserve Bank, or Benworth PR must rescind the Fraudulent Transfers, and Benworth PR does not have sufficient assets to satisfy the debt or rescind the Fraudulent Transfers, Benworth PR's corporate fiction should be discarded and the Navarros should be held personally responsible for satisfying Benworth PR's obligations in that regard, and should be subject to all equitable remedies imposed on Benworth PR.

<strong><u>SEVENTH CAUSE OF ACTION: CONVERSION</u></strong>

106. The Reserve Bank repeats and incorporates by reference all the preceding paragraphs as if fully set forth herein.

107. During the period of 2021 to 2024, Benworth FL transferred millions of dollars to Benworth PR and the Navarros, which include, in whole or in part, cash proceeds of the Pledged PPP Loans.

108. The transferred funds constitute a portion of the PPP Collateral over which the Reserve Bank holds a first-priority lien and, therefore, is the rightful property of the Reserve Bank.

109. Separate and independent from Benworth FL's defaults on its obligations to the Reserve Bank under the Program Agreements, Benworth FL's transfers to Benworth PR and the Navarros indicates its intent to unlawfully exercise or assert dominion over property inconsistent with the Reserve Bank's right of possession.

110. Defendants' actions have caused damage to the Reserve Bank and deprived it of its use of the funds for an indefinite period, including, but not limited to, up to the date of the filing of this *Complaint*.

<strong><u>PRAYER AND RELIEF</u></strong>

111. Based on the foregoing, the Reserve Bank has the right to collect from Defendants all amounts owed under the Program Agreements, plus interest. Its causes of action are warranted

30

under the applicable law cited herein and Defendants should be held liable to the Reserve Bank for all amounts due under the Program Agreements, which as of July 10, 2024 amount to $66,980,967.08 in principal amount plus accrued interest from the date of the Advances, and other fees, costs and reimbursable amounts under the Program Agreements.

**WHEREFORE**, based on the allegations contained in paragraphs 1 through 110 above, the Reserve Bank respectfully requests that the Court enter judgment in favor of the Reserve Bank:

(i) Finding that Benworth FL defaulted on its obligations to the Reserve Bank under the terms of the Program Agreements;

(ii) Issuing a judgment ordering the Defendants to pay the Reserve Bank the amounts owed under the Program Agreements, which consist of $66,980,967.08 of principal, plus accrued interest from the applicable date of each of the Advances, including, as applicable, default interest, until the date the Reserve Bank receives payment in full, as well as such additional costs as are owing under the Program Agreements;

(iii) Rescinding the Fraudulent Transfers;

(iv) Declaring that Benworth PR is the *alter ego* and/or successor of Benworth FL and, therefore, Benworth PR is liable for Benworth FL's debt to the Reserve Bank;

(v) Declaring that the Navarros are personally liable for satisfying Benworth FL's and Benworth PR's obligations to the Reserve Bank as a result of the piercing of the corporate veil;

31

(vi) Finding that Benworth FL and Benworth PR converted the collateral of the Reserve Bank and continue to exercise dominion and control over the Reserve Bank's collateral, including the Pledged PPP Loans and the proceeds generated therefrom;

(vii) Ordering Defendants to pay the Reserve Bank costs and expenses incurred in pursuing this action pursuant to Fed. R. Civ. P. 54; and

(viii) Ordering Defendants to pay the Reserve Bank interest on the judgment as allowed by law.

Dated: July 10, 2024                                  Respectfully submitted,

Lisa M. Schweitzer (*pro hac vice* pending)
lschweitzer@cgsh.com

Thomas S. Kessler (*pro hac vice* pending)
tkessler@cgsh.com

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
*Attorneys for the Federal Reserve Bank of San Francisco*

*s/ Antonio L. Roig Lorenzo*
Antonio L. Roig Lorenzo
antonio.roig@oneillborges.com
USDC-PR No. 207712

*s/ Salvador J. Antonetti Stutts*
Salvador J. Antonetti Stutts
salvador.antonetti@oneillborges.com
USDC-PR No. 215002

*s/ Ubaldo M. Fernández Barrera*
Ubaldo M. Fernandez Barrera
ubaldo.fernandez@oneillborges.com
USDC-PR No. 224807

*s/ Aníbal A. Román Medina*
Anibal A. Roman Medina
anibal.roman@oneillborges.com
USDC-PR No. 308410

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave., Ste. 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
*Attorneys for the Federal Reserve Bank of San Francisco*

32

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 10, 2024, I filed a copy of the foregoing document using the Court's

CM/ECF system, which will automatically generate a Notice of Electronic Filing to all counsel of

record in this matter.

*<u>s/ Aníbal A. Román Medina</u>*
Aníbal A. Román Medina
